**INDEX OF EXHIBITS TO THE DECLARATION OF JOHN A FISHER**

| Exhibit No. | Description of Exhibit |
|:---:|:---:|
| 1. | July 5, 2019 Letter to Rami Rahim, Bikash Koley, and Brian Martin |
| 2. | August 9, 2019 Email from Dave Saunders to John Fisher |
| 3. | August 13, 2019 Email from John Fisher to Dave Saunders |
| 4. | September 10, 2019 email from Dave Saunders to John Fisher |
| 5. | September 13, 2019 email from John Fisher to Dave Saunders |
| 6. | October 24, 2019 email from Dave Saunders to John Fisher |
| 7. | November 6, 2019 email from John Fisher to Dave Saunders |
| 8. | April 6, 2020 email from John Fisher to Dave Saunders |
| 9. | May 4, 2020 email from John Fisher to Dave Saunders |

# Exhibit 1



July 5, 2019

Rami Rahim                                    Bikash Koley
CEO                                           CTO
Juniper Networks Inc                          Juniper Networks Inc
1133 Innovation Way                           1133 Innovation Way
Sunnyvale, CA 94089                           Sunnyvale, CA 94089

Brian Martin
General Counsel
Juniper Networks Inc
1133 Innovation Way
Sunnyvale, CA 94089

Re:  Swarm Technology Licensing Opportunity

Dear Sirs:

Swarm Technology LLC is the owner of two US Patents (US 9,852,004 and US 9,146,777) as well as other pending applications which may be relevant to Juniper Network's Zero-Touch Provisioning.  The purpose of this letter is to highlight a licensing opportunity relating to zero-touch provisioning; this letter is not and should not be construed as an accusation of infringement.

I have enclosed a copy of the '004 patent (SYSTEM AND METHOD FOR PARALLEL PROCESSING USING DYNAMICALLY CONFIGURING PROACTIVE CO-PROCESSING CELLS) as well as a claim chart which demonstrates the correlation between claim 1 of the '004 patent and your Zero-Touch Provisioning.  The claim chart is based on your "Zero Touch Wireless Deployment with Juniper Networks Switches and Aerohive Access Points".

Swarm is now seeking to license its patents to a number of hardware and software providers, and accordingly, would welcome an opportunity to meet with you to discuss terms of a non-exclusive license.  Swarm intends to be fair to all licensees, but more favorable terms will be available to the first licensee.

(480) 319-2233          phxfish@gmail.com          8300 S. Homestead Lane, Tempe, AZ 85284



Swarm would welcome the opportunity to discuss this licensing opportunity with you. Please contact me to let us know when you will meet with Mr. Alfonso Iñiguez and me.

Sincerely yours,

John A. Fisher
IP licensing Consultant

Cc: Alfonso Iñiguez

# Exhibit 2

Dave Saunders <dmsaunders@juniper.net>                    Fri, Aug 9, 4:17 PM
                                                          (2 days ago)
to me

**FRE 408 Communication**

Dear Mr. Fisher,

Thank you for your July 5, 2019 letter to Messrs. Rahim and Martin, to which I am responding. As an innovator, Juniper takes intellectual property rights seriously—both its own and the valid and enforceable rights of others. So we have begun analyzing the patents and claim chart attached to your letter. Our analysis is ongoing, but we have some preliminary questions:

1. The preamble of claim 1 requires a "processing system." It is unclear to me what in Figure A you believe is the processing system. Can you please provide more detail?

2. Claim 1 requires a "controller", and it appears that you are pointing to "administrators" as meeting the "controller" element. Is this correct? And if so, what are the "administrators" that you are pointing to?

3. You identify a "HiveManager" and an "Aerohive device" as allegedly meeting certain elements of claim 1. What is the "HiveManager"? What is an "Aerohive device"?

4. Claim 1 requires a "task pool" but the claim chart attached to your letter does not appear to identify anything that allegedly meets the "task pool" claim element. What are you pointing to as allegedly meeting the "task pool" element?

5. Claim 1 requires a first "co-processor" configured to successively retrieve a "first task" from the task pool but the claim chart attached to your letter does not appear to identify anything that allegedly meets the "first task" claim element. What are you pointing to as allegedly meeting the "first task" claim element?

6. Claim 1 requires a first co-processor configured to "process" the first task but the claim chart attached to your letter does not appear to identify any processing of a task. What is the processing that you believe meets this claim element?

7. Claim 1 requires a first co-processor configured to "generate first resulting data" but it is unclear from the claim chart attached to your letter what you believe constitutes "generat[ing]" that meets the claim. What process do you believe satisfies the element "generate first resulting data"?

8. Claim 1 requires a first co-processor configured to "update the task pool to reflect completion of the first task," but it is unclear from the claim chart attached to your letter what you are pointing to as allegedly satisfying this claim element. Can you please explain why you believe this claim element is satisfied?

*Aug 9, page 2*

The answers to the above questions will allow us to continue our evaluation of the patents and claim chart attached to your letter.  Thank you and I am happy to set up a call to discuss if you believe that would be more productive.

Best,
Dave

------------------------

**David M. Saunders**
Director, Litigation
**Juniper Networks**
1 (408) 936-5784
dmsaunders@juniper.net
www.juniper.net

# Exhibit 3

8/13/2019                                                         Gmail - Swarm Technology Licensing Opportunity

 Gmail                                                    John Fisher <phxfish@gmail.com>

## Swarm Technology Licensing Opportunity
1 message

**John Fisher** <phxfish@gmail.com>                               Tue, Aug 13, 2019 at 9:24 AM
To: Dave Saunders <dmsaunders@juniper.net>
Cc: Alfonso Íñiguez <alfonso@swarmtechnology.us>
Bcc: "Kelly, Michael K." <MKelly@jsslaw.com>

Dear Mr. Saunders,

Juniper calls them "HiveManager" and "Aerohive device"; Swarm calls the substantial equivalents "task pool" and "co-processor". Each his own lexicographer.

I have attached answers to your eight questions, with the answers based on the Juniper document which Swarm refers to as Reference 1. I assume that you either have talked to your technical people about the Swarm patent or that you will soon do so. With the knowledge they have of ZTP, beyond what is disclosed in Reference 1, I feel confident that they will confirm the correlation between the Juniper devices and Swarm's '004 patent.

Again, Swarm would welcome an opportunity to discuss this licensing opportunity with you.

I look forward to hearing from you.

John

---

📎 **Answers.juniper.pdf**
     200K

8|13 p²

*1. The preamble of claim 1 requires a "processing system." It is unclear to me what in Figure A you believe is the processing system. Can you please provide more detail?*

Answer:

Figure A appears on page 6 of the document titled *Zero Touch Wireless Deployment with Juniper Networks Switches and Aerohive Access Points* referred herein as *Reference 1*.

Patent '004 Claim 1, describes a system "configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis."

In the same manner, Figure A shows a system described as an "environment to support the ZTP process" [Reference 1, page 6] that "allows automatic provisioning of new switches without manual intervention" [Reference 1, page 3].

Is Figure A a processing system? Yes, because the "objective of this document [Reference 1] is to demonstrate plug-and-play deployment of Juniper Networks® EX Series switches" [Reference 1, page 3]. Furthermore, as known in the networking field, a *network switch* is a device that receives, *processes*, and forwards data packets to destination devices.

*2. Claim 1 requires a "controller", and it appears that you are pointing to "administrators" as meeting the "controller" element. Is this correct? And if so, what are the "administrators" that you are pointing to?*

Answer:

The "administrator" is the "Network administrator" [Reference 1, page 6].

As described in Patent '004 [column 11, lines 56-50], "the controller 402 may be a smartphone, tablet, laptop, or other device which may include a display 404 and a user interface (e.g., keypad) 406 for facilitating user interaction with the various devices on the network." In the same manner, "Network administrators can prepare this configuration manually, or they can use Network Director to generate this configuration." [Reference 1, page 6]. The Network Director has a GUI (Graphical User Interface) [cf. Reference 1, page 4]

*3. You identify a "HiveManager" and an "Aerohive device" as allegedly meeting certain elements of claim 1. What is the "HiveManager"? What is an "Aerohive device"?*

Answer:

The "HiveManager" is a **task** repository from which the Aerohive gets a **task**. A **task** is also referred to as configuration and firmware.

Adding tasks to the HiveManage is indeced by:
"Aerohive Device Onboarding in HiveManager
Auto-provisioning allows administrators to quickly deploy Aerohive devices. With auto-provisioning, once an Aerohive device communicates with the HiveManager, the device will automatically receive the latest configuration and firmware.
This significantly shortens the time and effort required to deploy an Aerohive WiFi solution.
The first step is to onboard the devices.
     1. Login to HiveManager NG and click the ⊕ Menu Shortcut icon
     2. Select Onboard Devices from the drop-down menu
     3. Click Add Real Devices"
[Reference 1, page 6].

"Network administrators can manually prepare all **tasks** shown below . . .
- Software image file name
- Configuration file name

1

$8|13$   $p3$

- File transfer mode
- Server IP address where these files are located

[Reference 1, page 6]

The "Aerohive device" is the device that automatically communicates with the task repository to retrieve a **task**, as described here:

"With auto-provisioning, once an Aerohive device communicates with the HiveManager, the device will automatically receive the latest configuration and firmware." [Reference 1, page 4]

*4. Claim 1 requires a "task pool" but the claim chart attached to your letter does not appear to identify anything that allegedly meets the "task pool" claim element. What are you pointing to as allegedly meeting the "task pool" element?*

Answer:

Given that the HiveManager is a task repository — as described on Answer 3 — the "task pool" is the HiveManager that contains the **tasks** also mentioned on Answer 3.

*5. Claim 1 requires a first "co-processor" configured to successively retrieve a "first task" from the task pool but the claim chart attached to your letter does not appear to identify anything that allegedly meets the "first task" claim element. What are you pointing to as allegedly meeting the "first task" claim element?*

Answer:

The "first task" can be one of the **tasks** shown below:

"Network administrators can manually prepare all **tasks** shown below ...
- Software image file name
- Configuration file name
- File transfer mode
- Server IP address where these files are located"

[Reference 1, page 6]

Retrieving a first task from the task pool is indicated by:

"With auto-provisioning, once an Aerohive device communicates with the HiveManager, the device will automatically receive the latest configuration and firmware." [Reference 1, page 4]

*6. Claim 1 requires a first co-processor configured to "process" the first task but the claim chart attached to your letter does not appear to identify any processing of a task. What is the processing that you believe meets this claim element?*

Answer:

The "processing" consists in the "*effort* required to *deploy* an Aerohive" [Reference 1, page 4]. More specifically, the effort consists in the "*automatic provisioning* of new switches without manual intervention." [Reference 1, page 3].

*7. Claim 1 requires a first co-processor configured to "generate first resulting data" but it is unclear from the claim chart attached to your letter what you believe constitutes "generat[ing]" that meets the claim. What process do you believe satisfies the element "generate first resulting data"?*

Answer:

The "generation" consists in comparing, making a decision, downloading the software image, and installing it:

2

8|13 p 4

"The device compares the downloaded image file with the installed software version. If the downloaded image file is different from the installed software version, the downloaded software image is installed and the switch reboots." [Reference 1, page 11]

"At this point, the switch has the software image required for the device and also has the common *configuration* file intended for that device type." [Reference 1, page 11], hence the installed *configuration* file is the "first resulting data."

*8. Claim 1 requires a first co-processor configured to "update the task pool to reflect completion of the first task," but it is unclear from the claim chart attached to your letter what you are pointing to as allegedly satisfying this claim element. Can you please explain why you believe this claim element is satisfied?*

Answer:

Once the device (Aerohive) has been automatically provisioned, the task pool (HiveManager) reflects the completion of the task.

This is specified in Reference 1, as follows:

"Aerohive Auto-Provisioning in HiveManager
1. After the devices have been on-boarded successfully, go to the Configure tab > Common Objects and navigate to Auto Provisioning." [Reference 1, page 13]

Upon successful auto-provisioning, the HiveManager is updated to reflect the completion of the task:

"Go to the Monitor tab where you will find the devices listed. *To verify that the device has been provisioned, click on the device and verify that policy and other settings are as expected.* Click on the AP host name and *verify that the correct network policy was applied.*" [Reference 1, page 17]

3

# Exhibit 4

 Gmail

John Fisher <phxfish@gmail.com>

---

## Swarm Technology Licensing Opportunity

---

**Dave Saunders** <dmsaunders@juniper.net>                                    Tue, Sep 10, 2019 at 3:30 PM
To: John Fisher <phxfish@gmail.com>

**FRE 408 Communication**

Dear Mr. Fisher,

Thank you again for your email.  We have a few follow-up questions based on the answers that you sent to our first set of questions:

1. My understanding is that the "Network Administrator" identified as allegedly satisfying the "controller" limitation is a person.  Is that consistent with your understanding?

2. Is it your contention that the alleged "tasks" that meet the claim are "software image file name," "configuration file name," "file transfer mode," and "server IP address where these files are located"?  And is it also your contention that the foregoing is a "task pool" inside what you refer to as "HiveManager"?

Thank you and I look forward to your response.

Best,

Dave

---

**From:** John Fisher <phxfish@gmail.com>
**Date:** Tuesday, August 13, 2019 at 9:25 AM
**To:** Dave Saunders <dmsaunders@juniper.net>
**Cc:** Alfonso Íñiguez <alfonso@swarmtechnology.us>
**Subject:** Swarm Technology Licensing Opportunity

Dear Mr. Saunders,

[Quoted text hidden]

# Exhibit 5

9/13/2019                                    Gmail - Swarm Technology Licensing Opportunity

 Gmail                                    John Fisher <phxfish@gmail.com>

## Swarm Technology Licensing Opportunity
1 message

**John Fisher** <phxfish@gmail.com>                     Fri, Sep 13, 2019 at 11:19 AM
To: Dave Saunders <dmsaunders@juniper.net>, Alfonso Íñiguez <alfonso@swarmtechnology.us>
Bcc: "Kelly, Michael K." <MKelly@jsslaw.com>

### FRE 408 Communication

Dear Mr. Saunders,

In your email of September 10 you posed two questions.  The following is Swarm's response to those questions.

Question1:
*My understanding is that the "Network Administrator" identified as allegedly satisfying the "controller" limitation is a person.  Is that consistent with your understanding?*

Answer:
In the interest of simplification, the claim chart originally provided references a single document titled *Zero Touch Wireless Deployment with Juniper Networks Switches and Aerohive Access Points*, which we refer to as Reference 1.
Reference 1 describes:
"Network administrators can prepare this configuration manually, or they can use Network Director to generate this configuration."
[Reference 1, page 6].
In other words, the "Network Administrator" uses a device with a user interface to facilitate user interaction with the HiveManager.

In the same manner, patent '004 describes:
"the *controller* 402 may be a smartphone, tablet, laptop, or other *device* which may include a *display* 404 and a *user interface (e.g., keypad)* 406 for facilitating *user interaction* with the various devices on the network." (emphasis added, Patent '004 column 11, lines 46-50)

Given the references cited above, the "controller" is equivalent to the "Network Administrator" as descried in Reference 1. Nevertheless, the "controller" is not a person, but rather it is a device — used by the Network Administrator — with a user interface that facilitates user interaction with the HiveManager.

The mapping of the "controller" with a device — used by the Network Administrator — with a user interface that facilitates user interaction with the HiveManager is illustrated in the *Aerohive Deployment Guide*, which we will refer to as Reference 2.



*Figure 1  Three communication planes in the Aerohive cooperative control architecture*

Source: Aerohive Deployment Guide, Page 5

As descried in Figure 1:

 "an admin [Network Administrator] can use the HiveManager to configure, maintain, and monitor multiple devices, essentially coordinating the control and data planes from a single, central location." (Reference 2, page 5)

Note, in Figure 1, that the HiveManager is connected to a device — used by the Network Administrator — with a user interface that facilitates user interaction.

A further illustration of the mapping of the "controller" with a device — used by the Network Administrator — with a user interface that facilitates user interaction with the HiveManager is shown below:



Source: http://www.comm3.net/products/aerohive-network-solutions/aerohive-technology-behind-solution/application-visibility-and-c

Question 2 (part A):
*Is it your contention that the alleged "tasks" that meet the claim are "software image file name," "configuration file name," "file transfer mode," and "server IP address where these files are located"?*

Answer:
The cited tasks are non-limiting examples of tasks, additional examples of tasks are described below:
"When it connects to HiveManager, the device performs the following *tasks*, depending upon the settings in the auto provisioning profile:

9|17 p3

• The device downloads the latest HiveOS firmware and then activates it by rebooting.
• It downloads its configuration and then reboots to activate that.
Upon completing the auto provisioning process, the devices are connected to HiveManager for further management and monitoring"
(emphasis added, Reference 2, Page 70)

Question 2 (part B):
*And is it also your contention that the foregoing is a "task pool" inside what you refer to as "HiveManager"?*

Answer:

Conceptually, the HiveManager as described in Reference 1 is equivalent to the "task pool" described in patent '004. Moreover, it is
conceivable to develop a HiveManager that contains an integrated "controller" in such case the "task pool" would be inside the
HiveManager, in either case the "task pool" would be accessible by MAC address, IP address, ohmically or wirelessly:

As descried in patent '004:

"Alternatively, the task pool 13 may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task
pool 13; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC
and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative
embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among
multiple CPU 11 systems, or dedicated to a given CPU 11. The task pool 13 may also be addressable by the cells 12. The task pool 13
may be disposed in a dedicated hardware block to provide maximum access speed by the CPU 11 and cells 12. Alternatively, the task
pool 13 may be software based, wherein the contents of the task pool 13 are stored in memory, analogous to the hardware-based
embodiment, but represented by data structures." ('004 Colum 6, line 58 to Column 7, line7)

I hope that this response adequately answers your questions.

I have also attached a draft licensing agreement for your consideration. In the draft Section 1.3 LICENSED PRODUCTS is left
blank. I leave it to you to fill in the blank with a definition that is appropriate for Juniper products. Section 3 provides a broad license
under Swarm Patents. Section 4, the payment section, also contains blanks that are to be the subject of negotiation. Although Swarm
proposes a running royalty (in the range of 1%), as I have noted in the past, a much more favorable settlement is available to early
licensees. Swarm is open to alternate settlements such as a lump sum payment or fixed payments over time.

I look forward to continuing this discussion.

Respectfully,

John



swarm-juniper agreement..docx
24K

## SWARM TECHNOLOGY LLC PATENT LICENSE AGREEMENT

This Agreement is entered into on this _____ day of _____ , 2019 by and between Swarm Technology LLC located at 732 E Lehi Rd, Mesa, AZ 85203 (hereinafter called SWARM) and Juniper Networks, Inc. having a place of business at 1133 Innovation Way, Sunneyvale, CA 94089 (hereinafter called JUNIPER).

WHEREAS SWARM owns various patents issued and applications for patents pending as to which JUNIPER desires to acquire licenses as hereinafter provided,

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth, it is agreed as follows:

Section 1 – DEFINITIONS

The capitalized terms used herein shall have the definitions assigned to them in this Section 1 and shall include the singular as well as the plural.

1.1     SWARM PATENTS means US 9,146,777 and US 9,852,004 and any patents or applications in any country of the world claiming priority from one of said patents.

1.2     SUBSIDIARY means a corporation, company, or other entity more than fifty percent of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled directly or indirectly by JUNIPER, but such corporation, company or other entity shall be deemed a SUBSIDIARY only so long as such ownership or control exists.

1.3     LICENSED PRODUCTS means _____ .

1.4     EFFECTIVE DATE means the date of last necessary signature hereto as such date is entered on the first page hereof.

1.5     NET SELLING PRICE means

(a) the aggregate of the selling prices or greater fair market value of LICENSED PRODUCTS used internally, leased or otherwise disposed of by JUNIPER or sold either in sales between parties which are in affiliation or in other than normal arm's length commercial transactions and

(b) the total revenues received by JUNIPER from customers in the usual course of business for LICENSED PRODUCTS sold, leased, or otherwise disposed of by JUNIPER in normal arm's length commercial transactions between parties which are not in affiliation

less returns, discounts, duties and excise, sales, use, and value added taxes, and similar taxes levied in respect to such sales.

Section 2 - RELEASES

SWARM hereby releases, acquits, and forever discharges JUNIPER for any time prior to the EFFECTIVE DATE from any and all claims or liability for acts of infringement or alleged infringement of any SWARM PATENT under which a license or a right is herein granted by SWARM to or for JUNIPER and which, if performed after the EFFFECTIVE DATE, would have been licensed or permitted under or pursuant to the terms of this Agreement.

Section 3 – GRANTS

3.1    SWARM hereby grants to JUNIPER and its SUBSIDIARIES, for the term of this Agreement, a world wide, non-exclusive, non-transferable license under SWARM PATENTS without the right to sub-license to make, to import, use, lease, sell, offer for sale, or otherwise dispose of LICENSED PRODUCTS.

3.2    During the term of this Agreement, SWARM agrees not to make any claim of infringement for the use of LICENSED PRODUCTS against the customers, distributors, and users of LICENSED PRODUCTS that are made, imported, leased, sold, or otherwise disposed of by JUNIPER based upon any claim of any SWARM PATENT under which such LICENSED PRODUCTS are licensed hereunder.

Section 4 – PAYMENTS

4.1    In consideration of the release of Section 2, JUNIPER agrees to pay to SWARM within thirty days of the EFFECTIVE DATE the non-refundable sum of  _____ .

4.2    In consideration of the rights and license granted by SWARM under Section 3 for the period beginning on the EFFECTIVE DATE, JUNIPER agrees to pay SWARM _____ percent of the NET SELLING PRICE of all LICENSED PRODUCTS leased, sold, or otherwise disposed of by JUNIPER or its SUBSIDIARIES after the EFFECTIVE DATE

4.3    The payments by JUNIPER to be made in accordance with Section 4.2 shall be made each year during the term of this Agreement in two semiannual installments, one within thirty days after the close of the fiscal year of JUNIPER and one within thirty days after the first half of the fiscal year of JUNIPER.

4.4    Payments shall be made in United States currency to Swarm Technology LLC, 732 E Lehi Rd, Mesa, AZ 85203.

4.5    Any payment hereunder which is delayed beyond the due date shall be subject to an interest charge of one percent per month on the unpaid balance until paid in full.  The forgoing payment of interest shall not affect SWARM'S right to terminate in accordance with Section 5.

4.6     With respect to the royalty set forth in Section 4.2, JUNIPER shall keep clear and accurate records with respect to LICENSED PRODUCTS fielded.  These records shall be retained for a period of three years from the date of reporting and payment notwithstanding the expiration or other termination of this Agreement.  SWARM shall have the right through a mutually agreed upon independent certified public accountant and at its expense, to examine and audit, not more than once per year, and during normal business hours, all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amount of royalty payable to SWARM under this Agreement.  Prompt adjustment shall be made by JUNIPER to compensate for any errors and/or omissions disclosed by such examination or audit.

Section 5 – TERM, TERMINATION, AND ASSIGNABILITY

5.1     The term of this Agreement shall be from the EFFECTIVE DATE until the expiration date of the last to expire of the SWARM PATENTS unless terminated earlier as elsewhere provided in this Agreement.

5.2     In the event of the failure of JUNIPER to make the payments required under Section 4, if such failure is not corrected within forty five days after written notice from SWARM detailing such failure, this Agreement shall terminate.  In the event of termination of this Agreement in accordance with this Section 5.2 all licenses and rights granted by SWARM to JUNIPER shall terminate as of the date termination takes effect.

5.3     The rights provided for in this Agreement may be assigned or transferred only with the prior written consent of SWARM.

Section 6 – MISCELLANEOUS PROIVISIONS

6.1     Nothing contained is this Agreement shall be construed as:

6.1.1   conferring any license or right with respect to any trademark, trade or brand name, or corporate name of SWARM;

6.1.2   imposing on SWARM any obligation to institute any suit or action for infringement of any SWARM PATENT, or to defend any suit or action brought by a third party which challenges or concerns the validity of any SWARM PATENT.

6.1.3   a warranty or representation by SWARM that any manufacture, use, sale, lease, or other disposition of LICENSED PRODUCTS will be free from infringement of any patents other than the SWARM PATENTS licensed herein;

6.1.4   an obligation of SWARM to provide any technical information.

6.2     This Agreement and the performance of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Arizona.

6.3    This Agreement is the result of negotiation between the parties; accordingly this Agreement shall not be construed for or against either party regardless of which party drafted this Agreement or any portion thereof.

6.4    This Agreement sets forth the entire Agreement and understanding between the parties as to the subject matter hereof and merges all prior discussions between them.  Neither party shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein.

6.5    The parties shall have the right to disclose the existence of this Agreement.  The parties, however, shall keep the terms of Sections 4.1 and 4.2 confidential and shall not now or hereafter divulge any part thereof to any third party except:

6.5.1   with the prior written consent of the other party; or

6.5.2   to any governmental body having jurisdiction to request and to read the same; or

6.5.3   as otherwise may be required by law or legal processes; or

6.5.4   to legal counsel representing either party hereto.

6.5.5   Notwithstanding the above, no disclosure of Sections 4.1 and 4.2 of this Agreement shall be made pursuant to Sections 6.5.2 or 6.5.3 without the disclosing party first giving the other party reasonable prior notice of such intended disclosure so as to allow the other party sufficient time to seek a protective order or otherwise assure the confidentiality of Sections 4.1 and 4.2 of this Agreement as that other party shall deem appropriate.

6.5.6   The provisions of this Section 6.5 shall survive termination of this Agreement and continue in perpetuity.

6.6    All notices required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if dispatched by registered airmail, postage prepaid, in any post office in the United States, addressed as follows:

6.6.1   If to SWARM:

Swarm Technology LLC

732 E Lehi Rd

Mesa, AZ 85203

6.6.2   If to JUNIPER:

        General Counsel

        Juniper Networks, Inc.

        1133 Innovation Way

        Sunnyvale, CA 94089

6.6.3   The date of receipt of such a notice shall be the date for the commencement of the running of the period provided for in such notice or the date at which such notice takes effect, as the case may be.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate.

Swarm Technology LLC                                    JUNIPER

By     Alfonso Iñiguez_____        By     _____

Title   CEO_____        Title   _____

Date   _____        Date   _____

# Exhibit 6

From: **Dave Saunders** <dmsaunders@juniper.net>
Date: Thu, Oct 24, 2019 at 12:46 PM
Subject: Re: Swarm Technology Licensing Opportunity
To: John Fisher <phxfish@gmail.com>


Dear Mr. Fisher,

Thank you for your email—I was planning on reaching out to you this week.

We have had a chance to review the materials that you provided.  While we appreciate the offer, we are not interested in taking a license at this time.  Nor do we believe that a license is required because our products do not use the technology claimed by Swarm Technology's patents.  This conclusion is consistent with your July 5, 2019 letter's statement that it "is and should not be construed as an accusation of infringement."  Of course, if my understanding is incorrect, and you do allege that we infringe one or more of Swarm Technology's patents, please let me know.

Thank you again for your patience while we reviewed the material provided.  Please do not hesitate to let me know if you have any questions.

Best regards,
Dave

# Exhibit 7

Dear Mr. Saunders:

I was surprised and disappointed by your email of October 24 saying Juniper is not interested in taking a license at this time. In the interest of continuing the good faith discussions both parties have been pursuing, I would like to make a few observations.

In past communications Swarm has answered all of your questions concerning the '004 claim chart. Having answered all of your questions, it appears that you have failed to express any position that would prevail in a Markman hearing.

From the very beginning Swarm has couched its correspondence as a "licensing opportunity." Swarm is in communication with several other companies – your competitors. As I have stated repeatedly, the first licensee will enjoy much more favorable licensing terms. The first licensee will therefore be at a competitive advantage with respect to other players in the parallel processing field.

In the not too distant future it is very probable that automated provisioning, plug and play deployment, intent-driven automation, IoT (regardless of the name) will be the subject of industry-wide standardization. Swarm believes the industry will standardize around the Swarm claimed technology. Consider the opportunity of being an early licensee with advantageous licensing terms and being able to influence the direction of the standard.

Although you have said Juniper does not require a license, I have to disagree. I would like to discuss some options with you that Juniper might find acceptable. I think a brief telephone conversation is a preferable way to proceed, rather than a continued exchange of written positions.

Swarm is open to a variety of licensing options for the first licensee. As you can imagine, being able to announce the signing of a first licensee (without disclosing financial terms) can be valuable to Swarm.

If you would like to have such a conversation, send me a telephone number to call and some options of convenient times to contact you.

Regards,

John

*follow up phone conversation 12/3/19*

# Exhibit 8



**Alfonso Íñiguez <alfonso@swarmtechnology.us>**

---

## Swarm Technology Licensing Opportunity
1 message

---

**John Fisher** <phxfish@gmail.com>                    Mon, Apr 6, 2020 at 11:38 AM
To: dmsaunders@juniper.net, Alfonso Íñiguez <alfonso@swarmtechnology.us>

FRE 408

Dear Mr. Saunders,

I first want to express my hope that you and your colleagues are staying healthy in this unusual time of international pandemic.

When we spoke in December as a follow up to back and forth emails of October and November you said Juniper was not interested in taking a license under the Swarm patents. In the past you reviewed Swarm's claim chart that illustrates the correspondence between claim 1 of the '004 patent and a number of Juniper products.  Swarm continues to believe that that claim chart correctly demonstrates the need for a license.

A new patent, 10,592,275, has recently been issued to Swarm.  I have attached a claim chart that again illustrates the relevance of Swarm patents, this time the '275 patent, to Juniper products.

As I have said from the beginning, Swarm is willing to offer a license under all of its patents on terms that will be fair to all licensees; the most favorable terms will be available to an early licensee.  I look forward to discussing such a licensing opportunity with you.

John Fisher

---

    Virus-free. www.avast.com

---

 **Swarm_Patent_275_Juniper_Claim_Chart 04062020.pdf**
991K

# Exhibit 9



**Alfonso Íñiguez <alfonso@swarmtechnology.us>**

---

## Swarm Technology Licensing Opportunity
1 message

---

**John Fisher** <phxfish@gmail.com>                                      Mon, May 4, 2020 at 1:31 PM
To: Dave Saunders <dmsaunders@juniper.net>
Cc: Alfonso Íñiguez <alfonso@swarmtechnology.us>

Dear Mr. Saunders,

On April 6, 2020 I sent you a claim chart that illustrated the relevance of Swarm's newly issued US Patent 10,592,275 to
various Juniper products.  I have just discovered that there is an error in that chart.  In copying the chart for transmission
to you I truncated the claim, leaving off the last elements.  I have attached a corrected claim chart for your consideration.
Please review this corrected chart and discard the one sent previously.
I apologize for any inconvenience this may have caused you.


Regards,
John Fisher


📄 **Swarm_Patent_275_Juniper_Claim_Chart_Amended.pdf**
    998K