# Exhibit B

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
-------------------------------x
JUNIPER NETWORKS, INC., and  :
APSTRA, INC.,              :
                           :
        Plaintiffs,   :
                           :   Case No.
    vs.                    :
                           :   3:20-cv-03137-JD
SWARM TECHNOLOGY LLC,      :
                           :
        Defendant.    :
-------------------------------x

** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
** PURSUANT TO PROTECTIVE ORDER **

VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF SWARM
TECHNOLOGY CORPORATE REPRESENTATIVE AND IN HIS
INDIVIDUAL CAPACITY
ALFONSO ÍÑIGUEZ
Friday, May 14, 2021
9:04 a.m. Pacific Daylight Time

REPORTER: Dawn A. Jaques, CSR, CLR

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

```
 1    APPEARANCES:
 2
 3      On behalf of the Plaintiffs:
          R. WILLIAM SIGLER, ESQ.
 4        Fisch Sigler LLP
          5301 Wisconsin Avenue, NW
 5        Fourth Floor
          Washington, D.C.  20015
 6        PHONE:  (202) 362-3520
 7        EMAIL:  bill.sigler@fischllp.com
 8
 9      On behalf of the Defendant:
          MICHAEL K. KELLY, ESQ.
10        CHRISTINE JONES, ESQ.
          TIMOTHY CASEY, ESQ.
11        Beus Gilbert McGroder
          701 N. 44th Street
12        Phoenix, Arizona  85008
          PHONE:  (480) 429-3015
13        EMAIL:  mkelly@beusgilbert.com
14             cjones@beusgilbert.com
15
16    VIDEOGRAPHER AND EXHIBIT TECHNICIAN:
17        Billy Fahnert, Digital Evidence Group
18
19
20
21
22
```

## Page 3

```
 1                   I-N-D-E-X
 2    WITNESS:                    PAGE:
 3    ALFONSO INIGUEZ
 4        Examination by Mr. Sigler      10
 5        Examination by Mr. Kelly      214
 6
 7              E-X-H-I-B-I-T-S
 8    INIGUEZ DEPOSITION EXHIBIT:        PAGE:
 9    Exhibit 1  July 16, 2018, letter to
              Alexis B. Bjorlin of Intel
10            from Michael Kelly
              SW-JU-JV-0000132 - 0000133      11
11    Exhibit 2  July 16, 2018, letter to
              Tim Teter of NVIDIA from
12            Michael Kelly
              SW-JU-JV-0000110 - 0000111      22
13    Exhibit 3  July 16, 2018, letter to
              Thomas Wyatt of AppsDynamic
14            from Michael Kelly
              SW-JU-JV-0000130 - 0000131      27
15    Exhibit 4  July 16, 2018, letter to
              Brian Modoff of Qualcomm
16            from Michael Kelly
              SW-JU-JV-0000126 - 0000127      27
17    Exhibit 5  July 16, 2018, letter to
              Vincent Pangrazio of Cavium
18            from Michael Kelly
              SW-JU-JV-0000118 - 0000119      28
19    Exhibit 6  July 16, 2018, letter to
              Lawrence Ellison of Oracle
20            from Michael Kelly
              SW-JU-JV-0000114 - 0000115      29
21
22
```

## Page 4

```
 1               INDEX (Continued)
 2              E-X-H-I-B-I-T-S
 3    INIGUEZ DEPOSITION EXHIBIT:        PAGE:
 4    Exhibit 7  July 16, 2018, letter to
              Brian Stevens of Google
 5            from Michael Kelly
              SW-JU-JV-0000112 - 0000113      31
 6    Exhibit 8  July 16, 2018, letter to
              Katherine Adams of Google
 7            from Michael Kelly
              SW-JU-JV-0000116 - 0000117      31
 8    Exhibit 9  September 27, 2018, letter
              to Michael Kelly from Denise
 9            Kerstein of Apple
              Re: Your Correspondence to Apple
10            SW-JU-JV-0000134      35
11    Exhibit 10  December 5, 2014, letter to
              Michael Kelly from Jeff Lasker
12            of Apple
              SW-JU-JV-0000001      41
13    Exhibit 11  Letter template from Michael Kelly
              SW-JU-JV-0001349      47
14    Exhibit 12  Letter template from Michael Kelly
              SW-JU-JV-0001393      51
15    Exhibit 13  May 12, 2021, letter to Fisch
              Sigler LLP from Elvis Sulejmani,
16            Paralegal of Beus Gilbert McGroder
              (No Bates stamp) (3 pages)      59
17    Exhibit 14  Notice of 30(b)(6) deposition
              of Swarm Technology LLC
18            (No Bates number) (8 pages)      71
19    Exhibit 15  July 16, 2018, letter to
              Bikash Koley of Juniper Networks
20            from Michael Kelly
              SW-JU-JV-0000124 - 0000125      87
21
22
```

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 5

```
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3   INIGUEZ DEPOSITION EXHIBIT:            PAGE:
 4   Exhibit 16  September 13, 2019, email to
         Dave Saunders and Alfonso Iniguez
 5       from John Fisher, SUBJECT: Swarm
         Technology Licensing Opportunity
 6       SW-JU-JV-0000278 - 0000286       97
 7   Exhibit 17  November 6, 2019, email to Dave
         Saunders from John Fisher
 8       SUBJECT: Swarm Technology
         Licensing Opportunity
 9       (No Bates number) (1 page)        99
10   Exhibit 18  "Exhibit 2," April 16, 2020,
         letter to Mansour Karam and
11       Sasha Ratkovic of Apstra Inc.
         RE: Swarm Technology
12       Licensing Opportunity
         (No Bates number) (13 pages)     112
13   Exhibit 19  October 29, 2019, email to
         Theo Foster (Haynes and Boone)
14       from John Fisher, SUBJECT:
         Swarm Technology Licensing
15       Opportunity, with attachment
         Cisco Response
16       SW-JU-JV-0000210 - 0000231      122
17   Exhibit 20  October 29 - November 27, 2019,
         email chain between John Fisher
18       and Theo Foster, SUBJECT:
         Swarm Technology Licensing
19       Opportunity
         SW-JU-JV-0000204 - 0000209      126
20
21
22
```

Page 7

```
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3   INIGUEZ DEPOSITION EXHIBIT:            PAGE:
 4   Exhibit 27  September 6-10, 2019, email chain
         between John Fisher and Deanna
 5       Kwong, SUBJECT:  Swarm Technology,
         U.S. Patent Nos. 6,852,004
 6       & 9,146,777
         SW-JU-JV-0000168                149
 7   Exhibit 28  "Exhibit G," Mutual Nondisclosure
         Agreement between RPX Corporation
 8       and Swarm Technology LLC
         (No Bates number) (4 pages)     154
 9   Exhibit 29  January 24-26, 2020, email chain
         between John Fisher and Ryan
10       Hanneken, SUBJECT: Swarm
         Technology/RPX
11       SW-JU-JV-0000315 - 0000317      158
12   Exhibit 30  January 28, 2020, email to
         Ryan Hanneken from John Fisher
13       SUBJECT: Swarm Technology/RPX
         non-disclosure agreement
14       SW-JU-JV-0000311                165
15   Exhibit 31  Defendant Swarm Technology
         LLC's Answers to Juniper
16       Networks, Inc.'s Interrogatories
         Regarding Venue and Jurisdiction
17       (No Bates numbers) (8 pages)    177
18   Exhibit 32  2017 Swarm Technology
         Business Plan
19       SW-JU-JV-0001304 - 0001322      184
20   Exhibit 33  Undated PowerPoint pitch deck
         "Swarm Technology"
21       SW-JU-JV-0001323 - 0001338      190
22
```

Page 6

```
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3   INIGUEZ DEPOSITION EXHIBIT:            PAGE:
 4   Exhibit 21  December 13, 2019, email to
         Theo Foster from John Fisher
 5       SUBJECT:  Swarm Technology
         Licensing Opportunity, with
 6       attachment Cisco 121319
         SW-JU-JV-0000190 - 0000201      132
 7   Exhibit 22  July 5, 2019, letter to Jayshree
         Ullal and Mark Taxay of Arista
 8       Networks from John Fisher
         Re:  Swarm Technology
 9       Licensing Opportunity
         SW-JU-JV-0001361                137
10   Exhibit 23  September 12, 2019, email to John
         Fisher from Sean Christofferson
11       SUBJECT: Swarm Technologies
         Licensing Letter
12       SW-JU-JV-0001301                139
13   Exhibit 24  May 6, 2020, email to Sean
         Christofferson from John Fisher
14       SUBJECT:  Swarm Technology
         Licensing Offer
15       SW-JU-JV-0000167                143
16   Exhibit 25  July 5, 2019, letter to Keerti
         Melkote and Willie Hernandez
17       from John Fisher, Re Swarm
         Technology Licensing Opportunity
18       SW-JU-JV-0001362                146
19   Exhibit 26  September 5, 2019, letter to
         John Fisher from Deanna Kwong
20       of Hewlett Packard Enterprise
         RE: Swarm Technology, U.S. Patent
21       Nos. 6,852,004 & 9,146,777
         SW-JU-JV-0001274                148
22
```

Page 8

```
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3   INIGUEZ DEPOSITION EXHIBIT:            PAGE:
 4   Exhibit 34  Undated PowerPoint pitch desk
         "Swarm Technology - We've
 5       synthesized swarm intelligence"
         SW-JU-JV-0001339 - 0001357      193
 6   Exhibit 35  Swarm Technology Executive Summary
         SW-JU-JV-0001358 - 0001329      200
 7   Exhibit 36  October 17, 2017, email chain
         between John Fisher and Ankit Jain
 8       SUBJECT: Swarm Technology:
         Pitch Deck
 9       SW-JU-JV-0000350 - 0000351      202
10   Exhibit 37  Amended Declaration of Alfonso
         Iniguez In Support of Swarm's
11       Motion to Dismiss Amended Complaint
         (No Bates numbers) (3 pages)    206
12
13
14
15
16
17
18
19
20
21
22
```

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 9

```
 1           P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We are on the
 3  record.  This is the 30(b)(6) deposition of
 4  Swarm Technology LLC, represented by Alfonso
 5  Íñiguez, in the matter of Juniper Networks, Inc.,
 6  et al., vs. Swarm Technology LLC, in the
 7  United States District Court, Northern District of
 8  California, San Francisco Division.
 9           Name is Billy Fahnert; I am the video
10  technician today.  The court reporter is
11  Dawn Jaques.  We are here on behalf of Digital
12  Evidence Group.  Today's date is May 14th, 2021.
13  The time is 9:04 a.m. Pacific Daylight Time.
14           All parties have stipulated to the
15  witness being sworn in remotely.
16           Counsel, please identify yourselves
17  for the record, and then the witness will be sworn
18  in.
19           MR. KELLY:  Michael Kelly --
20           MR. SIGLER:  Good morning.
21           MR. KELLY:  Michael -- go ahead.
22           MR. SIGLER:  I'm Bill Sigler of
```

Page 10

```
 1  Fisch Sigler LLP in Washington, D.C., and I'm here
 2  today representing Juniper Networks and Apstra.
 3           MR. KELLY:  I'm Michael Kelly of the
 4  law firm of Beus Gilbert McGroder in Phoenix,
 5  Arizona, representing the witness in both his
 6  individual capacity as Alfonso Íñiguez, the
 7  inventor of the patents, and in his representative
 8  capacity as a 30(b)(6) designee for the Defendant
 9  Swarm.
10           THE REPORTER:  Okay, sir, would you
11  raise your right hand to be sworn, please?
12           (The witness was administered the oath.)
13  Whereupon,
14           ALFONSO ÍNIGUEZ,
15           was called as a witness, after having been
16           first duly sworn by the Notary Public,
17           was examined and testified as follows:
18  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19           BY MR. SIGLER:
20      Q   Good morning, Mr. Íñiguez.
21      A   Good morning.
22      Q   We haven't met -- we haven't before,
```

Page 11

```
 1  sir.  I'm Bill Sigler, one of the attorneys
 2  representing Juniper and Apstra in the case.
 3  Thank you for joining us today.
 4           I want to start by asking you about a
 5  document that your lawyers produced to us.
 6           Mr. Fahnert, can you please put Tab A
 7  on the screen, and we'll mark that as Exhibit 1,
 8  please.
 9           (Iniguez Exhibit 1 was marked
10           for identification.)
11           BY MR. SIGLER:
12      Q   Mr. Íñiguez, can you see the document
13  that we placed on the screen as Exhibit 1?
14      A   Yes, I can see.
15      Q   Okay.  Do you see, sir, at the top of
16  this document it's dated July 16th, 2018?
17      A   Can you repeat that?  Because there
18  was some noise in here that I couldn't hear your
19  question.
20      Q   Sure.  Do you see, sir, that this
21  document is dated July 16th, 2018?
22      A   Yes.  Yes, I can see that.
```

Page 12

```
 1      Q   All right.  And do you see, sir, right
 2  below that that it says that it's being sent via
 3  United States mail?
 4      A   Yes.
 5      Q   And it's addressed to Alexis B.
 6  Bjorlin.  Is that correct, sir?
 7      A   Yes, that's correct.
 8      Q   And that individual is identified as a
 9  Corporate Vice President General Manager at Intel,
10  right, sir?
11      A   Yes, that's correct.
12           MR. KELLY:  Mr. Sigler, I'm sorry, do
13  you have a Bates number for this document?
14           MR. SIGLER:  The Bates number appears
15  above the document on the screen.
16           MR. KELLY:  Oh, I see it up there.
17  I'm sorry.  I was looking for it.  Okay,
18  thank you.
19           MR. SIGLER:  No worries.
20           BY MR. SIGLER:
21      Q   All right, Mr. Íñiguez, refocusing
22  back on Exhibit 1, do you see at the top there
```

3 (Pages 9 to 12)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 13

1  that there's some letterhead, and Michael K.
2  Kelly's name is there?
3          A   Yes, I see.  Are you asking me if I
4  see Michael Kelly on the letterhead?
5          Q   Yes.  Is that Michael K. Kelly
6  identified there?
7          A   Yes.
8          Q   Who is Mr. Kelly?
9          A   He's my attorney.  At the time when I
10  send the letter, he was my patent attorney.
11          Q   Okay.  So he was serving as a lawyer
12  for Swarm at the time of this letter?
13          A   Well, he was my -- I assume, yes.  He
14  was my patent attorney, so he was, yes,
15  representing Swarm.
16          Q   And Mr. Kelly is representing Swarm in
17  this case, right, sir?
18          A   I'm having a problem hearing.  I use
19  hearing aids, but can you raise the volume?
20          MS. JONES:  I can try.
21          (Pause in the proceedings.)
22          THE WITNESS:  Okay, ready?  All right.

---

Page 14

1          BY MR. SIGLER:
2          Q   Are you ready, sir?
3          A   Yes, I'm ready.
4          Q   Okay, thank you.
5              And so Mr. Kelly is representing Swarm
6  in this case, right?
7          A   Correct.
8          Q   And how long have you known Mr. Kelly?
9          A   I have known Mr. Kelly for
10  approximately seven years.
11          Q   When did -- when did -- strike that.
12              When did Swarm first retain Mr. Kelly
13  to act as an attorney on its behalf?
14          A   I don't have the exact date, but at
15  one point, around seven years ago, I contacted
16  Mr. Kelly, and he did patent and prosecution for
17  Swarm.
18              At that time, he was working for
19  another firm, Ingressia Fisher Lorenz is the name
20  of this Swarm [sic] -- of the company -- of the
21  firm.
22          Q   So he first started doing work for

---

Page 15

1  Swarm in about 2014?
2          A   2014?  I would say yes.
3          Q   Okay, thank you, sir.
4          A   Yeah.
5          Q   And have you seen this letter before,
6  sir?
7          A   Yes, I have.
8          Q   Did you look at this letter in
9  preparing for the deposition today?
10          A   I did.
11          Q   Let's focus now on the first paragraph
12  of the body of this letter to Mr. Bjorlin at
13  Intel, please.
14              Can you see that there, Mr. Íñiguez?
15          A   Yes, I can see it.
16          Q   All right.  And the letter opens by
17  saying "The purpose of this letter is to highlight
18  a licensing opportunity," right, sir?
19          A   Yes.
20          Q   All right.  And going to the next
21  sentence, it says, "In short, Swarm's research and
22  development efforts in IoT devices, edge

---

Page 16

1  computing, intent-based autonomy, plug-and-play
2  robotics, and swarm processing systems (featured
3  at www.swarmtechnology.us) have yielded a
4  significant and growing global patent portfolio."
5          Do you see that, sir?
6          A   Yes, I see it.
7          Q   And then the letter goes on to state
8  that Swarm is currently seeking to license that
9  global patent portfolio, right, sir?
10          A   Yes.
11          Q   Okay.  Mr. Fahnert, if you could back
12  out of that view and go to the remaining
13  paragraphs on the screen, please?
14              Sir, can you see that on your screen?
15          A   Yes, I can see it.
16          Q   All right.  So would you agree with
17  me, sir, that this letter references Swarm's
18  '004 patent?
19          A   Yes, it does.
20          Q   And the letter also references Swarm's
21  '777 patent?
22          A   Yes.

---

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 17

1      Q   All right.  And below that, in point
2  three, it references a pending patent application
3  that ends in 480, right?
4      A   That's correct.
5      Q   And that 480 application became the
6  '275 patent at issue, right, sir?
7      A   That is correct.
8      Q   And do you understand, sir, that the
9  three patents at issue in this case are the '004,
10  '777, and '275 patents?
11     A   Yes.
12     Q   All right.  Mr. Fahnert, can you
13  please take us to page 2 of this document?
14         At the bottom there, Mr. Íñiguez, do
15  you see that you're copied on this letter?
16     A   Yes.
17     Q   And did you receive a copy of this
18  letter in July 2018 when it was sent?
19     A   Yes, I have a -- I received a copy of
20  the letter.
21     Q   All right.  And the last paragraph in
22  the body of the letter says, "We would welcome the

Page 18

1  opportunity to discuss exclusive or non-exclusive
2  patent licensing arrangements with you."
3         Do you see that, sir?
4      A   Yes.
5      Q   So in July 2018, Swarm offered Intel
6  the opportunity to license Swarm's patents, right,
7  sir?
8         MR. KELLY:  Objection to the
9  foundation and to form.
10         MR. SIGLER:  Mr. Kelly, Judge Donato's
11  discovery order very strictly restricts speaking
12  objections.  You should limit your objections to
13  form or scope, or if you have a privilege
14  instruction, please.  It's in paragraph 13 of his
15  Order.
16         BY MR. SIGLER:
17     Q   Mr. Íñiguez, I'm going to ask this
18  again.  So in July 2018, Swarm offered Intel the
19  opportunity to license Swarm's patents, right,
20  sir?
21         MR. KELLY:  Objection as to form.
22         THE WITNESS:  On that date, we send

Page 19

1  that letter that you are showing me on the screen.
2  If that is the question, then the answer is yes.
3         BY MR. SIGLER:
4      Q   And that letter stated that Swarm
5  would welcome the opportunity to discuss exclusive
6  or non-exclusive patent licensing arrangements
7  with Intel, right, sir?
8      A   Yes.
9      Q   All right.  Did Intel ever respond to
10  this letter?
11     A   I -- we did not get a response from
12  that letter.
13     Q   Did Mr. Kelly or any other
14  representatives of Swarm ever speak to Intel on
15  the phone about licensing Swarm's patents?
16         MR. KELLY:  Objection to the extent
17  answering that question would invade the
18  privilege.
19         THE WITNESS:  As far as I can
20  remember, we -- we never -- this -- we didn't get
21  a response on this letter.
22         So if you're asking if we contacted

Page 20

1  them by phone or other means, no, that was -- that
2  was this letter.
3         BY MR. SIGLER:
4      Q   So Swarm didn't have any further
5  communications beyond this letter with Intel about
6  licensing Swarm's patents?
7      A   We didn't get any communication.
8         I don't know if we -- we provided a
9  list of companies to whom we sent letters.  I
10  don't know if -- I cannot recall if we have sent a
11  previous letter to Intel.
12     Q   And what list of companies are you
13  referring to?
14     A   The companies that --
15     Q   Strike that.  Strike that.  I'm sorry,
16  that was a bad question.
17         You said that Swarm provided a list of
18  companies to which it sent letters about licensing
19  Swarm's patents, right?
20     A   Well, when we produced the documents,
21  we provided all the letters that we sent, and all
22  that information is in your hands at this point.

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 21

1          Q   You referenced a list of companies
2     that Swarm sent letters to, right, sir?
3          A   When I say "list," I said they're
4     included in the -- in those -- in those files that
5     we produced.  That's what I mean by "list."
6          Q   So the files that -- if I see a letter
7     like this, like the one we're looking at to Intel
8     on July 16, 2018, if I see that in these documents
9     that Swarm produced to me, that means it was sent?
10         A   Wait, let me see.  I want to make sure
11    that I understood the question.
12             You're asking -- can you please repeat
13    the question?  I have to make sure that I'm
14    responding properly.
15         Q   Sure.  No, and I understand.
16             I received this letter to Intel in the
17    production that Swarm provided to us in this case.
18             If a letter like this is in the
19    production, does that mean that it was a letter
20    that Swarm actually sent at the time --
21         A   Yes.
22         Q   -- of the letter?

Page 22

1          A   Yes.
2          Q   Okay.  So, for example, if there's a
3     letter in that production to Google dated
4     July 13th, 2018, does that mean that Swarm
5     actually sent that letter to Google at that time
6     in July 2018?
7          A   Yes.
8          Q   Okay.  Thank you, sir.
9              Mr. Fahnert, you can take that one off
10    the screen, and I'd like to move on to the
11    document that is Tab B, and mark that as
12    Exhibit 2.
13             (Iniguez Exhibit 2 was marked
14             for identification.)
15             BY MR. SIGLER:
16         Q   Mr. Íñiguez, can you see Exhibit 2 on
17    the screen?
18         A   Yes, I can see it.
19         Q   All right.  And do you recognize,
20    this, sir, as -- well, strike that.  Let's go
21    through it.
22             Mr. Íñiguez, do you see that this

Page 23

1     letter is also dated July 16, 2018?
2          A   Yes.
3          Q   And it also indicates that it's sent
4     by -- excuse me, strike that.
5              It also states that it was sent by
6     United States mail, right, sir?
7          A   Correct.
8          Q   And it's also from Mr. Kelly, right,
9     sir?
10         A   Yes, that's correct.
11         Q   And this one is addressed to Tim Teter
12    of NVIDIA, right, sir?
13         A   That's correct.
14         Q   And it's addressed to him specifically
15    in Santa Clara, California, right, sir?
16         A   That's correct.
17         Q   All right.  And you can pull back out,
18    Mr. Fahnert.  Thank you.
19             Mr. Íñiguez, do you recognize this as
20    the same letter that Swarm sent to Intel that we
21    looked at as Exhibit 1?
22         A   It is the -- it is essentially -- very

Page 24

1     similar content, other than some names within --
2     inside the letter.
3          Q   All right.  So at this time,
4     July 16th, 2018, Swarm sent out a set of letters
5     to different companies, right, sir?
6          A   Yes.
7          Q   And each of those letters stated to
8     the addressee that Swarm would welcome the
9     opportunity to discuss exclusive or non-exclusive
10    patent licensing?
11             MR. KELLY:  Could we see the second
12    page of this letter, please?
13             BY MR. SIGLER:
14         Q   Mr. Íñiguez, I'm going to repeat my
15    question.
16             Did each of those letters sent
17    July 16, 2018, state that Swarm would welcome the
18    opportunity to discuss exclusive or non-exclusive
19    patent licensing arrangements with the addressee?
20             MR. KELLY:  Could we please see
21    page 2?
22             MR. SIGLER:  Mr. Kelly, do you have an

6 (Pages 21 to 24)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 25

1  objection?
2      MR. KELLY:  Yes.  I have an objection
3  as to the form.
4      BY MR. SIGLER:
5      Q   Okay.  Mr. Íñiguez, can you answer my
6  question?
7      A   Yes, the answer is yes.
8      Q   So Swarm sent letters to many
9  companies on July 16th, 2018, that said that Swarm
10 would welcome the opportunity to discuss exclusive
11 or non-exclusive patent licensing arrangements
12 with them, right, sir?
13     MR. KELLY:  Objection, form.
14     THE WITNESS:  Yes.
15     BY MR. SIGLER:
16     Q   Okay.  And many of those companies --
17 well, strike that.
18         Many of those letters were sent to
19 companies in California, right, sir?
20     A   Some of the companies are in
21 California.
22     Q   All right.  Did Swarm send a letter on

Page 26

1  July 16th -- well, strike that.
2      Q   Did Swarm send one of those letters on
3  July 16th, 2018, to NVIDIA?
4      A   The letter that you're showing on the
5  screen?  Yes.
6      Q   All right.  And sent to NVIDIA in
7  California, right, sir?
8      A   That is correct.
9      Q   And did Swarm also send this same
10 letter in 2018 to a company called AppsDynamic in
11 California?
12     MR. KELLY:  Objection, form.
13     THE WITNESS:  Can you show me that
14 letter?  I would like to see it.
15     BY MR. SIGLER:
16     Q   Okay.  Are you familiar with a company
17 called AppsDynamic?
18     A   I am, but I'm not -- I don't know if
19 the date that you're quoting matches what you're
20 saying, so I would have to see the letter.
21     Q   Fair enough.  Fair enough.  I'm just
22 trying to use our time efficiently, but we can do

Page 27

1  it this way too.
2      Mr. Fahnert, you can take Exhibit 2
3  off the screen, and let's pull up Tab C and mark
4  that as Exhibit 3, please.
5      (Iniguez Exhibit 3 was marked
6      for identification.)
7      BY MR. SIGLER:
8      Q   Do you see Exhibit 3 on the screen in
9  front of you, Mr. Íñiguez?
10     A   Yes, I see it.
11     Q   All right.  And so would you agree
12 with me, sir, that Swarm sent this same letter
13 that we've been discussing in Exhibits 1 and 2 to
14 AppsDynamic in San Francisco, California, on
15 July 16, 2018?
16     A   Yes.
17     Q   All right.  Mr. Fahnert, you can pull
18 that down and please put up Tab D, which we'll
19 mark as Exhibit 4.
20     (Iniguez Exhibit 4 was marked
21     for identification.)
22

Page 28

1      BY MR. SIGLER:
2      Q   Mr. Íñiguez, can you see Exhibit 4 on
3  your screen?
4      A   Yes, I can see it.
5      Q   All right, sir.  So based on
6  Exhibit 4, did Swarm send Qualcomm in San Diego,
7  California, the same letter that we've been
8  discussing in July 2018?
9      A   Yes.  Again, with some changes in
10 names, the essence of the letter is the same.
11     Q   All right.  And the essence of the
12 letter was that Swarm would like to discuss patent
13 licensing arrangements with Qualcomm, right?
14     A   Correct.
15     Q   All right.  Mr. Fahnert, you can take
16 that one down, and let's please move on to Tab E,
17 which we'll mark as Exhibit 5.
18     (Iniguez Exhibit 5 was marked
19     for identification.)
20     BY MR. SIGLER:
21     Q   Mr. Íñiguez, do you see Exhibit 5 on
22 the screen there?

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 29

1     A   I can see the letter.
2     Q   And this letter is also dated July 16,
3  2018, right?
4     A   Correct.
5     Q   And this letter is addressed to a
6  gentleman at Cavium in San Jose, California,
7  right?
8     A   That is correct.
9     Q   And like the others -- well, the --
10 strike that.
11        Like the other letters we've been
12 discussing, this one offers Cavium the opportunity
13 to discuss exclusive or non-exclusive patent
14 licensing arrangements with Swarm, right?
15    A   Correct.
16    Q   Okay, Mr. Fahnert, you can take that
17 one down, and let's please move on to Tab F, and
18 mark that as Exhibit 6, I believe.
19        (Iniguez Exhibit 6 was marked
20         for identification.)
21        BY MR. SIGLER:
22    Q   All right, Mr. Íñiguez, do you have

Page 30

1  Exhibit 6 on your screen there?
2     A   Yes, I can see it.
3     Q   And do you see that this is a letter
4  dated July 16, 2018?
5     A   Yes.
6     Q   And it's addressed to Larry Ellison,
7  the chairman of Oracle in Redwood Shores,
8  California, right?
9     A   Yes.  Could you please zoom in?  It's
10 a little hard to read.
11    Q   Sure.
12    A   Okay, thank you.
13        Yes, the answer is yes.
14    Q   All right.  And similar to the other
15 letters we've been looking at, this letter also
16 highlights a licensing opportunity for Oracle to
17 license some of its patents, right, sir?
18    A   Yes.
19    Q   All right, Mr. Fahnert, you can put --
20 excuse me, take that one down, and let's please
21 put Tab G up on the screen, and mark that as
22 Exhibit 7.

Page 31

1        (Iniguez Exhibit 7 was marked
2         for identification.)
3        BY MR. SIGLER:
4     Q   Mr. Íñiguez, do you see that Exhibit 7
5  is also dated July 16th, 2018?
6     A   That is correct.
7     Q   And it's addressed to Brian Stevens at
8  Google in Mountain View, California, right?
9     A   Yes.
10    Q   And similar to the other letters we've
11 seen so far today, this one offers Google the
12 opportunity to discuss licensing Swarm's patents,
13 right?
14    A   That is correct.
15    Q   All right.  Mr. Fahnert, you can take
16 that one down, please, and let's move on to Tab H,
17 and mark that as Exhibit 8.
18        (Iniguez Exhibit 8 was marked
19         for identification.)
20        BY MR. SIGLER:
21    Q   Mr. Íñiguez, do you see that this is a
22 letter dated July 16, 2018?

Page 32

1     A   Yes.
2     Q   All right.  And it's addressed to
3  Katherine Adams, the General Counsel of Apple, in
4  Cupertino, California, right?
5     A   That is correct.
6     Q   And this letter also, like the other
7  ones -- well, strike that.
8        This letter offers Apple the
9  opportunity to discuss licensing Swarm's patents,
10 right, sir?
11    A   Yes.
12    Q   All right.  I have some follow-up
13 questions on some of these entities.
14        Do you know if NVIDIA ever responded
15 to the letter that Swarm sent them in July 2018?
16    A   We did not get a response from NVIDIA.
17    Q   Did you get a response from
18 AppsDynamic?
19    A   No.
20    Q   Let me back up for a second.
21        Has Swarm -- other than the July 16,
22 2018, letter, has Swarm sent any other letters or

8 (Pages 29 to 32)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 33

1   emails or other communications to NVIDIA?
2       A   Again, I would have to go back to all
3   the files that we produced to see an earlier
4   letter to NVIDIA. I don't recall this on the top
5   of my head.
6       Q   Okay. After the July 16, 2018, letter
7   to Qualcomm, did Swarm have any additional
8   communications with Qualcomm?
9       A   Same answer as for NVIDIA. I -- well,
10  they did not respond, and again, when you say
11  "additional communication," I would have to go
12  back to all the documents that we produced to find
13  any other document.
14      Q   Do you recall as you sit here today
15  any further communications with Qualcomm?
16      A   No, I don't recall any communication
17  with Qualcomm.
18      Q   All right. And sitting here today, do
19  you recall any further communications with Cavium?
20      A   No, no. No communication with Cavium.
21      Q   All right. And sitting here today, do
22  you recall any further communications between

Page 34

1   Swarm and Oracle?
2       A   No communication.
3       Q   All right. And do you recall any
4   further communications between Swarm and Google?
5       A   Swarm -- what is the name of the
6   company?
7       Q   Google.
8       A   Which one?
9       Q   Google.
10      A   Oh, Google. No, no.
11          There's -- there's a person there
12  who -- I did not have any communication with
13  Google, that's it.
14      Q   You said there is a person there.
15  What did you mean by that?
16      A   Yes. On the documents that we
17  produced, there is a person that has a -- is
18  an investor. I think it's called Global -- Global
19  Ventures, and you have seen that on the documents
20  that we produced.
21          And when I -- when he send me the
22  email in order to provide the pitch deck, he sent

Page 35

1   a notice that he sent later on, a notice that he
2   sent -- he used his -- a Google.com email;
3   however, he was not contacting me in the name of
4   Google. He was contacting me in the name of
5   Global Ventures, his company.
6       Q   Okay, we'll come back to that in a
7   bit.
8           Mr. Fahnert, can you please put Tab I
9   on the screen, and we'll mark that as Exhibit 9.
10          (Iniguez Exhibit 9 was marked
11           for identification.)
12      BY MR. SIGLER:
13      Q   Mr. Íñiguez, do you have Exhibit 9 on
14  your screen?
15      A   Yes, I can see it.
16      Q   All right. And if you can blow up the
17  whole thing, Mr. Fahnert, that would be great.
18  Thank you.
19          All right. And do you see, sir, that
20  this is a September 27th, 2018, letter?
21      A   Yes, I can see it.
22      Q   And it's addressed to Mr. Kelly, your

Page 36

1   attorney, correct?
2       A   Correct.
3       Q   And it's from Denise Kerstein of
4   Apple, Inc., right, sir?
5       A   Correct.
6       Q   And let's go to the second paragraph,
7   please. It says, "We would like to thank you for
8   the offer to sell or license your patent(s) to
9   Apple as a business opportunity."
10          Do you see that, sir?
11      A   Yes, I see it.
12      Q   All right. So here Apple is thanking
13  Swarm for the offer to sell or license its patents
14  to Apple, right?
15      MR. KELLY: Objection.
16      THE WITNESS: I see it, yes.
17      BY MR. SIGLER:
18      Q   All right. And Apple goes on to
19  say that -- well, strike that.
20          This letter goes on to say "Apple is
21  not interested in purchasing or licensing them."
22          Do you see that, sir?

9 (Pages 33 to 36)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 37

1    A   Yes, I see that.
2    Q   Did Swarm respond to this letter from
3  Ms. Kerstein?
4    A   From that letter?  No.  That was the
5  end of the communication.
6    Q   Why didn't Swarm respond to Apple's
7  letter?
8        MR. KELLY:  Objection.
9        THE WITNESS:  Because the letter from
10  Swarm to Apple said that this is an opportunity, a
11  licensing opportunity, and then Apple responded
12  that it's not -- it's not interested in that
13  opportunity, and that was the end of it.
14        BY MR. SIGLER:
15    Q   Okay.  Swarm also sent a letter in
16  July 2018 to Juniper, right?
17    A   Can you show me the letter?  Because
18  I'm not sure about the date that you're referring.
19  I would like to see it.
20    Q   Okay, we'll get to that.  Let me make
21  it less specific than that.
22        Swarm has also sent some letters to

Page 38

1  Juniper, right?
2    A   At one point, I did send letters to
3  Juniper.
4    Q   And those letters similarly offered
5  the opportunity to license Swarm's patents, right?
6    A   Yes, they offered the --
7        MR. KELLY:  Objection to the form of
8  that question.
9        BY MR. SIGLER:
10    Q   And Juniper provided some responses
11  stating that they weren't interested in licensing
12  Swarm's patents, right?
13    A   Can you show me the correspondence
14  that you're referring to?
15    Q   Yeah, we'll get to that in a bit.
16  We'll get to that in a bit.
17        You don't recall that, though, that
18  Juniper told Swarm that it wasn't interested in
19  licensing Swarm's patents?
20    A   In order to provide a truthful answer,
21  it's not a simple yes or no.  I would like to see
22  the letter and elaborate on the topic.

Page 39

1    Q   Okay.  All right, sir.
2        We can take the Apple document off the
3  screen, Mr. Fahnert.  Thank you.
4        All right, so based on the exhibits
5  we've seen together so far, Mr. Íñiguez, you'd
6  agree that Swarm sent letters in 2018 to Apple,
7  NVIDIA, Google, Oracle, Cavium, Qualcomm, and
8  AppsDynamic and Intel offering them an opportunity
9  to license Swarm's patents, right, sir?
10        MR. KELLY:  Object.  Object to the
11  form of the question.
12        THE WITNESS:  Yes.
13        BY MR. SIGLER:
14    Q   All right.  And why did Swarm send
15  those letters to these particular companies in
16  2018?
17    A   Because, as I mention in that letter,
18  it was a good match between what Swarm had to
19  offer and what those companies have to offer, and
20  for that reason, we presented an opportunity.
21    Q   Who made the decision about which
22  companies to send that letter to?

Page 40

1        MR. KELLY:  Objection.
2        THE WITNESS:  It was a --
3        MR. KELLY:  I'm going to instruct the
4  witness not to answer to the extent that would
5  invade the attorney-client privilege.
6        MR. SIGLER:  Yeah, my question is just
7  who.  I'm not asking for the content of the
8  discussion.  So who made that decision?
9        THE WITNESS:  I did.
10        BY MR. SIGLER:
11    Q   Okay.  And so, for example, why did
12  you decide to send the letter to NVIDIA that we
13  saw?
14        MR. KELLY:  Object to that question to
15  the extent it calls for attorney-client privileged
16  information.
17        THE WITNESS:  Because Swarm provides a
18  computer architecture that is a good match for any
19  of those companies.
20        MR. SIGLER:  Okay.  Mr. Fahnert, could
21  we please put Tab J on the screen, and let's mark
22  that as Exhibit 10.

10  (Pages 37 to 40)

Page 41

1          (Iniguez Exhibit 10 was marked
2          for identification.)
3          THE VIDEOGRAPHER: My apologies. It
4    appears I lost internet and got booted out of
5    Zoom.
6          MR. SIGLER: Okay, no worries. We'll
7    wait while you straighten it out.
8          THE VIDEOGRAPHER: Okay, I should be
9    all set, and so stand by and we can be recording
10   again. Okay, back on record. The time is 9:41.
11         BY MR. SIGLER:
12     Q   All right. And Mr. Fahnert, we wanted
13   to put Tab J on the screen, please, and we'll
14   identify that as Exhibit 10. Thank you, sir. And
15   if you could, Mr. Fahnert, if you could just blow
16   up the top half of that document, please?
17         All right, Mr. Íñiguez, can you see
18   Exhibit 10 on your screen?
19     A   Yes, I see it.
20     Q   And do you see that it's dated
21   December 5, 2014, sir?
22     A   Yes.

Page 42

1      Q   And it's addressed to your attorney,
2    Mr. Kelly, right, sir?
3      A   Yes.
4      Q   And actually, if you could back out,
5    Mr. Fahnert, and show us the bottom, please.
6    Thank you, sir.
7          And Mr. Íñiguez, this letter is from
8    Jeff Lasker of Apple Inc., right, sir?
9      A   Yes.
10     Q   Mr. Fahnert, if we could go to that
11   top paragraph again, please, sir.
12         And Mr. Íñiguez, the letter starts --
13   the letter from Mr. Lasker starts by saying, "I've
14   been asked to respond to your letter to Apple."
15         Do you see that, sir?
16     A   Correct.
17     Q   And did Swarm send a letter to Apple
18   in 2014?
19     A   Yes.
20     Q   And do you understand, sir, that we've
21   asked Swarm to provide that letter, but we've been
22   told Swarm doesn't have it?

Page 43

1      A   We have the content of the letter, and
2    we have the email that shows when I approved that
3    content of that letter.
4      Q   Okay. Where would that letter itself
5    be located?
6      A   The letter that Apple received?  I
7    don't know if Apple has kept it; perhaps they
8    have.
9      Q   Where did Swarm search for that
10   letter?
11     A   I do not have -- if you follow the
12   email thread, you can see that I was given to
13   approve the content of the letter, and I approved
14   it, and then the letter was sent by the firm.
15         I do not have a copy of that letter.
16     Q   And I don't have a copy of the email
17   you're talking about, as far as I know, so,
18   Counsel, we're going to ask for a copy of that
19   email that apparently shows that this letter --
20   excuse me, that a letter was sent to Apple by
21   Swarm in 2014.
22         MR. KELLY: Mr. Sigler, I'm fairly

Page 44

1    certain that that was included in the documents we
2    produced.
3          And we can do this on or off the
4    record, but just to clarify, that was seven years
5    ago, and that was two law firms ago for me.  We
6    don't have that letter.  I assumed that
7    Mr. Iniguez did.  He doesn't have it either.
8          So what we did, in an effort to
9    respond to your request regarding contacts with
10   California, we provided you a list of the names of
11   the companies that each of the same template
12   letters went to, and we provided you that template
13   letter.
14         I don't have copies.  If you need
15   them, you can subpoena Ingrassia, or I've offered
16   in the past to contact them informally and see if
17   we can get hard copies.
18         They're a paperless law firm.  They're
19   a prosecution firm primarily, and they don't
20   maintain paper copies, to my recollection.  I
21   haven't been there in seven years, though.
22         But you do have a list of all the

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 45

1    contacts, and you have the template letter.
2         BY MR. SIGLER:
3         Q    And just for clarity, did anyone on
4    behalf of Swarm ask that firm for copies of these
5    letters?
6         A    I did not.
7              MR. SIGLER:  Mr. Kelly, did outside
8    counsel ask that firm, on behalf of Swarm, for
9    copies of those letters?
10             MR. KELLY:  That would invade the
11   attorney-client privilege.
12             Mr. Sigler, I will represent to you
13   that we made the good-faith decision that we were
14   fully responsive to your request for contacts by
15   giving you the names of every company that letter
16   went to, and giving you the letter.
17             If we had the letter as well, we'd
18   give it to you, but we don't.
19             MR. SIGLER:  All right, and we'll get
20   to that, but of course, as experienced counsel,
21   you understand that those are Mr. Íñiguez's and
22   Swarm's files.  They have every right to those

Page 46

1    files from the law firm, and should --
2              MR. KELLY:  I don't know that --
3              MR. SIGLER:  -- and should have
4    asked -- and should have asked the firm for those.
5    Those are within your possession, custody and
6    control.  So we're going to note --
7              MR. KELLY:  They are not --
8              MR. SIGLER:  -- on the record that --
9              MR. KELLY:  Mr. Sigler, they are not
10   in our custody and control.  They are not.
11             MR. SIGLER:  Well, Swarm, as the
12   client, has a right to those materials under the
13   law, and they should have been produced.
14             MR. KELLY:  Mr. Sigler, you're
15   explaining -- trying to instruct me as to how I
16   need to handle my client.  We've handled it
17   entirely properly, I assure you.
18             If we had the letters, we'd give them
19   to you.  We don't, so we gave you the names of the
20   recipients and the template form of the letter,
21   which we represent to you is identical in every
22   case.

Page 47

1         That was seven years ago, and they
2    have a document retention policy that doesn't
3    retain documents.
4         Do you want me to -- if Judge Donato
5    requires me to call them, I certainly will.  I
6    don't know that that's going to result in getting
7    you the letters, but I'll do whatever the Court
8    instructs.
9              MR. SIGLER:  Well, let's see what the
10   testimony is, if it's consistent with your
11   representations, Mr. Kelly.  Hopefully, it will
12   be.
13             Mr. Íñiguez -- and actually,
14   Mr. Fahnert, you can take this document off the
15   screen, please.
16             All right, let's put -- apologies.
17   Let's put Tab XX on the screen, please, and mark
18   that -- well, actually, Mr. Fahnert, strike that.
19   Let's put Tab YY on the screen, please, and mark
20   that as Exhibit 11.
21             (Iniguez Exhibit 11 was marked
22             for identification.)

Page 48

1         BY MR. SIGLER:
2         Q    All right, Mr. Íñiguez, do you have
3    Exhibit 11 on the screen in front of you, sir?
4         A    Yeah.  Can you please zoom in?
5         Q    Yeah.  Mr. Fahnert, can you zoom in,
6    please?  Thank you.
7              Do you recognize this document,
8    Mr. Íñiguez?
9         A    Yes, I do.
10        Q    And is this the template of the letter
11   that Swarm sent to Apple in 2014?
12        A    Yes, that's correct.
13        Q    And did you review this template at
14   the time in 2014?
15        A    Did I -- can you repeat that question?
16        Q    Well, let me back up.
17             Who wrote this letter in 2014?
18             MR. KELLY:  Object to form.
19             THE WITNESS:  Assuming -- can you
20   repeat the question?
21             BY MR. SIGLER:
22        Q    Sure.  Who wrote this letter in 2014?

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 49

1          MR. KELLY:  Same objection.
2          THE WITNESS:  This letter was written
3    in conjunction with my patent attorney.
4          BY MR. SIGLER:
5      Q   And your patent attorney was
6    Mr. Kelly, right?
7      A   Correct.
8      Q   So you helped write this letter; is
9    that right?
10          MR. KELLY:  Objection.
11          THE WITNESS:  Mr. Sigler, I am not an
12    attorney.  I basically conveyed the information
13    that I want to present, and then my attorney takes
14    care of the mechanics of writing the letter.
15          BY MR. SIGLER:
16      Q   Okay.  So did Mr. Kelly write this
17    letter?
18          MR. KELLY:  Objection.
19          THE WITNESS:  Again, as I mentioned
20    before, I provided -- provided the idea that I
21    wanted to convey, and my attorney, Mr. Kelly,
22    wrote -- put this in writing.

Page 50

1          BY MR. SIGLER:
2      Q   Okay, understood.  That's all I was
3    trying to determine.  Okay.
4          And this -- well, strike that.
5          If you actually go down, Mr. Fahnert,
6    please, to the signature.  The letter states that
7    it's from Mr. Kelly, right, sir?
8      A   Correct.
9      Q   All right.  And we actually got two
10    templates from your attorney, so if we could take
11    this one off the screen, and we may come back to
12    it, Mr. Fahnert, but if you take that off and put
13    up YY, please -- or excuse me, yes, Tab -- was
14    that Tab YY, Mr. Fahnert?  I'm sorry.
15          THE VIDEOGRAPHER:  That was Tab YY,
16    yes.
17          MR. SIGLER:  Let's go Tab XX, please.
18          MR. KELLY:  Is this 12?
19          MR. SIGLER:  I was going to just ask.
20    Am I correct that this is Exhibit 12?
21          THE VIDEOGRAPHER:  This is 12.
22          MR. SIGLER:  Okay, thank you, sir.

Page 51

1          (Iniguez Exhibit 12 was marked
2           for identification.)
3          BY MR. SIGLER:
4      Q   Okay, so Mr. Íñiguez, do you see
5    Exhibit 12 in front of you there?
6      A   I can see it.
7      Q   Okay.  Do you recognize this as a
8    template of the letter that was sent to Apple and
9    others in 2014?
10      A   Is that the same letter you showed me
11    a minute before, or is that a different letter?
12      Q   Well, I got two templates from your
13    counsel, and so I'm trying to determine what might
14    be different between these two letters, but I
15    can't really answer that on my own.
16          So do you recall there being two
17    different templates for the letter that went out
18    in 2014?
19      A   Can you show me the differences
20    between those two letters?
21      Q   Sure.  Let's stick with this one for a
22    moment.  If we could go to the paragraph that

Page 52

1    starts with "Mr. Íñiguez," please.
2      A   Yes, I can see that.
3      Q   Okay, you can see that, all right.
4          And then, Mr. Fahnert, would it be
5    possible to put up that same paragraph from the
6    other letter, please, Exhibit 11?
7      A   Yes, it's possible.
8          (Exhibits 11 and 12 displayed
9           on Zoom screen.)
10          BY MR. SIGLER:
11      Q   All right, do you see those there,
12    Mr. Íñiguez?
13      A   Yes, I see.
14      Q   All right.  And on the first letter
15    that we see at the top of the screen there, it
16    appears to contain less information than the
17    second -- that the second letter.
18          Do you see in the second letter it
19    says -- it mentions that you held key positions at
20    Motorola and Freescale, sir?
21      A   Yes, I can see that.
22      Q   And do you see that in the other

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 53

1    letter that's shown above that?
2        A    It's not there.
3        Q    And in the last sentence of this
4    paragraph in the bottom letter, it says that
5    you're a leading contributor, and references the
6    IEEE, refers to DesignCon and DVCon as the
7    dominant technical conferences.
8        Do you see that, sir?
9        A    Yes.  For multiple years, I was a
10   member of the Technical Committee for those two
11   conferences, DesignCon and DVCon.  And what I did
12   was a -- I helped with the review -- the peer
13   review of papers submitted to conferences.
14       Q    And we can -- Mr. Fahnert, if you
15   could back out of these paragraphs, and let's go
16   to -- let's focus on -- excuse me.  Let's focus on
17   Exhibit 11, please, and let's just go to the whole
18   body of it, please.
19       Do you see the start of the letter,
20   Mr. Íñiguez, says "We represent
21   Swarm Technology™, LLC and its principal, Alfonso
22   Íñiguez, in connection with intellectual property

Page 54

1    matters"?
2        A    Yes.
3        Q    And in the second paragraph it
4    describes some of Swarm's patent applications,
5    right, sir?
6        A    That is correct.
7        Q    All right.  And one of those
8    applications is the -- ends in the numbers 332,
9    right, sir?
10       A    Yes.
11       Q    And do you recognize that as the
12   application that became the '004 patent, sir?
13       A    I would have to go back to the
14   U.S. Patent Office files to verify that
15   information.
16       Q    Okay.  Let's go to the second
17   paragraph from the bottom of the letter, and the
18   last sentence of it says, "We believe Swarm's
19   technology will play a pivotal role in the
20   emerging IoT paradigm, and that Swarm's patent
21   portfolio can provide Swarm's joint development
22   partner with an unprecedented competitive and

Page 55

1    legal advantage."
2        Do you see that, sir?
3        A    Yes, I see it.
4        Q    And so you'd agree that Swarm's
5    portfolio would need to be licensed to the partner
6    for them to achieve these advantages, right?
7        MR. KELLY:  Objection, form.
8        THE WITNESS:  I mentioned before, we
9    presented an opportunity to license those patents.
10       BY MR. SIGLER:
11       Q    Okay.  And this letter in 2014 was
12   presenting that opportunity to license Swarm's
13   patents, right?
14       MR. KELLY:  Objection to form.
15       THE WITNESS:  Mr. Sigler, I am not an
16   attorney.  I cannot make a legal conclusion by
17   looking into that letter.
18       BY MR. SIGLER:
19       Q    Well, was this letter offering an
20   opportunity to license Swarm's patent portfolio,
21   sir?
22       MR. KELLY:  I'll instruct the witness

Page 56

1    that if you need a moment to review the text of
2    the letter, you're welcome to do that.
3        THE WITNESS:  Okay, I need a moment to
4    review.
5        MR. SIGLER:  Sure.
6        THE WITNESS:  The letter is saying
7    that Swarm is posing a joint development, to be a
8    joint development partner, and again --
9        BY MR. SIGLER:
10       Q    Go ahead, sir.  I'm sorry.
11       A    It's an opportunity to co-develop.
12       Q    And the part that I was just reading
13   that refers to providing the partner with an
14   unprecedented competitive and legal advantage,
15   what did Swarm mean by "legal advantage"?
16       MR. KELLY:  You can read the entire
17   contents of the letter, if you'd like to do that,
18   before you answer questions regarding the content
19   of that letter.
20       THE WITNESS:  Mm-hmm.
21       MR. SIGLER:  Mr. Kelly, I'm going to
22   caution you again to stop with the speaking

14  (Pages 53 to 56)

Page 57

1    objections and commentary.  If you have an
2    objection, make it.
3            If Mr. Íñiguez would like to read part
4    of the letter to refresh his memory or help him
5    answer, he can identify that for me.
6            Again, what you're doing is directly
7    contrary to Judge Donato's order on discovery in
8    civil cases.
9            So Mr. Íñiguez, I'm going to ask my
10   question again.
11           What is the legal advantage to the
12   joint development partner that Swarm is offering
13   here?
14           MR. KELLY:  Objection to form.
15           THE WITNESS:  Again, Mr. Sigler, I
16   cannot speculate.  I cannot make a legal judgment
17   because I am not an attorney.
18           BY MR. SIGLER:
19       Q   Okay.  You'd agree, however, that this
20   letter that was sent in 2014 references Swarm's
21   patent applications, right, sir?
22       A   Yes.

Page 58

1        Q   All right.  And the final paragraph of
2    the letter says, "We would be happy to provide
3    collateral materials, including didactic video
4    tools, to assist your investigation and analysis,
5    at your request."
6            Do you see that, sir?
7        A   That is correct.
8        Q   What is this letter referring to when
9    it says "collateral materials"?
10           MR. KELLY:  Objection, form.
11           THE WITNESS:  Yes, I provided -- well,
12   I shouldn't say "provided."  I designed or
13   developed -- that's the word.  I developed a set
14   of didactic videos that explain this new paradigm
15   in this computer architecture.
16           They're required, because what I did,
17   I invented a new paradigm in computing, and I
18   needed to explain to other companies how this
19   worked.  For this purpose, I made those didactic
20   videos.
21           BY MR. SIGLER:
22       Q   Okay.  Were there other collateral

Page 59

1    materials that this letter is referring to besides
2    those videos?
3        A   The collateral material is basically
4    the explanation of this new architecture, and
5    this --
6        Q   And did those collateral -- go ahead,
7    sir.
8        A   Yeah.  And this is -- this is now
9    provided on my website.  I have a tab on my
10   website that says something along the lines of
11   academy, and that provides the videos that explain
12   how this architecture works.
13       Q   Okay.  Mr. Fahnert, you can take this
14   document off the screen, please, and let's put up
15   Tab ZZ, please, as Exhibit 13.
16           (Iniguez Exhibit 13 was marked
17           for identification.)
18           BY MR. SIGLER:
19       Q   All right, Mr. Íñiguez, do you see
20   that this is a letter dated May 12, 2001 [sic]?
21       A   Yes, I see it.
22           Could you please zoom in?

Page 60

1        Q   Sure.  Mr. Fahnert, can you do that,
2    please?  All right.
3            And it's addressed to me and some of
4    my colleagues, right, sir?
5        A   Yes, I can see that.
6        Q   All right.  And if we could go to --
7    Mr. Fahnert, if you could take us through the last
8    page, please.
9            All right, Mr. Íñiguez, do you see
10   that this letter is signed by a Mr. Elvis
11   Sulejmani?  Do you see that on the screen, sir?
12       A   Yes, I can see it.
13       Q   And he's a paralegal at Beus Gilbert,
14   Swarm's counsel in this matter, right, sir?
15       A   Correct.
16       Q   All right.  Mr. Fahnert, can you take
17   us to page 2 of the letter, please?
18           Do you see there's a list here on
19   page 2 at the bottom, sir?
20       A   Yes, I see it.
21       Q   All right.  And that list actually
22   continues on over into page 3.  And Mr. Fahnert,

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 61

1    could you also put that on the screen?
2          All right, do you see that list of 23
3    companies on the screen, Mr. Íñiguez?
4          A   Yes, I see it.
5          Q   And are these the companies that Swarm
6    sent that template -- strike that.
7          Are these the companies that Swarm
8    sent a letter to in 2014 that matches the
9    templates we just saw?
10         A   That is -- that is the proposed list,
11   but I must -- I must say that I don't believe that
12   we sent letters to Free [sic]. So that was the
13   initial proposal, and at the end, I don't know --
14   I don't recall the exact companies that we
15   selected, but sure, I know that we did not send to
16   Freescale.
17         Q   Okay. Other than Freescale, did Swarm
18   send letters in 2014 using the template we just
19   saw? Strike that.
20         Aside from Freescale, did Swarm send a
21   letter to each of the companies on this list
22   matching the template we just saw?

Page 62

1          A   I would say to some. Again, National
2    Instruments, I don't believe we sent one to
3    National Instruments.
4          Q   Did Swarm send a letter using the
5    template we just saw to Google in 2014?
6          A   Yes.
7          Q   Did Swarm send a similar letter to
8    Nest in 2014?
9          A   Yes.
10         Q   Did Swarm send a similar letter to
11   Apple in 2014?
12         A   Yes.
13         Q   Did Swarm send a letter matching the
14   template to Cisco in 2014?
15         A   Yes.
16         Q   All right. Did Swarm also send
17   letters matching the template we just saw in 2014
18   to Intel, Oracle, Qualcomm, HP, AMD, Atmel, and
19   NVIDIA?
20         A   From the companies that you mentioned,
21   I am not sure about AMD. The rest, the answer is
22   yes.

Page 63

1          Q   Okay. And are you aware, sir, that
2    those companies I just mentioned are based in
3    California?
4          A   Yes.
5          Q   All right. So Swarm sent letters to
6    each of those companies in 2014 in California,
7    right, sir?
8          MR. KELLY: Objection to form.
9          THE WITNESS: We were not targeting
10   the State of California. Those companies are
11   located throughout the world, and some happen to
12   be located in California, but that was not our
13   target.
14         BY MR. SIGLER:
15         Q   Yeah, that wasn't my question, sir.
16         My question was did Swarm send letters
17   to those companies that I referenced -- Google,
18   Nest, Apple, Cisco, Intel, Oracle, QualComm, HP,
19   Atmel, and NVIDIA -- in 2014 in California?
20         MR. KELLY: Objection to form.
21         THE WITNESS: Yes.
22

Page 64

1          BY MR. SIGLER:
2          Q   Thank you, sir.
3          Has Swarm ever told any company that
4    it requires a license to Swarm's patents?
5          A   Okay, can you please repeat that
6    question? Because the AC just turned on here, and
7    I have a problem hearing.
8          Q   No problem. No problem.
9          Had Swarm ever told any company that
10   it requires a license to Swarm's patents?
11         A   We never -- we never asked any
12   company. We never made any demands asking that
13   they require a license.
14         Q   Okay, but has Swarm ever said to a
15   company that it requires a license to Swarm's
16   patents?
17         A   We did -- we offer the opportunity,
18   but we did not make any demands.
19         Q   Okay. So Swarm never told any
20   company that it required a license to Swarm's
21   patents?
22         MR. KELLY: Object to the form.

16 (Pages 61 to 64)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 65

1  Object to the form.
2          THE WITNESS:  Again, when we -- when
3  we sent those letters, we said that this is not an
4  accusation of infringement.  We just invited the
5  opportunity to see this opportunity to license.
6  That was it.
7          BY MR. SIGLER:
8      Q   Well, if a company required a license
9  to Swarm's patents, that would mean that that
10  company was infringing Swarm's patents, right,
11  sir?
12          MR. KELLY:  Objection, form.
13          THE WITNESS:  Are you asking me if I said
14  to a company that they are required?  Can you --
15          BY MR. SIGLER:
16      Q   Well, it sounds like from your
17  testimony that Swarm never said to a company that
18  you require a license to my patents, right?
19      A   To the best that I know, based on the
20  documentation that I have provided and seen and
21  have, I never demanded the requirement of a
22  license.

Page 66

1      Q   Because if Swarm -- oh, I'm sorry,
2  sir, go ahead.
3      A   Again, we just -- this is very clear
4  in every letter.  We presented an opportunity for
5  the license, but an opportunity is not a
6  requirement.
7      Q   Right.  And so if Swarm said to a
8  company we think you're required to take a license
9  to our patents, that would mean that Swarm thought
10  that company was infringing Swarm's patents,
11  right?
12          MR. KELLY:  Objection to the form of
13  the question.
14          BY MR. SIGLER:
15      Q   I can ask the question again.
16          Mr. Íñiguez, you'd agree with me that
17  if Swarm told a company that it requires a license
18  to Swarm's patents, that would mean that Swarm
19  believed that company was infringing Swarm's
20  patents, right?
21          MR. KELLY:  Object to the form of the
22  question, and also instruct the witness not to

Page 67

1  answer that question to the extent it would
2  require him to divulge attorney-client privileged
3  information.
4          THE WITNESS:  Again, I am not an
5  attorney.  You're asking me to make a legal
6  judgment, and I cannot do the -- I am not -- I'm
7  not an attorney.
8          BY MR. SIGLER:
9      Q   Okay, so -- okay, let me move on.
10          Swarm also sent letters to Juniper,
11  Cisco, Arista, HP, and Apstra about Swarm's
12  patents, right, sir?
13      A   Yes, but can you repeat that list --
14      Q   Sure.
15      A   -- of names?
16      Q   Well, let's go one by one.
17          Swarm also sent letters to Juniper
18  about Swarm's patents, right?
19          MR. KELLY:  Object to the form.
20          THE WITNESS:  Right.
21          BY MR. SIGLER:
22      Q   And Swarm also sent letters to Cisco

Page 68

1  about licensing Swarm's patents, right?
2      A   Correct.
3      Q   And Swarm also sent letters to Arista
4  about licensing Swarm's patents, right?
5          MR. KELLY:  Object to the form.
6          THE WITNESS:  Correct.
7          BY MR. SIGLER:
8      Q   And Swarm also sent letters to HPE
9  offering the opportunity to license Swarm's
10  patents, right?
11          MR. KELLY:  Same objection.
12          THE WITNESS:  Correct.
13          BY MR. SIGLER:
14      Q   And Swarm also sent letters to Apstra
15  offering them the opportunity to license Swarm's
16  patents, right?
17      A   Correct.
18      Q   And those companies are all based in
19  California, right, sir?
20          MR. KELLY:  Objection, form.
21          THE WITNESS:  Yes, they are.
22

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 69

1        BY MR. SIGLER:
2        Q   And beyond this group of companies we
3    talked about so far today, has Swarm contacted any
4    other companies in California about licensing
5    Swarm's patents?
6        A   Those are only -- the only companies
7    in California.
8        Q   Okay.  Would you like to take a break,
9    Mr. Íñiguez?  I can keep going, or we can take a
10   break.  It's up to you.  I'm at a stopping point.
11       A   Yes, let's take a break.
12          MR. SIGLER:  Okay.
13          THE VIDEOGRAPHER:  Okay.
14          MR. KELLY:  Off the record.
15          THE VIDEOGRAPHER:  We are going off
16   the record.  The time is 10:15.
17          (A break was taken.)
18          THE VIDEOGRAPHER:  We are back on the
19   record.  The time is 10:36.
20          BY MR. SIGLER:
21       Q   Welcome back, Mr. Íñiguez.
22       A   Thank you.

Page 70

1        Q   Did you speak to your lawyers during
2    the break?
3        A   We have a -- we had a conversation.
4        Q   Did you talk at all about the
5    substance of your testimony here today?
6        A   We talk about speaking -- telling the
7    truth, which I have been doing, by the way.
8        Q   Did you talk about anything else
9    regarding your testimony today?
10       A   Anything about -- can you be more
11   specific about what you're asking?
12       Q   Did you talk about any of your -- the
13   answers that you've given today to my questions?
14       A   As far as -- as far as giving moral
15   support, yes.
16       Q   All right, understood.
17          Mr. Fahnert, can you please mark --
18   pull up the next exhibit?  It will be Tab L.
19          THE REPORTER:  Are we marking that as
20   Exhibit 14?
21          MR. SIGLER:  Yes, please.  I was going
22   to ask.

Page 71

1          (Iniguez Exhibit 14 was marked
2           for identification.)
3          BY MR. SIGLER:
4        Q   Mr. Íñiguez, do you have Exhibit 14
5    on the screen here, sir?
6        A   Can you make that bigger?
7          Okay, I can see it now, yes.
8        Q   Okay.  Do you see that this is a
9    Notice of Deposition to Swarm Technology, sir?
10       A   Yes, I can see it.
11       Q   And have you seen this deposition
12   notice to Swarm before?
13       A   Yes, I have.
14       Q   And did you review it in preparing for
15   your deposition today?
16       A   Yes, I did.
17       Q   Okay.  And you're appearing here today
18   in response to this deposition notice on behalf of
19   Swarm, right, sir?
20       A   Yes.
21       Q   All right.  And you're prepared to
22   testify on the topics in this notice here today on

Page 72

1    behalf of Swarm?
2        A   Yes, I am prepared.
3        Q   Okay.  All right, you can take that
4    down, Mr. Fahnert.
5          Mr. Íñiguez, have you ever had your
6    deposition taken before?
7        A   A deposition before?
8        Q   Yes.
9        A   No, my first time.
10       Q   Okay.  Have you ever testified in
11   court before?
12       A   Well, one time my -- my sister went
13   through a divorce, and my former brother-in-law,
14   for some reason, asked me to go in as a witness,
15   and I went there as a witness.  And he represented
16   himself; that was an interesting scenario.
17          That was my only time in court.
18       Q   Okay.  Did you do anything to prepare
19   for the deposition today?
20       A   Well, I prepared by providing all the
21   documentation that I was asked to produce, and I
22   read the document so that I'm aware of the topics

18  (Pages 69 to 72)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 73

1    that we're going to discuss today.
2        Q    And did you meet with your attorneys
3    in preparing for the deposition today?
4        A    I have met with my attorneys multiple
5    times throughout this lawsuit.
6        Q    Did you meet with them specifically to
7    prepare for this deposition?
8            MR. KELLY:  I'll instruct the witness
9    not to answer to the extent that doing so would
10   require invading the attorney-client privilege.
11           THE WITNESS:  Since I was not aware
12   what a deposition, the only time I came across
13   that concept was when I saw it possibly on a
14   movie, and I needed to know what this is all
15   about, and they instructed -- they told me how
16   this works.  That was my first one.
17           BY MR. SIGLER:
18       Q    And it's just -- I'm just looking for
19   a yes or no.  I'm not asking about what you talked
20   about, but did you meet with your attorneys to
21   prepare for the deposition today?
22       A    Yes.

Page 74

1        Q    All right.  When did you meet with
2    them?
3        A    I met with them -- you're asking for a
4    specific date --
5        Q    Yes.
6        A    -- or just in general?
7            I met them more than once this week.
8        Q    Okay.  What days this week?
9            MR. KELLY:  Objection, form.
10           BY MR. SIGLER:
11       Q    What days did you meet with them this
12   week, sir?
13       A    I'm thinking.  I'm thinking.
14       Q    Okay.
15       A    If today is Friday, then it would have
16   been Wednesday, and then Thursday.
17       Q    How long did you meet with them on
18   Monday?
19       A    How much time we --
20           MR. KELLY:  Object to the form of that
21   question.
22           THE WITNESS:  Are you asking for how

Page 75

1    many -- how much time precisely, or --
2            BY MR. SIGLER:
3        Q    Ballpark.  How many -- how long did
4    you meet with your attorneys on Wednesday?
5        A    Well, I have to say that we discussed
6    multiple topics related to the --
7            MR. KELLY:  I'll instruct the witness
8    not to answer to the extent doing so will require
9    you to disclose the substance of attorney-client
10   privileged information.
11           THE WITNESS:  Yes, that was
12   attorney-client privileged information.
13           BY MR. SIGLER:
14       Q    All right.  How long did you meet with
15   them to prepare for this deposition specifically?
16           MR. KELLY:  Objection to form.
17           THE WITNESS:  Ballpark number, I would
18   say a couple of hours each day.
19           BY MR. SIGLER:
20       Q    Okay.  And -- go ahead, sir,
21   I'm sorry.  Were you going to add to that?
22       A    Yeah.  And we -- we went through the

Page 76

1    documentation that we produced, and I basically --
2    throughout this preparation, I was providing them
3    with all the documentation that you have
4    requested.
5        Q    Did you go through all the documents
6    that Swarm produced with your attorneys?
7            MR. KELLY:  Objection to form.
8            THE WITNESS:  Those are 1,300 pages
9    that we produced, and I am familiarized with all
10   the documentation, but I cannot quote you on every
11   single line that each document contains.
12           BY MR. SIGLER:
13       Q    Sure, and I understand that, sir.
14           Aside from your attorneys, did you
15   speak with anyone else to prepare for the
16   deposition today?
17       A    No.
18       Q    Do you know a gentleman named
19   John Fisher?
20       A    Yes.
21       Q    Who's Mr. Fisher?
22       A    Mr. Fisher is a patent

19 (Pages 73 to 76)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 77

1    representative.  In the letters, his name is --
2    basically he's representing Swarm in order to seek
3    this opportunity to consider licensing with those
4    companies in California.  So that was his role.
5        Q    Did you speak with Mr. Fisher in
6    preparing for the deposition today?
7        A    No, I did not.
8        Q    Okay.  Where is Swarm located, sir?
9        A    It is located in Mesa, Arizona.
10       Q    When was Swarm founded?
11       A    The precise date I don't have on the
12   top of my head, but when they filed for the LLC,
13   between 2013 or 2014.  I would have to go back and
14   check the actual date.
15       Q    But you think it's in 2013 or 2014,
16   sir?
17       A    Around those years, yes.
18       Q    Okay.  Does Swarm have any employees?
19       A    No.
20       Q    Does Swarm have officers?
21       A    Basically the company is owned by my
22   wife and myself, that's it.

Page 78

1        Q    Okay.  Is Swarm's only business --
2    strike that.
3            Is Swarm's only current business
4    licensing its patents?
5            MR. KELLY:  Objection, form.
6            THE WITNESS:  No, and this is clearly
7    stated and explained in the business plan that you
8    have.  The business plan goes extensively over the
9    development of robotics and how to apply Swarm
10   intelligence into robots, including drones and
11   rovers, and that is a big portion of the business.
12           BY MR. SIGLER:
13       Q    Okay.  Has Swarm ever sold any
14   products?
15       A    No.
16       Q    Has Swarm ever made any revenue?
17       A    As included -- as is stated in the
18   business plan, Swarm is a pre-revenue company.
19       Q    So Swarm hasn't realized any revenue
20   to this point?
21       A    Correct, there's no revenue.
22       Q    Okay.  Does Swarm have plans to sell

Page 79

1    product in the future?
2            MR. KELLY:  Object to the form.
3            THE WITNESS:  That is included in the
4    pitch deck, yes.  The idea is to fabricate Swarm
5    intelligent works, fabricate those in Arizona, and
6    then sell them from Arizona.
7            BY MR. SIGLER:
8        Q    And where would you sell those
9    products?  Well, strike that, bad question.
10           You said you'd be selling those from
11   Arizona, right, sir?
12       A    That is -- that is the -- that is the
13   plan.  This is the reason why, again, the business
14   plan is saying that we're asking for funding, so
15   that we can fabricate and produce those products.
16       Q    Okay.  Will Swarm be offering to sell
17   those products to anyone in California?
18           MR. KELLY:  Object to form.
19           THE WITNESS:  Swarm will be offering
20   those products to any person in the world, not
21   specific to California.
22

Page 80

1            BY MR. SIGLER:
2        Q    Okay.  So anyone anywhere in the
3    United States, right?
4            MR. KELLY:  Object to form.
5            THE WITNESS:  And not only
6    United States.  They could be located anywhere --
7    anywhere in the world.
8            BY MR. SIGLER:
9        Q    Okay.  And that would include
10   California, right, sir?
11       A    Yes.
12       Q    All right.  Has Swarm ever licensed
13   any of its patents to anyone?
14       A    No.  Swarm does not -- does not have
15   any licenses with anyone, inside California or
16   outside California, and that includes it has no
17   exclusive licenses, and no non-exclusive licenses.
18       Q    Have you ever traveled to California?
19       A    Yes, I have.
20       Q    Approximately how many times?
21       A    How often?
22       Q    I'm sorry, sir.  I said about how many

20  (Pages 77 to 80)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 81

1    times have you traveled to California?
2          MR. KELLY:  Object to the form.
3          THE WITNESS:  Well, I have taken my
4    kids to Disneyland a couple of times, SeaWorld.
5          In the early 2000s, my wife and I made
6    multiple trips to Los Angeles.  We were working as
7    the executive couple for the American counter, and
8    we went there once a month.
9          And then later on, I traveled to trade
10   shows.  To be more specific, three trade shows.
11         BY MR. SIGLER:
12         Q    Okay.  Have you ever traveled to
13   California on behalf of Swarm?
14         A    Only when I went to those three trade
15   shows.
16         Q    Okay.  And those three trade shows
17   were all in Santa Clara, California, right, sir?
18         A    Correct.
19         Q    Has Swarm ever paid anyone to help
20   with licensing its patents?
21         A    No.  No, we never paid anybody to --
22   are you asking about hiring somebody as an

Page 82

1    employee?  Can you repeat that question?  I want
2    to make sure that I got it correct.
3          Q    Has Swarm ever paid anyone to help its
4    efforts to license its patents?
5          MR. KELLY:  Object to the form.
6          THE WITNESS:  No, we have not.  We
7    have never paid anybody.
8          BY MR. SIGLER:
9          Q    Did Swarm pay Mr. Fisher for his
10   services in helping to license Swarm's patents?
11         MR. KELLY:  Same objection.
12         THE WITNESS:  No, it did not.
13         BY MR. SIGLER:
14         Q    Okay.  But Mr. Fisher did, at least
15   for a time, represent Swarm; is that correct, sir?
16         A    Swarm -- Mr. Fisher dedicated time for
17   this, but I did not -- or Swarm did not pay
18   anything to Mr. Fisher.
19         Q    How was he compensated for his time
20   during that work for Swarm?
21         MR. SIGLER:  Object to the form.
22         THE WITNESS:  That is attorney-client

Page 83

1    privileged information.
2          BY MR. SIGLER:
3          Q    Well, did Mr. Fisher have a -- well,
4    strike that.
5          If Swarm obtained a patent license --
6    or excuse me.
7          If Swarm licensed its patents to
8    another company through Mr. Fisher's efforts and
9    Swarm was compensated, was Mr. Fisher entitled to
10   a part of that compensation?
11         MR. KELLY:  Object to the form, and
12   object to the extent it requires the witness to
13   divulge the substance of attorney-client
14   privileged communications.
15         THE WITNESS:  That is -- again, Swarm
16   has never licensed any patents, and that includes
17   the effort attempted by Mr. Fisher.
18         BY MR. SIGLER:
19         Q    What did -- well, strike that.
20         I mean, I disagree that the nature of
21   this relationship is in any way protected by the
22   attorney-client privilege, and I'll note that on

Page 84

1    the record.
2          How was Swarm compensating Mr. Fisher
3    for his time sending correspondence to potential
4    licensees?
5          MR. KELLY:  Same objection.
6          THE WITNESS:  Same response.  It is
7    attorney-client privileged information.
8          BY MR. SIGLER:
9          Q    Did Mr. Fisher have any interest in --
10   well, strike that.
11         Was Mr. Fisher entitled -- well, I
12   already asked that, so strike that.  All right.
13         Well, I'm just going to disagree on
14   the record about this, and we can talk about it
15   later and I'll reserve my rights, but if
16   Mr. Fisher had any kind of stake or incentive to
17   get these patents licensed, including to entities
18   in California, I don't think that's protected by
19   the attorney-client privilege.
20         MR. KELLY:  Noted.
21         MR. SIGLER:  So we can talk about that
22   later.

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 85

1           BY MR. SIGLER:
2      Q   Does Swarm have any investors right
3  now?
4      A   Swarm does not have any investors.  It
5  was -- it is -- it was our hope to find an
6  investor, and at this point, Swarm is a
7  self-funded company.  The only owners in Swarm are
8  my wife and myself.
9      Q   Has Swarm ever had any investors
10  besides you and your wife?
11          MR. KELLY:  Objection.
12          THE WITNESS:  There are no -- there
13  are no investors in Swarm.
14          As indicated in my business plan, we
15  have family members that are contributing to
16  helping Swarm, but they are not investors in
17  Swarm.
18          BY MR. SIGLER:
19      Q   Has anyone ever questioned the
20  validity of Swarm's patents?
21          MR. KELLY:  Objection, form.
22          THE WITNESS:  Has anybody questioned

Page 86

1  the validity?  You mean going to the patent office
2  and filing paperwork for that purpose?
3          BY MR. SIGLER:
4      Q   Has anyone ever sent Swarm a letter,
5  for example, stating that they don't believe
6  Swarm's patents are valid?
7          MR. KELLY:  Object to the form.
8          THE WITNESS:  I want to make sure that
9  I understood the question.
10          Are you talking about a
11  company providing some type of documentation
12  showing those patents are invalid?
13          BY MR. SIGLER:
14      Q   It's broader than that.
15          Has any company ever said to Swarm or
16  its representatives we don't think your patents
17  are valid?
18          MR. KELLY:  Object to form.
19          THE WITNESS:  To the best of my
20  recollection, I don't believe they have.
21          I would have to see the document in
22  front of me in order to be able to comment on

Page 87

1  that.
2          BY MR. SIGLER:
3      Q   Okay.  Mr. -- well, strike that.
4          Mr. Íñiguez, Swarm had some
5  communications with Juniper before this lawsuit,
6  right?
7      A   Correct.
8      Q   Mr. Fahnert, can you please put Tab VV
9  on the screen, and I believe that should be
10  Exhibit 15.
11          (Iniguez Exhibit 15 was marked
12           for identification.)
13          BY MR. SIGLER:
14      Q   Do you see Exhibit 15 on your screen,
15  Mr. Íñiguez?
16      A   Yes, I can see it.
17      Q   All right.  Do you see that it's a
18  July 16, 2018, letter, sir?
19      A   Yes.
20      Q   And it's addressed to Bikash Koley,
21  the CTO of Juniper Networks in Sunnyvale,
22  California, right, sir?

Page 88

1      A   Correct.
2      Q   And this is another letter from your
3  attorney, Mr. Kelly, right, sir?
4      A   Correct.
5      Q   And like the other letters on this
6  same date that we looked at earlier today, this
7  one also highlights a licensing opportunity,
8  right, sir?
9      A   Correct.
10      Q   All right.  And if we could go to the
11  second page, please, Mr. Fahnert.
12          Do you see, sir, that this letter,
13  like the other ones we looked at previously,
14  states that Swarm would welcome the opportunity to
15  discuss exclusive or non-exclusive patent
16  licensing arrangements with you?
17      A   Correct.
18      Q   All right.  So Swarm was -- well,
19  strike that.
20          Do you know if Swarm ever got a
21  response to this letter from Juniper?
22      A   There is a -- yes, there's a response

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 89

1   from Juniper.
2       Q   In fact, sir, Swarm continued to send
3   Juniper letters until May 2020, right?
4       A   I don't remember the exact dates, but
5   yes, we continued to correspond.
6       Q   Okay.  And in the production and the
7   other materials that I have, I found 11 letters or
8   emails that Swarm sent to Juniper between 2018 and
9   2020 about licensing Swarm's patents.
10          Does that sound about right to you?
11          MR. KELLY:  Object to form.
12          THE WITNESS:  Can you please show me
13  that email?
14          BY MR. SIGLER:
15      Q   Well, we're on limited time here, so I
16  just wanted to see if that sounded right to you.
17          I also found five letters or emails
18  from Juniper to Swarm during that time.  Does that
19  sound about right to you?
20          MR. KELLY:  Object to the form.
21          THE WITNESS:  We corresponded through
22  email.  I don't remember the exact number of

Page 90

1   letters or emails, but those emails are in your
2   possession at this point.
3           BY MR. SIGLER:
4       Q   All right.  And are you aware that
5   Mr. Fisher had a call with someone from Juniper at
6   one point, sir?
7       A   I believe so.
8       Q   Were you on that call?
9       A   I was not.
10      Q   Did Mr. Fisher tell you about what
11  happened on that call?
12      A   We had multiple conversations -- I had
13  multiple conversations with Mr. Fisher, but I
14  don't remember every detail of those
15  conversations.
16      Q   Why did Swarm continue to send letters
17  to Juniper for almost two years?
18          MR. KELLY:  Object to the form.
19          THE WITNESS:  Why?  Because as stated
20  in the initial letter, the initial letter says
21  this is an opportunity for a possible patent or
22  licensing opportunity.  Juniper responded, and

Page 91

1   then that was precisely what we're asking.  We
2   wanted to have a communication on that topic, and
3   that was it.
4           BY MR. SIGLER:
5       Q   Well, Juniper responded by telling you
6   they weren't interested in the license, right,
7   sir?
8           MR. KELLY:  Object to the form.
9           THE WITNESS:  I would have to see the
10  letter that you're referring to in order to make a
11  comment.
12          BY MR. SIGLER:
13      Q   All right, we'll get to that.
14          Swarm sent Juniper some charts mapping
15  Swarm's patent claims to Juniper's products,
16  right?
17      A   Basically -- are you referring to the
18  claim chart when you say "mapping"?
19          Can you repeat the question?
20      Q   Sure.  Did Swarm send Juniper claim
21  charts?
22      A   Correct.

Page 92

1       Q   Why did Swarm send those claim charts
2   to Juniper?
3           MR. KELLY:  Object to form.
4           THE WITNESS:  The claim chart showed a
5   mapping between the claims included -- in this
6   case, one claim included in the patent -- and the
7   mapping of the product.  That's the purpose of the
8   claim chart; it's a mapping.
9           BY MR. SIGLER:
10      Q   All right.  Did Swarm believe that
11  Juniper infringes Swarm's patents?
12          MR. KELLY:  Objection to the form of
13  the question.
14          THE WITNESS:  Again, as indicated in
15  the cover letter that included that claim chart,
16  the cover letter said that this is an opportunity,
17  licensing opportunity, and then we provided the
18  claim chart.
19          BY MR. SIGLER:
20      Q   And did Swarm believe that Juniper's
21  products infringed Swarm's patents?
22          MR. KELLY:  Object to the form.

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 93

1    THE WITNESS:  Again, we're -- we're
2  presenting Juniper an opportunity, and the claim
3  chart shows this -- this opportunity showing a
4  mapping between the claims and a product.  That's
5  all it is, is to show that there's a mapping.
6    BY MR. SIGLER:
7    Q   It's to show that the elements of the
8  claim are the same as what you see in the Juniper
9  products, right, sir?
10    MR. KELLY:  Object to form.
11    THE WITNESS:  It basically shows
12  that -- again, the patent describes an invention
13  claim, and then we're showing the mapping with the
14  product that in this case Juniper has.
15    BY MR. SIGLER:
16    Q   And Swarm has filed a lawsuit against
17  Amazon in Arizona, right, sir?
18    A   That is correct.
19    Q   And in preparation for that lawsuit,
20  did Swarm create claim charts mapping Amazon's
21  products to Swarm's patent claims?
22    MR. KELLY:  Object to the form.

Page 94

1    THE WITNESS:  It is important not to
2  take a document out of context.
3    In the case of the claim chart that I
4  provided to Juniper, I'm showing a mapping of the
5  product, and that claim chart includes a cover
6  letter saying that this is not an accusation of
7  infringement.  It is basically just presenting an
8  opportunity.
9    In the case, as you mentioned, of AWS,
10  the claim chart has a different context.
11    BY MR. SIGLER:
12    Q   And that wasn't my question, sir.  My
13  question was a far more simple and narrow one.
14    Did Swarm create claim charts mapping
15  Amazon's products to Swarm's patent claims in
16  preparing for filing its Complaint against Amazon?
17    A   I don't have the exact document in
18  front of me of that AWS Complaint, but that is
19  public record.  If you show me the document, then
20  I should be able to explain it to you.
21    Q   Did you create the claim charts that
22  were sent to Juniper?

Page 95

1    MR. KELLY:  Object to form.
2    THE WITNESS:  I am -- I created the
3  initial draft of the claim chart.  Again, I am not
4  an attorney.  I provide the initial information,
5  and I get help from my attorney using
6  attorney-client privilege, and then produce the
7  document.
8    BY MR. SIGLER:
9    Q   And Swarm also sent Juniper a draft
10  license agreement under which Juniper would
11  license Swarm's patents, right?
12    A   At one point, we sent a draft license
13  agreement.
14    Q   Has Swarm ever sent a draft license
15  agreement to anyone else?
16    MR. KELLY:  Object to form.
17    THE WITNESS:  Swarm does not have
18  any -- for the record, does not have any executed
19  license agreements -- excuse me (witness clearing
20  throat) -- does not have any executed license
21  agreements.
22    We sent -- provided the documentations

Page 96

1  that we produced.  We have a draft license
2  agreement that we sent to Phi Robotics, and that
3  was never executed.  That's a company located in
4  Mumbai, India.
5    BY MR. SIGLER:
6    Q   Okay.  Other than Juniper and
7  Phi Robotics, has Swarm ever sent a draft license
8  agreement to anyone else?
9    MR. KELLY:  Object to the form.
10    THE WITNESS:  Those are the only
11  license agreements that we have ever sent.
12    BY MR. SIGLER:
13    Q   Okay.  So the only license -- the only
14  draft license agreement that you ever sent to
15  anyone in the United States went to Juniper in
16  California, right, sir?
17    A   Yes.
18    MR. KELLY:  Object to the form.
19    THE WITNESS:  That is correct.
20    BY MR. SIGLER:
21    Q   Mr. Fahnert, can you please put Tab O
22  on the screen?  First, let's identify this as

24  (Pages 93 to 96)

5/14/2021        Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 97

1    Exhibit 16 for the record, please.
2         (Iniguez Exhibit 16 was marked
3         for identification.)
4         BY MR. SIGLER:
5         Q   Mr. Íñiguez, have you seen this email
6    before?
7         A   Yes, I have.
8         Q   It's an email from your
9    representative, Mr. Fisher, right?
10        A   Correct.
11        Q   And it's to Dave Saunders at Juniper,
12   right?
13        A   Correct.
14        Q   And it's also addressed to you, right?
15        A   Correct.
16        Q   And this is the email where Swarm
17   attaches the draft licensing agreement that it
18   sent to Juniper, right?
19        A   Right.  Can you scroll down to the
20   bottom where -- so that I can see better?
21        Q   Sure.
22        A   Okay.  Is there another -- there's

Page 98

1    another page to this email, correct?
2         Q   Yes.  And I'm only going to ask you
3    about a couple of pages of these.  For now, on the
4    first page, there's a heading that says "Answer:"
5    if we could focus on that.
6         And do you see, sir, that it says,
7    "Answer: In the interest of simplification, the
8    claim chart originally provided"?
9         Do you see that?
10        A   Yes, I can see that.
11        Q   Okay.  So this is referring to a claim
12   chart that was previously sent by Swarm to
13   Juniper, right?
14        A   Correct.
15        Q   All right.  If we could go to the
16   attached license agreement, which is at, I believe
17   it's the fifth page of this document.  The Bates
18   number ends in 282.
19        Do you see that on your screen,
20   Mr. Íñiguez?
21        A   Yes, I see it.
22        Q   All right.  Who drafted this License

Page 99

1    Agreement?
2         MR. KELLY:  Object to form.
3         THE WITNESS:  Can you scroll -- can
4    you zoom in a little bit?
5         This document was provided by my
6    attorney.
7         BY MR. SIGLER:
8         Q   Which attorney?
9         A   Michael Kelly.
10        Q   Okay.  And then Mr. Fisher provided it
11   to Juniper, right?
12        MR. KELLY:  Object to form.
13        THE WITNESS:  Correct.
14        BY MR. SIGLER:
15        Q   All right, we can take that off the
16   screen.
17        Let's put up Tab WW, please, which
18   will be Exhibit 17.
19        (Iniguez Exhibit 17 was marked
20        for identification.)
21        BY MR. SIGLER:
22        Q   Mr. Íñiguez, do you see that this is

Page 100

1    another email from Mr. Fisher?
2         A   Yes, I see it.
3         Q   And it's dated November 6, 2019,
4    right?
5         A   Yes.
6         Q   And it's to Mr. Saunders at Juniper,
7    right?
8         A   Correct.
9         Q   And you are copied on this email,
10   right?
11        A   Yes.
12        Q   All right.  And if we could go --
13   well, you see it there on the screen actually
14   already.  You can put that back up, Mr. Fahnert.
15   I'm sorry.
16        Mr. Fisher opens his email by saying,
17   "Dear Mr. Saunders, I was surprised and
18   disappointed by your email of October 24 saying
19   Juniper is not interested in taking a license at
20   this time."  Do you see that, sir?
21        A   Yes, I see it.
22        Q   So Juniper had told Swarm prior to

25  (Pages 97 to 100)

5/14/2021        Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 101

1   this email that Juniper wasn't interested in
2   taking a license to Swarm's patents, right?
3            MR. KELLY:  Object to the form.
4            THE WITNESS:  Yes.
5            BY MR. SIGLER:
6        Q   All right.  And in the second
7   paragraph it says in the second sentence, "Having
8   answered all of your questions, it appears that
9   you have failed to express any position that would
10  prevail in a Markman hearing."
11           Do you see that, sir?
12       A   Yes, I see it.
13       Q   Do you know what a Markman hearing is?
14       A   Yes, I have an idea of what it is.
15  I've never been involved in one.  I just have
16  general knowledge of what that is.
17       Q   And what's your general knowledge of
18  what a Markman hearing is?
19       A   The terms in a specific claim are
20  looked into the definitions, what they mean, and
21  then they see if that mapping from the product
22  that is mapping to.  That is my general knowledge.

Page 102

1        Q   And that's a hearing that takes place
2   in court, right?
3        A   That is my understanding.
4        Q   And that's a hearing that occurs if a
5   company sues another company for patent
6   infringement, right?
7        A   As a person who's not an attorney, I
8   don't know.  I'm sure they could -- it could be
9   the case, but I don't know if that is for every
10  type of Markman hearing.  Again, I don't know.
11       Q   Okay, but it's your understanding that
12  that would be a hearing that would take place in a
13  lawsuit, right, sir?
14       A   I don't know about a lawsuit.  I know
15  it's a hearing that takes place in court, but I
16  don't know if it's related to a lawsuit.
17       Q   Okay.  So here Mr. Fisher is referring
18  to a hearing that would take place in court,
19  right?
20       A   Yes.
21       Q   All right.  And if we could scroll
22  down to the -- I think it's the third paragraph at

Page 103

1   the bottom.  It starts with "although."
2            Do you see that paragraph, sir?
3        A   Yes, I see it.
4        Q   All right.  And the first sentence
5   says, "Although you have said Juniper does not
6   require a license, I have to disagree."
7            Do you see that, sir?
8        A   I see it, yes.
9        Q   So Swarm told Juniper that it required
10  a license to Swarm's patents, right?
11       A   Can you please repeat that question?
12       Q   Sure.  So Mr. Fisher, on behalf of
13  Swarm, is telling Juniper here that Juniper
14  requires a license to Swarm's patents, right?
15           MR. KELLY:  Object to form.
16           THE WITNESS:  Well, what it says over
17  there is what you just read.  It says, "Although
18  you have said Juniper does not require a license,
19  I have to disagree."  That's what it says.
20           BY MR. SIGLER:
21       Q   Okay.  So Mr. Fisher is stating that
22  Juniper does require a license to Swarm's patents,

Page 104

1   right?
2            MR. KELLY:  Form.
3            THE WITNESS:  Well, what it says, it
4   is stating, "Although you have said Juniper does
5   not require a license, I have to disagree."
6   That's what it says.
7            BY MR. SIGLER:
8        Q   So Juniper told Swarm that it doesn't
9   require a license, right?
10       A   Well, again, as mentioned here,
11  Mr. Fisher is disagreeing with Juniper.
12       Q   And Juniper said we don't require a
13  license to Swarm's patents, right?
14       A   Yes.
15       Q   And Mr. Fisher, on behalf of Swarm,
16  said no, you're wrong, correct?
17           MR. KELLY:  Object to the form.
18           THE WITNESS:  Mr. Fisher is
19  disagreeing, as we can see in the letter.
20           BY MR. SIGLER:
21       Q   Okay.  Well, we'll have the Court take
22  a look at it, and it can come to its own

26 (Pages 101 to 104)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 105

```
 1   grammatical understanding of what's going on
 2   there.
 3          Did Swarm at this time believe that
 4   Juniper required a license to its patents?
 5      A   Again --
 6          MR. KELLY:  Object to form.
 7          THE WITNESS:  Again, it's important to
 8   look back to the initial intention.
 9          Swarm offered, in this case Juniper,
10   an opportunity to license.  It has never been the
11   intention of going into court.  Short of us just
12   seeking to license this patent, it never intended
13   to sue anyone, and that letter is not saying that
14   it's going to be suing anyone.
15          BY MR. SIGLER:
16      Q   I just want to know, at this time, did
17   Swarm believe that Juniper was infringing Swarm's
18   patents?
19          MR. KELLY:  Same objection.
20          THE WITNESS:  Please repeat that
21   question.
22
```

---

Page 106

```
 1          BY MR. SIGLER:
 2      Q   It's a yes-or-no -- yes-or-no answer.
 3          At this time, did Swarm believe that
 4   Juniper was infringing Swarm's patents?
 5          MR. KELLY:  Objection.
 6          THE WITNESS:  It doesn't say
 7   "infringing" in that letter.  Again, we go back to
 8   my original statement.
 9          BY MR. SIGLER:
10      Q   I'm not asking you about the letter.
11   I'm asking you, at this time, did Swarm believe
12   that Juniper was infringing Swarm's patents?
13          MR. KELLY:  Object to form.
14          THE WITNESS:  We never used the term
15   "infringement."
16          BY MR. SIGLER:
17      Q   But did Swarm believe that Juniper was
18   infringing Swarm's patents?
19          MR. KELLY:  Counsel --
20          MR. SIGLER:  He's not answering my
21   question, Mr. Kelly.  I'm just looking for an
22   answer to my question.
```

---

Page 107

```
 1          MR. KELLY:  This is five times, sir.
 2          MR. SIGLER:  No, he hasn't.  He's said
 3   what he wants you guys to tell him to say.
 4          I'm just asking because, you know, my
 5   client -- my client might face down a willful
 6   infringement allegation like Amazon is facing down
 7   right now where you all rely on letters like this
 8   to say, hey, you were on notice of our patents,
 9   and you're willfully infringing.
10          So I want to know, at this time in
11   2019, did Swarm believe that Juniper was
12   infringing Swarm's patents?
13          MR. KELLY:  Object to the form.
14          THE WITNESS:  Again, the claim chart
15   served the purpose of mapping the claim with a
16   product.  That's all we're doing, and we're
17   presenting with a licensing opportunity.
18          It has never been the intention of
19   Swarm to sue Juniper, and the facts speak for
20   themselves.  There's no legal -- Swarm never
21   threatened Juniper to sue, and we never did
22   anything, and eventually Juniper sued Swarm.
```

---

Page 108

```
 1          BY MR. SIGLER:
 2      Q   And earlier today we saw some
 3   correspondence with Apple, right, sir?
 4      A   Earlier today?  Can you repeat that
 5   question?
 6      Q   Sure.  Earlier today we looked at some
 7   letters that Swarm sent to Apple, right?
 8      A   Correct.
 9      Q   All right.  And in one of those
10   letters that came back from Apple, Apple said to
11   Swarm we're not interested in licensing your
12   patents, right, sir?
13      A   Correct.
14      Q   And I believe you told me that --
15   well, strike that.
16          And Swarm didn't reply to that letter,
17   right?
18      A   We weren't sent a letter?
19          Can you repeat that question?
20      Q   Sure.  Swarm didn't reply to Apple's
21   letter saying that Apple wasn't interested in
22   licensing Swarm's patents, right?
```

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 109

1          MR. KELLY:  Object to form.
2          THE WITNESS:  Correct, we did not
3     respond.
4          BY MR. SIGLER:
5          Q    And you told me earlier today that's
6     because Apple said they weren't interested in
7     taking a license, right?
8          MR. KELLY:  Object to form.
9          THE WITNESS:  Correct.
10          BY MR. SIGLER:
11          Q    And here, sir, Juniper has told Swarm
12     that they're not interested in taking a license,
13     right?
14          A    Basically, as you can see on that
15     letter, Juniper provided information related to
16     the claim chart, and then we responded to their
17     concerns on the claim chart.
18              That is the nature of the
19     correspondence.  We're responding to concerns
20     raised by Juniper.
21          Q    And Juniper had said to Swarm that
22     Juniper wasn't interested in taking a license to

---

Page 110

1     Swarm's patents, right?
2          A    At one point -- I have to go back and
3     see the letter to see where that is conveyed.
4          Q    Let's scroll up to the beginning of
5     this letter again, please, Mr. Fahnert.  And I
6     read this to you before, but I'll do it again.
7              The opening of the letter says, "I was
8     surprised and disappointed by your email of
9     October 24 saying Juniper is not interested in
10     taking a license at this time."
11              Juniper told Swarm it was not
12     interested in taking a license, right, sir?
13          MR. KELLY:  Object to the form.
14          THE WITNESS:  Yes.  We can also see
15     there that it says we were continuing the
16     good faith discussions.  Those were good faith
17     discussions looking for an opportunity to explore
18     this opportunity.  That's it.
19          BY MR. SIGLER:
20          Q    But Swarm could have chosen to not
21     reply to Juniper's letter saying Juniper wasn't
22     interested, right?

---

Page 111

1          MR. KELLY:  Object to form.
2          THE WITNESS:  Juniper responded, as
3     you show in the previous letter, with some
4     definition of terms, and then we explain those
5     terms.
6          BY MR. SIGLER:
7          Q    If Juniper said it wasn't interested
8     in taking a license to Swarm's patents, why did
9     Swarm continue to send Juniper communications?
10          MR. KELLY:  Object to form.
11          THE WITNESS:  After -- after this
12     letter?
13          BY MR. SIGLER:
14          Q    Yes.
15          A    At one point, Swarm was granted
16     another patent, and we presented again Juniper the
17     opportunity with a bigger, better -- bigger
18     portfolio of patents.
19          Q    You did that because you wanted to
20     make sure Juniper was on notice of that patent,
21     right, sir?
22          MR. KELLY:  Object to form.

---

Page 112

1          THE WITNESS:  Since we had a previous
2     relationship, we thought it was opportunity to
3     present the opportunity one more time.
4          MR. SIGLER:  All right, we can take
5     down that document, Mr. Fahnert.  Let's move on to
6     another one.
7              Let's please bring up Tab P, and
8     I think that would be Exhibit 17?
9          THE REPORTER:  18.
10          MR. SIGLER:  Exhibit 18, apologies.
11          (Iniguez Exhibit 18 was marked
12          for identification.)
13          BY MR. SIGLER:
14          Q    All right, here we have Exhibit 18 on
15     your screen, Mr. Íñiguez.  And Mr. Fahnert, if you
16     could go back to the first page real quick.  I
17     just wanted to make clear what this is.
18              We filed this as an exhibit earlier in
19     the case, that's why it has this exhibit page on
20     it, but I wanted to ask you about the letter that
21     starts at the second page, please, so if we could
22     go there.  Thank you, Mr. Fahnert.

28 (Pages 109 to 112)

5/14/2021        Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 113

1        Do you see, Mr. Íñiguez, that this is
2    an April 16, 2020, letter?
3        A    Correct.
4        Q    And it is to two people at Apstra,
5    Inc., right?
6        A    Correct.
7        Q    Okay.  And they are Mansour Karam and
8    Sasha Ratkovic, right?
9        A    Correct.
10       Q    And it's addressed to them in
11   Menlo Park, California, right?
12       A    Yes.
13       Q    Okay.  And focusing in on the first
14   paragraph of the body there, if we could,
15   Mr. Fahnert -- actually, can we scroll down just a
16   little bit more?
17       Do you see there, Mr. Íñiguez, that
18   this is a letter from Mr. Fisher?
19       A    That is correct.
20       Q    And he's Swarm's IP licensing
21   consultant at this time, right?
22       MR. KELLY:  Object to the form.

Page 114

1        THE WITNESS:  Correct.
2    BY MR. SIGLER:
3        Q    And you're copied on this letter,
4    right, sir?
5        A    Yes.
6        Q    All right.  And now if we could scroll
7    up to the first paragraph, please.
8        And the letter opens by saying, "I
9    have written to you on three previous occasions to
10   bring to your attention the relationship between
11   Apstra products and technology developed and
12   patented by Swarm Technology (as claimed,
13   for example, in Swarm's US Patent 9,852,004)."
14       Do you see that, sir?
15       A    Yes, I do.
16       Q    All right.  So Mr. Fisher -- well,
17   strike that.
18       Based on this letter, this is the
19   fourth letter Mr. Fisher has sent to Apstra,
20   right?
21       A    Yes.
22       Q    And the next sentence says, "You have

Page 115

1    not responded to any of those letters."
2        Do you see that?
3        A    Yes, I do.
4        Q    So Apstra hadn't responded to
5    Mr. Fisher's prior three letters, right?
6        A    Correct.
7        Q    Okay.  A little further down in that
8    paragraph, we see here that it says, "I have
9    included with this letter a claim chart that shows
10   the relationship between the '275 patent and
11   Apstra products."  Do you see that, sir?
12       A    Yes.
13       Q    All right.  So this letter from Swarm
14   to Apstra includes a claim chart showing the
15   relationship between the '275 patent and Apstra
16   products, right?
17       A    Correct.
18       Q    And the next sentence says, "The '275
19   claim chart and the earlier provided '004 claim
20   chart use Apstra's own documents to identify claim
21   elements in Apstra products."
22       Do you see that, sir?

Page 116

1        A    Yes, I do.
2        Q    So based on this, prior to this
3    letter, Swarm had sent a claim chart to Apstra on
4    the Swarm '004 patent, right, sir?
5        MR. KELLY:  Object to the form.
6        THE WITNESS:  Correct.
7    BY MR. SIGLER:
8        Q    And at this time, sir, did Swarm
9    believe that Apstra was infringing Swarm's
10   patents?
11       MR. KELLY:  Objection, form.
12       THE WITNESS:  As indicated earlier,
13   the claim chart provided a relationship between
14   the patent and the product.  That's all we have
15   provided.
16       And the letters that we sent said the
17   same thing, that we're offering an opportunity for
18   licensing.
19       BY MR. SIGLER:
20       Q    So if Apstra got these claim charts
21   and they concluded that Swarm was accusing them of
22   infringing Swarm's patents, they would have been

29 (Pages 113 to 116)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 117

1    mistaken, right?
2          MR. KELLY:  Object to the form.
3          THE WITNESS:  Are you asking me to say
4    what Apstra thought about those letters?  I'm not
5    sure about the question.  Can you repeat the
6    question?
7          BY MR. SIGLER:
8       Q   Sure.  So Apstra received these claim
9    charts from Swarm, right?
10      A   Yes.
11      Q   And if the people at Apstra saw those
12   claim charts and thought to themselves Swarm is
13   accusing us of infringing its patents, that would
14   have been wrong, right?
15         MR. KELLY:  Object to the form.
16         THE WITNESS:  We never -- the letter
17   never accused Apstra.  Again, it is just
18   presenting an opportunity.  It's showing a
19   relationship between the claim and the product.
20   That's all what it is.
21         BY MR. SIGLER:
22      Q   Did -- before Swarm sued Amazon, did

Page 118

1    Swarm create claim charts mapping Amazon products
2    to Swarm's patent claims?
3          MR. KELLY:  Object to form.
4          THE WITNESS:  Before Amazon -- can you
5    repeat that question?  I want to make sure that I
6    get it.
7          BY MR. SIGLER:
8       Q   Sure.  Before Swarm sued Amazon, did
9    Swarm create claim charts matching up Amazon's
10   products to Swarm's claims?
11      A   I'm thinking.
12         I don't recall having an official
13   claim chart.  I get -- I take notes all the time,
14   but from my notes into an official claim chart, I
15   don't remember.
16      Q   Did Swarm ever send Amazon claim
17   charts before it sued them?
18         MR. KELLY:  Object to form.
19         THE WITNESS:  I'm thinking.
20         No, I don't recall doing that.  And
21   everything we have, we have provided in those
22   documents that we gave you, and I don't recall

Page 119

1    seeing claim charts previous to the lawsuit.
2          BY MR. SIGLER:
3       Q   Okay.  Swarm had some communications
4    with Cisco about licensing Swarm's patents, right?
5       A   Correct.
6       Q   And Swarm sent Cisco a letter offering
7    to license Swarm's patents in July 2018, right?
8       A   Correct.
9       Q   And Swarm sent Cisco claim charts
10   mapping Swarm's patents to Cisco's products,
11   right?
12      A   Correct.
13      Q   Who drafted those claim charts?
14         MR. KELLY:  Object to form.
15         THE WITNESS:  Again, it's same as
16   before.  I took the initial information, and then
17   conveyed the information to my attorney, and then
18   we eventually came up with this final product,
19   which is the claim chart.
20         BY MR. SIGLER:
21      Q   Okay.  And actually backing up for a
22   moment, let's go back to Apstra for a second.  I

Page 120

1    forgot to ask a question there.
2          Did Apstra ever respond to this letter
3    from Mr. Fisher?
4       A   No.  As stated in the letter, they did
5    not respond.
6       Q   Did Apstra respond to any of the
7    letters that Swarm sent them?
8       A   No.  As far as I remember, no, they
9    have not -- they did not respond.
10      Q   Okay.  All right, let's shift back to
11   Cisco now.
12         In the correspondence with Cisco, they
13   provided prior art to Swarm's patents, right?
14      A   Correct.
15      Q   And Cisco questioned the validity of
16   Swarm's patents, right?
17         MR. KELLY:  Object to form.
18         THE WITNESS:  Well, they provided --
19   as you mentioned, they provided prior art, and
20   then we responded to that prior art.  That is the
21   nature of the conversations that we had with
22   Cisco.

Page 121

1     BY MR. SIGLER:
2     Q   Okay.  So to your recollection, Cisco
3  never said that it thought Swarm's patents were
4  invalid; is that correct?
5         MR. KELLY:  Objection.
6         THE WITNESS:  I would have to go and
7  revise all the documentation in order to look for
8  that term that you are referring to.
9         BY MR. SIGLER:
10    Q   Do you understand what "invalidity"
11 means in the patent context?
12    A   I understand the concept.
13    Q   And what's that concept?
14    A   There's a procedure that somebody
15 raises to the United States Patent Office, and
16 then at the end, it determines that a specific
17 patent may not be valid.
18        To be more clear or specific, they go
19 after the claims, not necessarily the patent
20 itself.
21    Q   And do you understand that,
22 for example, a defendant in a patent infringement

Page 122

1  lawsuit can argue that the patent is invalid?
2     A   There's a procedure for that.  I have
3  never been involved with that, and I don't have
4  any more information to be able to tell you about
5  how that works.
6     Q   Has Swarm ever had any calls with
7  Cisco or Cisco's attorneys about Swarm's patents?
8         MR. KELLY:  Object to form.
9         THE WITNESS:  It is my understanding
10 that all communication was done through email.
11        BY MR. SIGLER:
12    Q   Okay, let's take a look at one of
13 those emails.  Mr. Fahnert, could you please put
14 Tab Q on the screen, which will be Exhibit 19, I
15 believe.
16        (Iniguez Exhibit 19 was marked
17         for identification.)
18        BY MR. SIGLER:
19    Q   All right, do you see this email on
20 the screen that's Exhibit 19, Mr. Íñiguez?
21    A   Yes, I see it.
22    Q   And this is an October 29, 2019,

Page 123

1  email, right, sir?
2     A   Yes.
3     Q   And it's from Mr. Fisher, right?
4     A   Correct.
5     Q   And it is to Theo Foster of Haynes and
6  Boone, right?
7     A   Yes.
8     Q   And do you recognize Mr. Foster as an
9  attorney working for Cisco, sir?
10    A   Yes, I do.
11    Q   All right.  And you are copied on this
12 email, right?
13    A   Correct.
14    Q   And Mr. Fisher says, "I have attached
15 a letter in response to your letter of October 11,
16 2019."  Do you see that, sir?
17    A   Yes.
18    Q   All right, let's take a look at that
19 letter.  If we could please go to the second page
20 of this document, Exhibit 19, and -- well, let me
21 start with, Mr. Íñiguez, do you recognize this as
22 the October 29th, 2019, letter referred to in the

Page 124

1  email?
2     A   Yes, I do.
3     Q   All right.  And if we could focus on
4  the paragraph that says "First:" please.
5     A   I see it.
6     Q   Okay.  Thank you, sir.
7         It says, "You again took issue with
8  Swarm's identification of 'controller' in the
9  Cisco device.  This issue can be summarized by
10 asking whether column A below on the left, which
11 sets forth the '004 claim language is equivalent
12 to column B on the right which describes the Cisco
13 device as described in Cisco references."
14        Do you see that, sir?
15    A   Yes, I see it.
16    Q   All right.  Do you know what
17 Mr. Fisher meant here when he said "equivalent"?
18        MR. KELLY:  Objection, form.
19        THE WITNESS:  Well, it's a mapping
20 of -- mapping between what the claim language is
21 saying and a specific product.
22

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 125

1      BY MR. SIGLER:
2      Q   Okay.  So he's saying that the claim
3   language is the same as what's shown in the Cisco
4   device, right?
5      MR. KELLY:  Object to form.
6      THE WITNESS:  Correct.
7      BY MR. SIGLER:
8      Q   And below that is a claim chart,
9   right, sir?
10     A   Okay, I can see it.
11         What is the question?
12     Q   That's a claim chart, right, sir?
13     A   This is -- correct, this is a portion
14   of a claim chart.
15     Q   All right.  And if we could go further
16   into this document, it's the page ending with 224,
17   please.  And if we could go to the top of the
18   screen, that paragraph at the top of the screen,
19   please.
20         And there, sir, in the final sentence
21   of that paragraph, do you see that it says, "A
22   claim chart showing the relationship of the

Page 126

1   '777 patent to Cisco product is appended below."
2      A   Yes, I see.
3      Q   So Mr. Fisher is providing a claim
4   chart mapping the claims of the '777 patent to
5   Cisco's product, right?
6      A   That is correct.
7      Q   All right, let's take a look at
8   another document regarding Cisco.  Mr. Fahnert,
9   could you please put Tab R on the screen?  And
10  this will be Exhibit 20.
11         (Iniguez Exhibit 20 was marked
12          for identification.)
13     BY MR. SIGLER:
14     Q   Is that on the screen, sir?
15     A   Yes, I can see it.
16     Q   All right.  And let's start with the
17  email at the top here, sir.  Do you see it's an
18  email from Mr. Fisher to you?
19     A   Yes, I can see it.
20     Q   All right.  And it's dated
21  November 27th, 2019, right?
22     A   Yes.

Page 127

1      Q   All right.  And there's an attachment.
2   It says "Cisco response to Swarm's 10-29-2019
3   Letter," right?
4      A   Yes.
5      Q   All right.  And Mr. Fisher says,
6   "Latest from Cisco.  I haven't studied it in
7   detail yet."  Do you see that, sir?
8      A   Correct.
9      Q   So Mr. Fisher was keeping you apprised
10  on the communications with Cisco at this time,
11  right?
12     A   That is correct.
13     Q   All right.  And he goes on to say,
14  "They have not cited any new art."
15         Do you see that, sir?
16     A   Yes.
17     Q   And he goes on to say, "I have your
18  new '777 claim chart, but am still working my way
19  through the references."
20         Do you see that, sir?
21     A   Yes, I see it.
22     Q   And in referring to your new '777

Page 128

1   claim chart, is he referring to a claim chart for
2   that patent that you created?
3      MR. KELLY:  Object to form.
4      THE WITNESS:  Correct.  This is a
5   draft that I provided to John, and then we
6   reviewed it together, and then by the end we get a
7   final product.
8      BY MR. SIGLER:
9      Q   Okay.  And so at this time, you were
10  aware that Cisco had cited prior art to
11  Mr. Fisher, right?
12     MR. KELLY:  Object to form.
13     THE WITNESS:  Yes.
14     BY MR. SIGLER:
15     Q   Let's push ahead in the document to
16  the page that ends in 208, please.  Thank you,
17  Mr. Fahnert.  And let's focus on the portion of
18  this that has the heading, it says "Invalidity."
19     A   Okay, I see it.
20     Q   Do you see that, sir?  All right.
21         And that paragraph starts with the
22  sentence, "As you requested, we previously

32  (Pages 125 to 128)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 129

1    provided a copy of the prior art article
2    'SETI@Home- Massively Distributed Computing for
3    SETI' for Swarm's review."
4            Do you see that, sir?
5        A    That is correct.
6        Q    All right.  And in this letter from --
7    well, let me back up for a moment.  I apologize.
8    Let's go back to the page that ends in 206,
9    please.
10           Do you see, sir, that this is a letter
11   from -- or excuse me, a letter to Mr. Fisher?
12       A    Yes, I can see it.
13       Q    And it's dated November 27, 2019,
14   right?
15       A    Correct.
16       Q    And it's from Mr. Foster, who is the
17   lawyer for Cisco, right?
18       A    Yes.
19       Q    All right.  Now, let's go back to
20   page 208, invalidity discussion.
21           Okay, so back here on page 208 of
22   Exhibit 20, Mr. Íñiguez, there's a paragraph with

Page 130

1    a heading that says "Invalidity," right?
2        A    Correct.
3        Q    And we talked a little bit about the
4    first sentence there, but let's go on to the
5    second sentence in that paragraph, which says, "We
6    believe that SETI@Home is highly relevant to the
7    asserted claims of both the '004 and the '777
8    patents."  Do you see that, sir?
9        A    Okay, let me review this.  Give me
10   just one second.  (Witness reviewing document.)
11           Yes, I can see it.
12       Q    And the next sentence says, "Together
13   with the background knowledge of a person of
14   ordinary skill in the art, the article teaches or
15   renders obvious the asserted claims as Swarm
16   interprets them."
17           Do you see that, sir?
18       A    I see it, yes.
19       Q    All right.  So here Cisco is telling
20   Swarm that Cisco believes the claims of Swarm's
21   patents are obvious, right, sir?
22       A    Yeah, that's an opinion from Cisco,

Page 131

1    correct.
2        Q    And do you understand the concept in
3    patent law of obviousness?
4        A    I understand.  Can you explain that to
5    me to make sure I got it correct?
6        Q    Let me ask you a more basic question.
7            Is it your understanding here in this
8    letter, sir, that Cisco is expressing their
9    opinion that Swarm's patents are invalid?
10           MR. KELLY:  Object to form.
11           THE WITNESS:  Yes, I can see that.
12           BY MR. SIGLER:
13       Q    Okay.  All right.
14           Do you recall how Swarm responded to
15   that opinion from Cisco?
16       A    Do I recall responding to this letter?
17   Is that what you're asking?  Can you repeat the
18   question, please?
19       Q    Sure.  Do you know if Swarm responded
20   to this letter?
21       A    Yes, we did.
22       Q    Okay.  And do you recall what Swarm

Page 132

1    said about Cisco's opinion that the patents are
2    invalid?
3        A    I don't recall the exact content of
4    the letter, but do you have it in your possession?
5    If you showed that to me, then that would be very
6    helpful.
7        Q    Sure, we can do that.
8            Mr. Fahnert, let's put Tab S on the
9    screen, please, which will be Exhibit 21.
10           (Iniguez Exhibit 21 was marked
11            for identification.)
12           BY MR. SIGLER:
13       Q    All right, you see here, Mr. Íñiguez,
14   this is an email from Mr. Fisher, right?
15       A    Yes.
16       Q    And it's to Mr. Foster, Cisco's
17   attorney, right?
18       A    Correct.
19       Q    And you're copied, right?
20       A    Yes.
21       Q    And it's dated December 13, 2019,
22   right?

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 133

1      A   Correct.
2      Q   And Mr. Fisher says to Mr. Foster that
3   he has attached a letter responding to Cisco's
4   November 27, 2019, letter, right?
5      A   That is correct.
6      Q   And that's the letter we just looked
7   at, right, sir, in Exhibit 20?
8      A   Yes.
9      Q   All right, let's go to the second page
10  of this document, please.
11          And do you recognize this,
12  Mr. Íñiguez, as the December 13th, 2019, letter to
13  Mr. Foster from Mr. Fisher?
14     A   Yes.
15     Q   And Mr. Fahnert, could you please take
16  us to the last page of this document, which ends
17  in 201?  Let's focus in on the second to last
18  paragraph, please, that starts with "furthermore."
19          And here Mr. Fisher, on behalf of
20  Swarm says, "Furthermore, the SETI reference fails
21  to disclose the claim requirement 'on a
22  plug-and-play basis' of the '004 patent."

Page 134

1          Do you see that, sir?
2      A   Yes, I see it.
3      Q   So here Mr. Fisher is expressing
4   Swarm's opinion that the '004 patent isn't
5   invalid, right?
6      A   Basically, yes, it is responding to
7   Cisco's concern.
8      Q   Okay.  Did Swarm ever tell Cisco that
9   Swarm didn't believe that Cisco needed a license
10  to Swarm's patents?
11          MR. KELLY:  Object to the form.
12          THE WITNESS:  Can you please repeat
13  that question?
14          BY MR. SIGLER:
15     Q   Sure.  Did Swarm ever tell Cisco that
16  Cisco didn't need a license to Swarm's patents?
17     A   We --
18          MR. KELLY:  Object to the form.
19          THE WITNESS:  As mentioned before, the
20  entire conversation is based on presenting Cisco
21  with an opportunity to license those patents.
22          If you're referring to a specific

Page 135

1   document, please show me the document so that I
2   can elaborate.
3          BY MR. SIGLER:
4      Q   Did Swarm ever tell Cisco that it
5   agreed that any of Swarm's patent claims are
6   invalid?
7          MR. KELLY:  Objection, form.
8          THE WITNESS:  Are you asking if Cisco
9   ever told Swarm if the patents were invalid?  I'm
10  not understanding -- I don't understand the
11  question.
12          BY MR. SIGLER:
13     Q   Yeah, my question is the other way
14  around.  Did Swarm ever tell Cisco that Swarm
15  agreed with Cisco's opinion that Swarm's patents
16  are invalid?
17     A   No.
18     Q   Okay.  Did Swarm ever tell Juniper
19  that Juniper didn't require a license to Swarm's
20  patents?
21          MR. KELLY:  Object to the form.
22          THE WITNESS:  I'm trying to see.

Page 136

1          We're offering an opportunity to --
2   we're offering an opportunity to license those
3   patents.  Were you asking us -- can you
4   please request -- can you please ask again so that
5   I can understand what you're asking?
6          BY MR. SIGLER:
7      Q   Sure.  Did Swarm ever tell Juniper
8   that Swarm agreed with Juniper's opinion that
9   Juniper didn't require a license to Swarm's
10  patents?
11          MR. KELLY:  Objection, form.
12          THE WITNESS:  No.
13          MR. SIGLER:  Why don't we -- it's a
14  good spot for a break, I think, so why don't we
15  take a break.
16          MR. KELLY:  Mr. Sigler, we just had
17  lunch brought in.  Do you mind if we take
18  20 minutes?
19          MR. SIGLER:  No, that's fine.  I was
20  going to ask if you guys wanted to fit in lunch,
21  given the time there.  So yeah, 20, 30, minutes is
22  fine.

34  (Pages 133 to 136)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC       Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 137

1    MR. KELLY: Okay, sounds great. We'll
2  bow back in at 12:22, 3:22 your time.
3    THE VIDEOGRAPHER: Okay, going off the
4  record. The time is 11:53.
5    (A break was taken.)
6    THE VIDEOGRAPHER: We are back on
7  record. The time is 12:37.
8    BY MR. SIGLER:
9    Q  All right, welcome back, Mr. Íñiguez.
10   Mr. Fahnert, can you please put Tab T
11 on the screen? And I believe this will be
12 Exhibit 22.
13   THE VIDEOGRAPHER: Correct.
14   MR. SIGLER: Thank you, sir.
15   (Iniguez Exhibit 22 was marked
16    for identification.)
17   BY MR. SIGLER:
18   Q  All right, Mr. Íñiguez, you have
19 Exhibit 22 on your screen there, sir?
20   A  Yes, I can see it.
21   Q  All right. And do you see that this
22 is a letter that has a Swarm Technology logo at

Page 138

1  the top, sir?
2    A  Correct.
3    Q  And this is another letter from
4  Mr. Fisher, sir?
5    A  That is correct.
6    Q  And you're copied on this letter, sir?
7    A  I am, yes.
8    Q  And this letter is dated July 5th,
9  2019, correct?
10   A  That is correct.
11   Q  And it's addressed to Jayshree Ullal
12 and Mark Taxay at Arista Networks, right, sir?
13   A  That is correct.
14   Q  And it's addressed to them in
15 Santa Clara, California, right?
16   A  Yes.
17   Q  Let's focus on the second paragraph,
18 please. Do you see there in the second paragraph
19 that Mr. Fisher indicates that he's enclosing a
20 claim chart, sir?
21   A  That is correct.
22   Q  And he says that the chart

Page 139

1  demonstrates the correlation between claim 1 of
2  the '004 patent and Arista's ZTP product, right?
3    A  Correct.
4    Q  All right. And then at the end of the
5  letter, he in the final paragraph asks -- well,
6  strike that. He says that Swarm would welcome the
7  opportunity to discuss this licensing opportunity
8  with Arista, right?
9    A  That's correct.
10   Q  All right, we can pull that one down,
11 and let's put up Tab U, please, which will be
12 Exhibit 23.
13   (Iniguez Exhibit 23 was marked
14    for identification.)
15   BY MR. SIGLER:
16   Q  Mr. Íñiguez, do you see that this is
17 an email from a Sean Christofferson at Arista?
18   A  Correct.
19   Q  And it's addressed to Mr. Fisher,
20 right?
21   A  Yes.
22   Q  And it's dated September 12, 2019,

Page 140

1  right?
2    A  Yes.
3    Q  And in this email, in the first
4  sentence, sir, it says, "I write to reply to your
5  letter of August 15, 2019 regarding an offer to
6  license certain Swarm technology."
7    Do you see that?
8    A  I'm trying to find the -- yeah.
9    This is the first line?
10   Q  Yeah. He says, "I write to reply to
11 your letter of August 15, 2019 regarding an offer
12 to license certain Swarm technology."
13   Do you see that, sir?
14   A  Yes, I see it.
15   Q  All right. And Mr. Christofferson
16 goes on to say -- and as we see at the bottom of
17 the screen here, sir, Mr. Christofferson
18 identifies himself as the Deputy General Counsel
19 of Arista, right?
20   A  Yes.
21   Q  And he's located in Santa Clara,
22 California, right?

35 (Pages 137 to 140)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 141

1     A   That is correct.
2     Q   All right.  And going back up to the
3  body of the letter, he continues on by saying, "We
4  have reviewed the patents you cited, and it is not
5  clear that they have anything to do with Arista's
6  ZTP feature.  Setting that issue aside, our ZTP
7  feature appears to have been introduced to the
8  market several years before the priority date of
9  those patents."
10         Are you familiar with the concept of a
11 priority date, sir?
12    A   Yes, I am.
13    Q   All right.  And do you understand here
14 that Mr. Christofferson is making an argument that
15 the Swarm Patents aren't valid, sir?
16         MR. KELLY:  Objection to the form.
17         THE WITNESS:  Let me see if I can find
18 that word "invalid" in the letter.
19         Give me a second.
20         (Witness reviewing Exhibit 23.)
21         I could not find the word "invalid."
22

Page 142

1          BY MR. SIGLER:
2     Q   Okay.  Well, you'd agree that he's
3  saying that Arista's ZTP feature was introduced to
4  the market before Swarm applied for its patents,
5  right?
6     A   That is what the letter says, correct.
7     Q   Okay.  And if that were true, then
8  Swarm's patents would be invalid, right, sir?
9          MR. KELLY:  Object to the form.
10         THE WITNESS:  Okay, can you rephrase
11 that question?  That was a very interesting
12 question, by the way, but can you please rephrase
13 it?
14         BY MR. SIGLER:
15    Q   Sure.  If what Mr. Christofferson was
16 saying were true, that Arista's ZTP feature was
17 introduced before Swarm filed for its patents,
18 then Swarm's patents would be invalid, right?
19         MR. KELLY:  Object to the form.
20         THE WITNESS:  That is for the
21 United States Patent Office to decide.
22

Page 143

1          BY MR. SIGLER:
2     Q   Okay.  And he closes the letter by
3  saying, "[I'm] certainly happy to discuss further,
4  but at this time I don't see the value of Swarm's
5  portfolio to Arista."
6          Do you see that, sir?
7     A   Yes, I see that.
8     Q   And do you recall Mr. Fisher responded
9  to Mr. Christofferson?
10    A   Are you asking me if Mr. Fisher
11 responded to that email?
12    Q   Yeah.  I'll make it easy for you.
13 Let's just look at that.
14         Can we please put Tab V on the screen?
15 And we'll mark it as Exhibit 23, please.
16         THE VIDEOGRAPHER:  24.
17         MR. SIGLER:  24, I'm sorry.
18         (Iniguez Exhibit 24 was marked
19          for identification.)
20         BY MR. SIGLER:
21    Q   All right, Mr. Íñiguez, do you see
22 that this is an email from Mr. Fisher?

Page 144

1     A   Yes, I see it.
2     Q   And it's dated May 6, 2020, right?
3     A   Yes.
4     Q   And it's regarding Swarm Technology
5  Licensing Offer, right?
6     A   Correct.
7     Q   And it's to Mr. Christofferson of
8  Arista, right?
9     A   That is correct.
10    Q   Okay.  And you're copied on this
11 email, correct?
12    A   Yes.
13    Q   All right.  And the email indicates
14 that two claim charts are attached, correct?
15    A   That is correct.
16    Q   And in the middle of the email,
17 actually, there's a line that starts with "I have
18 attached."  It says, "I have attached to this
19 email two further claim charts."
20         Do you see that, sir?
21    A   Yes, I see it.
22    Q   Okay.  So Swarm sent to Arista in

36 (Pages 141 to 144)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 145

1    May 2020 two additional claim charts, right, sir?
2        A    That is correct.
3        Q    All right.  And in the opening line
4    here, Mr. Fisher says that, "In an email to me on
5    September 12, 2019 you stated that you saw no
6    value to Arista in Swarm's patent portfolio."
7            Do you see that, sir?
8        A    Correct.
9        Q    And then Mr. Fisher says, "Swarm
10   disagrees with your conclusion."  Right, sir?
11       A    Correct.
12       Q    All right.  And Mr. Fisher closes this
13   letter by saying, "I would like to have an
14   opportunity to discuss such a licensing
15   opportunity with you."
16           Do you see that, sir?
17       A    Yes, I see it.
18       Q    Did Mr. Fisher, or any other
19   representative of Swarm, ever talk to Arista on
20   the phone about a licensing opportunity?
21           MR. KELLY:  Object to the form.
22           THE WITNESS:  I don't know.  I don't

Page 146

1    know the answer.  I don't recall that.
2            BY MR. SIGLER:
3        Q    You don't -- you don't remember any
4    phone call with Arista, sir?
5        A    Arista?  Is that the one that is
6    related to HP?  Can you refresh my memory?
7    There's one --
8        Q    That's Aruba, sir.
9        A    Okay.  In that case, the answer is I
10   don't recall.  The answer is no, I don't recall
11   having any conversations with Arista.
12       Q    Okay, thank you for that, sir.
13           Mr. Fahnert, let's put Tab W on the
14   screen and identify that as Exhibit 25.
15           (Iniguez Exhibit 25 was marked
16            for identification.)
17           THE WITNESS:  I can see it.
18           BY MR. SIGLER:
19       Q    Thank you, sir.
20           And this is another letter from
21   Mr. Fisher on behalf of Swarm, right?
22       A    That is correct.

Page 147

1        Q    And you're copied on this letter, sir?
2        A    Yes.
3        Q    And it's addressed to the President
4    and General Counsel of Aruba Networks in
5    Santa Clara, California, right?
6        A    That is correct.
7        Q    That's dated July 5, 2019, right?
8        A    Yes.
9        Q    All right.  And similar to the letter
10   we looked at to Arista, this one indicates that
11   Mr. Fisher is enclosing a copy of a claim chart
12   correlating the '004 patent to Aruba's products,
13   right?
14       A    That is correct.
15       Q    Okay.  And he says that Swarm would
16   welcome the opportunity to discuss a licensing
17   opportunity with Aruba, right?
18       A    That is correct.
19           MR. SIGLER:  Mr. Fahnert, please put
20   Tab X on the screen, and we'll identify that as
21   Exhibit 26.
22

Page 148

1            (Iniguez Exhibit 26 was marked
2             for identification.)
3            BY MR. SIGLER:
4        Q    And Mr. Íñiguez -- oh, I'm sorry, sir,
5    go ahead.
6        A    Yeah, I can see it.
7        Q    All right.  And you see this is a
8    letter from Deanna Kwong from HP to Mr. Fisher?
9        A    That is correct.
10       Q    And it's dated September 5, 2019,
11   right?
12       A    Yes.
13       Q    And Ms. Kwong says she's writing in
14   response to correspondence from Mr. Fisher dated
15   July 5, 2019, and August 15, 2019, right?
16       A    That is correct.
17       Q    And at the end she says, "Please also
18   reach out to let me know if you would like to set
19   up a time to discuss why HPE is not interested in
20   and does not need a license to U.S. Patent Nos;
21   9,852,004 & 9,146,777."
22           Do you see that, sir?

37 (Pages 145 to 148)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 149

1       A   Yes, I see.
2       Q   So HPE was telling Swarm through this
3  letter that it wasn't interested in a license to
4  Swarm's patents, right?
5       A   That is correct.
6       Q   All right.  In fact, HPE says they
7  believed that they don't need a license to the
8  '004 patent and '777 patents, right?
9       A   That is correct.
10      Q   Okay, we can take that down, and
11 please, Mr. Fahnert, put up Tab Y.
12      A   Is that a question?
13      Q   No.
14      A   Oh, never mind.
15      Q   This should be Tab Y, and it will be
16 identified as Exhibit 27.
17          (Iniguez Exhibit 27 was marked
18           for identification.)
19          THE WITNESS:  I can see it.
20          BY MR. SIGLER:
21      Q   Okay.  And here, Mr. Íñiguez, we have
22 an email chain between Ms. Kwong and Mr. Fisher,

Page 150

1  right?
2       A   Yes.
3       Q   And in the email at the top, Ms. Kwong
4  asks Mr. Fisher if he can be available for a call
5  on the following day, right?
6       A   That is correct.
7       Q   All right.  Did Mr. Fisher have a call
8  with Ms. Kwong from HPE?
9       A   Yes, he did.
10      Q   Were you on that call?
11      A   Yes, I was.
12      Q   And did HPE say on the call why they
13 believed they didn't need a license to Swarm's
14 patents?
15      A   I don't remember the exact words they
16 used, but essentially they said that they were not
17 interested in the licensing opportunity.
18      Q   Did they explain why?
19      A   They explained why, yes.
20          Can you scroll down a little bit?  I
21 want to see the context of the letter.
22          Yeah, they said that it was not

Page 151

1  applicable, essentially, what they said over
2  there, because they were making reference to a
3  ZTP patent -- patent.  That was -- that was the
4  entire conversation.
5       Q   Okay.  So they referred to a
6  ZTP patent, sir?
7       A   That is correct.
8       Q   And did they believe that that patent
9  was prior art to Swarm's patents?
10      A   That was -- that was what they
11 mentioned, correct.
12      Q   Okay.  So HPE said that they believed
13 that that patent rendered Swarm's patents invalid?
14      A   They didn't just draw the words.  They
15 simply said that they were not interested because
16 they had a patent on their ZTP.
17      Q   Okay.  And they believed that that
18 patent was prior art, and that it was earlier than
19 Swarm's patents, right?
20          MR. KELLY:  Objection, form.
21          THE WITNESS:  That was their opinion,
22 correct.

Page 152

1          BY MR. SIGLER:
2       Q   Okay.  And did HPE say -- well, strike
3  that.
4          Did HPE say that they believed that
5  their products didn't match Swarm's patent claims?
6          MR. KELLY:  Object to the form.
7          THE WITNESS:  They did not get into
8  that level of specifics.  They simply said we're
9  not interested because they had a ZTP patent.
10         It was a brief conversation.
11         BY MR. SIGLER:
12      Q   About how long did it last?
13      A   I would say between 5 and 10 minutes
14 perhaps.
15      Q   Okay.  And after that conversation in
16 2019 with HPE, has Swarm had any other
17 communications with HPE?
18      A   Not that I am aware of.  With this, we
19 provided the email, but from the top of my head, I
20 don't remember having other conversations with
21 HPE.
22      Q   Okay.  You can take that exhibit down,

38 (Pages 149 to 152)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 153

1    Mr. Fahnert.
2        Q    Are you familiar the company called
3    RPX, Mr. Íñiguez?
4        A    Yes, I am.
5        Q    Who's RPX?
6        A    It is a company that contacted
7    John Fisher with the possibility of buying the
8    license from -- licenses from Swarm.
9            And it is my understanding, based on
10   their website, that they buy licenses -- or no,
11   they buy patents, and then they offer some type of
12   licensing to different companies.  That's the
13   business model.
14       Q    How did they contact Mr. Fisher?
15       A    That's a very interesting question,
16   because we asked him who -- who told us [sic]
17   about us, and they said that it was confidential.
18       Q    Did RPX --
19       A    I'm sorry.
20       Q    Go ahead.
21       A    Oh, somebody told us to contact us,
22   and we don't know who that company is.

---

Page 154

1        Q    Okay.  Did RPX contact Mr. Fisher by
2    email?
3        A    That I'm not sure.  I don't recall.
4    It could have been email or phone.  I do not know.
5            MR. SIGLER:  Mr. Fahnert, can you
6    please put Tab BB on the screen, and we'll
7    identify this as Exhibit 28.
8            (Iniguez Exhibit 28 was marked
9             for identification.)
10           BY MR. SIGLER:
11       Q    And Mr. Íñiguez, there's an exhibit
12   letter on here because this is a document that was
13   previously filed in this case as an exhibit
14   attached to a brief, that's why that's there.
15           So if we could please go to the second
16   page of the document, Mr. Fahnert, and if we could
17   blow up the opening paragraph and title, please.
18           Do you recall a Mutual Nondisclosure
19   Agreement that Swarm entered with RPX,
20   Mr. Íñiguez?
21       A    That is correct.
22       Q    Okay.  And the title of this document

---

Page 155

1    is "MUTUAL NONDISCLOSURE AGREEMENT," right?
2        A    Correct.
3        Q    And it says that the Agreement is made
4    and entered into as of January 20th, 2020, right,
5    sir?
6        A    Yes.
7        Q    Between RPX, with its principal place
8    of business in San Francisco, right, sir?
9        A    That is correct.
10       Q    And Swarm, correct, sir?
11       A    Correct.
12       Q    All right.  Is this an agreement that
13   RPX provided to Swarm?
14       A    I do not recall who provided the
15   agreement.  I would need to ask John Fisher to
16   refresh my memory.
17       Q    And if we could take a look at the
18   first numbered paragraph that says "Purpose."
19           It says there, "The parties wish to
20   explore a business opportunity of mutual
21   interest."  Do you see that, sir?
22       A    Yes, I see.

---

Page 156

1        Q    What was that business opportunity of
2    mutual interest?
3        A    As I mentioned before, RPX contacted
4    Swarm with the possibility of buying Swarm's
5    patents.
6        Q    Did RPX make an offer to buy Swarm's
7    patents?
8        A    John and RPX had a conversation.  I
9    was not there.  And I know they talked about it,
10   and at the end, John said that it was not a
11   serious proposal, and that was the end of it.
12       Q    Okay.  So Mr. Fisher had a discussion
13   with RPX about a possible sale, right?
14       A    The discussion was about -- correct,
15   it was about RPX being interested in buying
16   Swarm's patents.
17       Q    Okay.  Mr. Fahnert, can you take us to
18   the final page of this document and the
19   "Miscellaneous" section, please.
20           Do you recall this part of the
21   agreement, Mr. Íñiguez?
22       A    Give me just one second to read this.

---

39 (Pages 153 to 156)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 157

1      Yes.
2      Q   Okay.  And you signed this agreement,
3   right, sir?
4      A   Yes, I did.
5      Q   And through this section here, the
6   Miscellaneous section, you agreed on behalf of
7   Swarm that any actions arising out of this
8   agreement would be heard in San Francisco, right?
9      A   That is correct.
10      Q   All right.  Had Swarm entered any
11   other agreements stating that disputes under the
12   agreement will be heard in California?
13      A   It went from my memory.
14      Give me just a second.
15      If we had NDAs, we have disclosed
16   those to you.  On the top of my head, I don't
17   remember, but perhaps you're going to help me.
18      Q   Well, the versions that I got are
19   redacted, so I can't help you, but we'll get to
20   that.
21      All right, let's go to -- we can take
22   that off the screen, please, Mr. Fahnert, and

Page 158

1   let's go to Tab Z, please.  And what exhibit
2   number will this be?
3      THE VIDEOGRAPHER:  29.
4      (Iniguez Exhibit 29 was marked
5      for identification.)
6      BY MR. SIGLER:
7      Q   Okay, we're looking at Exhibit 29.
8      Do you have that on the screen there?
9      A   I see.
10      Q   Yeah, and if we could actually pull
11   back out so Mr. Íñiguez can see the whole thing.
12      Sir, this is a chain of emails between
13   Mr. Fisher and Ryan Hanneken of RPX.
14      Do you see that, sir?
15      A   Yes, I see.
16      Q   And you are BCC'd on the top email,
17   right, sir?
18      A   Correct.
19      Q   And that top email is from Mr. Fisher
20   to Mr. Hanneken, right?
21      A   That is correct.
22      Q   And it's dated January 26, 2020,

Page 159

1   right?
2      A   Correct.
3      Q   All right.  And it shows there that it
4   attaches a document called "Question 3."
5      Do you see that?
6      A   Yes, I see that.
7      Q   Do you recall what's in that
8   Question 3 document?
9      A   I do not remember this from top of my
10   head.  I know that the content is confidential.
11      Q   Why is it confidential?
12      MR. KELLY:  Object to the form.
13      THE WITNESS:  Because it's a company
14   trade secret.
15      BY MR. SIGLER:
16      Q   All right, let's take a look at the
17   third page of this document that ends in 317.
18      And Mr. Íñiguez, is this the
19   Question 3 PDF that was attached to the email we
20   were just looking at?
21      A   Correct.
22      Q   And it says at the top "Question 3,

Page 160

1   Financial Consideration," right?
2      A   Correct.
3      Q   All right.  And then the entire thing
4   is covered up by a big black box that says
5   "Redacted," right?
6      A   That is correct.
7      Q   All right.  So you understand that
8   means I can't see what's in there, right?
9      A   That is correct.
10      Q   All right.  So what is stated in this
11   financial considerations document, sir?
12      A   Again, this is company confidential
13   information.  It's trade secret.
14      Q   And do you understand that there's a
15   protective order entered in this case, sir, that
16   protects trade secret, proprietary, confidential
17   information from being disclosed anywhere outside
18   this case?
19      MR. KELLY:  Object to the form.
20      BY MR. SIGLER:
21      Q   Can you tell me generally what this
22   redacted paragraph discusses?

40 (Pages 157 to 160)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 161

1      A   You know, it speaks about financial
2   consideration of the value of Swarm Patents.
3      Q   Okay.  So this is a document that was
4   provided by Mr. Fisher to RPX, right?
5      A   That is correct.
6      Q   And it discusses Swarm's view of the
7   value of its patent portfolio, right?
8      A   Correct.
9      Q   And it was provided to RPX as part of
10  the discussions between Swarm and RPX about
11  RPX possibly buying Swarm's patents, right?
12     A   It was part of our
13  Non-Disclosure Agreement discussion.
14     Q   Okay, so that wasn't exactly my
15  question.  I just want to clarify.
16         This was provided by Swarm to
17  RPX during the negotiations with RPX about a
18  possible purchase of Swarm's patents, right?
19     A   It was provided during the
20  conversations that we interchanged through email.
21     Q   Okay.  And if we could go back to
22  first page of this exhibit, please, do you see

Page 162

1   there -- let's go to the email at the bottom,
2   please, and this is an email from Mr. Fisher to
3   Mr. Hanneken at RPX, right?
4      A   That is correct.
5      Q   All right.  And he says that he is
6   sending this email to answer some of the items
7   that RPX requested, right?
8      A   That is correct.
9      Q   Then he says, quote, "The 'ballpark
10  price guidance,'" end quote, "will follow," right?
11     A   Correct.
12     Q   And that's referring to the financial
13  consideration information we saw in the attached
14  document, right?
15     A   Correct.
16     Q   So that's ballpark price guidance to
17  RPX about what Swarm might be willing to sell its
18  patents for, right?
19     A   Correct.
20     Q   Okay.  This email from Mr. Fisher, is
21  he responding to an email from Mr. Hanneken?
22     A   I don't know.  Everything that we had

Page 163

1   that -- all the communications that we had between
2   RPX and Swarm, we have provided.  If there is one,
3   then you should have it.  I cannot recall from the
4   top of my head.
5      Q   Okay.  Do you recall if Mr. -- because
6   I didn't get an email from RPX to Mr. Fisher
7   asking for this information; that's why I'm
8   curious about it.
9          So do you know if Mr. Hanneken asked
10  for this information over the phone to Mr. Fisher?
11     MR. KELLY:  Object to the form.
12     THE WITNESS:  This is the part that I
13  don't remember.
14     BY MR. SIGLER:
15     Q   Okay.  All right, looking at this
16  email, the part that's labeled 4, it says "I have
17  attached."  Do you see that, sir?
18     A   Yes, I see that.
19     Q   And Mr. Fisher indicates that he's
20  attached claim charts illustrating the application
21  of claim 1 of the '777 patent and '004 patent to
22  products of Cisco, right?

Page 164

1      A   That is correct.
2      Q   All right.  So Mr. Fisher sent
3   Mr. Hanneken at RPX copies of claim charts about
4   Cisco products, right?
5      A   That is correct.
6      Q   Did Mr. Fisher send -- besides the
7   claim charts and the Question 3 Financial
8   Considerations redacted document, did Mr. Fisher
9   send Mr. Hanneken or RPX any other documents?
10     A   As far as I know, this is what he
11  sent.
12     Q   All right.  And did Mr. Fisher have a
13  phone call with Mr. Hanneken after this?
14     A   I know they spoke on the phone.  I
15  don't know if that happened before or after, but I
16  know they spoke on the phone.
17     Q   Were you on that phone call?
18     A   I was not.
19     Q   All right.  Let's bring up the next
20  exhibit, which will be Tab AA, please, and that
21  will be Exhibit 30, I believe.
22

41 (Pages 161 to 164)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 165

1         (Iniguez Exhibit 30 was marked
2         for identification.)
3         BY MR. SIGLER:
4         Q   Do you see, Mr. Íñiguez, this is an
5    email from Mr. Fisher to Mr. Hanneken at RPX?
6         A   Yes, I see that.
7         Q   And it's dated January 28th, 2020,
8    right, sir?
9         A   Yes, I see it.
10        Q   It's a couple days after the emails we
11   just looked at, right?
12        A   Yes.
13        Q   All right.  And Mr. Fisher says,
14   "Ryan, it appears, based on our conversation this
15   afternoon, that the discussions between
16   Swarm Technology and RPX have concluded."
17        Do you see that, sir?
18        A   Yes, I see that.
19        Q   So this indicates that Mr. Fisher and
20   Mr. Hanneken had a conversation on the phone,
21   right?
22        A   Yes, I can see that.

---

Page 166

1         Q   And he indicates that the discussions
2    that Swarm and RPX had been having about a sale of
3    Swarm's patents have concluded, right, sir?
4         A   That is correct.
5         Q   And he asks for the return of
6    confidential information provided to RPX by Swarm,
7    right?
8         A   That is correct.  And based on that,
9    I'm assuming that RPX did their portion of the
10   Non-Disclosure Agreement, and they have destroyed
11   those copies.
12        Q   Do you know what confidential
13   information he's referring to there?
14        MR. KELLY:  Objection to form.
15        THE WITNESS:  As indicated in that
16   email, it says "such material."  I'm assuming that
17   everything John Fisher provided to RPX.
18        BY MR. SIGLER:
19        Q   Do you know -- I may have asked you
20   this already.  I apologize if I did.
21        Did Mr. Fisher and Mr. Hanneken
22   discuss on that call the financial information

---

Page 167

1    that Swarm provided RPX?
2         A   It's possible that they did.  I was
3    not on the conference call, and I don't know the
4    details of the conversation.
5         Q   Okay.  So you can't say one way or the
6    other whether Mr. Fisher on behalf of Swarm and
7    Mr. Hanneken on behalf of RPX negotiated about a
8    potential price for RPX to buy Swarm's patents?
9         A   I'm sure they spoke about that
10   Question No. 3 that you showed before.
11        Q   Okay.  All right.
12        So just to sum up, Swarm and
13   RPX entered a Non-Disclosure Agreement together,
14   right?
15        A   Correct.
16        Q   And Swarm sent RPX claim charts, some
17   information in Mr. Fisher's emails, and the
18   document titled "Financial Considerations," right?
19        A   That is correct.
20        Q   And Swarm and RPX had at least one
21   call to discuss a potential sale of Swarm's
22   patents, right?

---

Page 168

1         A   Correct.
2         Q   All right.  Has Swarm ever
3    participated in any trade shows, sir?
4         A   Yes.
5         Q   Which ones?
6         A   The first one was IoT World 2017; and
7    then IOT Tech Expo 2017; and again IoT World 2018.
8         Q   Okay.  And all three of those trade
9    shows were in Santa Clara, California, right?
10        A   That is correct.
11        Q   And those are the only three trade
12   shows that Swarm has participated in anywhere,
13   right?
14        A   I will not say anywhere, because by
15   anywhere, you're referring to trade shows outside
16   California, and there's a trade show outside
17   California that took place in Canada.  It's a
18   robotics trade show.  It's called the
19   R-I-R-O-S [sic].  IROS is the acronym for the
20   trade show.
21        Q   So Swarm also participated in one
22   other trade show, is that right, besides the three

---

42 (Pages 165 to 168)

5/14/2021         Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 169

1  in California?
2      A   Correct.
3      Q   And that trade show is in Canada,
4  right?
5      A   Correct.
6      Q   Okay.  Focusing on the three.
7  IOET [sic] -- excuse me, strike that.
8         Focusing on the three IoT trade shows
9  in Santa Clara, how many days total did Swarm
10 participate in those?
11     A   Typical trade show is three days.
12 That's a typical trade show.
13        I would have to go back -- in fact, on
14 my website you may be able to see the actual --
15 the actual dates for each trade show.  It could be
16 two days, it could be three days.
17     Q   Okay.  Looking at one of your
18 declarations, I came up with nine total days for
19 those trade shows.  Does that sound right?
20     A   That's about right.
21     Q   Okay.  And you personally attended
22 those three trade shows in Santa Clara on behalf

Page 170

1  of Swarm?
2      A   Yes, I did.
3      Q   How did you get there?
4      A   I got there by airplane.  And we had
5  provided the airplane tickets also on the
6  documents that we produced.
7      Q   All right.  And did you stay in a
8  hotel while you were there at those trade shows?
9      A   Yes, I did.
10     Q   Did you have any difficulty traveling
11 to and from those trade shows in Santa Clara?
12     A   Difficulty from Arizona to California,
13 or from the hotel to the trade show?
14     Q   Difficulty traveling from Arizona to
15 California.
16     A   Well, if you're asking about financial
17 difficulty, the answer is yes.  We -- this is a
18 self-funded company, and we do the best we can in
19 order to be able to fund this company.
20        In this case, we used miles from
21 credit cards, earned miles.  We used those the
22 best we can, and then we fly into -- into those

Page 171

1  trade shows, and that's -- and, yes, difficulty,
2  yes.
3      Q   All right.  Putting financials aside,
4  was it burdensome to travel to those trade shows
5  in Santa Clara, California?
6      A   Yes.  As you may have seen on my pitch
7  deck, it says that this is a self-funded company,
8  I am bootstrapping -- I am constrained by
9  bootstrapping.  It says right there.  And in that
10 sense, I need to take vacation time from my
11 employer, use the vacation time in order to go and
12 attend those trade shows.
13     Q   Well, it was important enough for
14 Swarm that you take those steps, right, sir?
15     A   Yes.
16     Q   All right.  Ballpark figure, how much
17 total did Swarm spend participating in these three
18 trade shows in Santa Clara?
19     A   In round numbers, each trade show is
20 different, but I would say around $6,000, that's
21 for the floor, and we provided that documentation.
22        And then when you add up airplanes,

Page 172

1  when you add up also hotel, meals -- I don't have
2  the exact number, but we keep track of everything.
3  If that is necessary, I can provide up to the last
4  cent that we have spent.
5      Q   But Swarm spent a significant amount
6  of its money attending these trade shows in
7  California, right?
8      A   If we define "significant" as in using
9  my savings, the answer is correct, yes.
10     Q   Okay.  What percentage of Swarm's
11 expenses in 2017 did it spend on going to the two
12 trade shows in California?
13        MR. KELLY:  Object to the form.
14        THE WITNESS:  A great majority of our
15 expenses go into patent prosecution.
16        In order to provide you a percentage,
17 I would need to ask my wife; she's the one who
18 keeps track of all the expenses in the company.
19        BY MR. SIGLER:
20     Q   Okay, appreciate that.  All right.
21        So Swarm attended these three trade
22 shows in Santa Clara to promote its technology,

43  (Pages 169 to 172)

5/14/2021         Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 173

1  right?
2      A   Correct.
3      Q   And it also attended these three trade
4  shows in Santa Clara to try to get companies to
5  license Swarm's patents, right?
6      MR. KELLY:  Object to the form.
7      THE WITNESS:  Again, as mentioned in
8  my pitch deck, the purpose of going to a trade
9  show is to exhibit technology.  I went to the
10 exhibit part to exhibit technology, and as far as
11 the company, the goal is to get funding for the
12 technology.  That was the main purpose.
13      There's also the possibility of
14 licensing -- or presenting the opportunity to
15 license the patents.
16      BY MR. SIGLER:
17      Q   Okay.  So one of the reasons that
18 Swarm attended these trade shows in Santa Clara
19 was to seek out potential patent licensing
20 opportunities, right?
21      A   One of the reasons.  Not the only one.
22 As I mentioned, the other one is to get an

Page 174

1  investor.
2      Q   Okay.  So I think you also mentioned
3  one more, so let me try to sum it up.
4      The reasons that Swarm attended these
5  three trade shows in California was to promote its
6  technology, seek out potential patent licensing
7  opportunities, and attract potential investors,
8  right?
9      A   Correct.
10     Q   All right.  And, in fact, in one of
11 your declarations you say that one of the things
12 Swarm wanted to do at these trade shows was
13 generate interest among companies to license
14 Swarm's patents.  Do you recall that, sir?
15      MR. KELLY:  Object to the form.
16      THE WITNESS:  Just repeat that.  I
17 want to make sure that I got it.
18      BY MR. SIGLER:
19      Q   Yeah.  So one of the things Swarm
20 wanted to do at these trade shows is generate
21 interest among companies to license Swarm's
22 patents, right?

Page 175

1      A   Correct.  As I mentioned before, we
2  want to present the opportunity to -- for
3  companies to consider licensing.
4      Q   And how did Swarm intend to do that?
5      A   At the trade show?
6      Q   Yes.
7      A   Well, the -- by the way, this -- my
8  booth, my exhibit, was the most popular exhibit in
9  the trade show.  And the reason why is because I
10 had robots that were working with -- or exhibiting
11 swarm intelligence, and I was constantly attending
12 people, explaining the architecture.
13      That's all we did in the trade show.
14 We were explaining the architecture.  It was
15 either myself or one of my chosen.  They took
16 turns to help me at the booth.  At one point, my
17 cousin went over there and helped me out, and we
18 were constantly explaining the architecture.
19      To answer your question, I was there
20 to promote, to exhibit technology, with the hope
21 that somebody would invest in the company, or
22 perhaps a company would be interested in licensing

Page 176

1  those patents.
2      Q   So was it a robot or robots?
3  I'm sorry.
4      A   Robots.  Robots.
5      Q   More than one, okay.
6      A   Yes.  We -- we're required to have
7  more than one.
8      Q   Okay.
9      A   This architecture, it allows you to
10 have multiple devices to work collectively with
11 collective intelligence.
12      Q   Okay.  And were those robots
13 prototypes?
14      A   Yes.
15      Q   So at these three trade shows in
16 Santa Clara, you displayed prototypes of Swarm's
17 products, right?
18      A   Correct.
19      Q   All right.  And at these trade shows,
20 did Swarm ever display a sign stating that its
21 patents were available for licensing?
22      A   Correct.

44  (Pages 173 to 176)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 177

1     Q    And did Swarm advertise that Swarm is
2   a technology licensing company?
3          MR. KELLY:  Object to the form.
4          THE WITNESS:  I would have to go back
5   and see the documentation, but as illustrated on
6   my pitch deck, in my business plan, Swarm was
7   seeking to obtain an investor in order to make
8   products in Mesa, Arizona, and the possibility of
9   licensing the patents has always been there.
10         BY MR. SIGLER:
11     Q    Okay.  And were -- well, strike that.
12         Did you speak to potential investors
13   at these trade shows in Santa Clara?
14     A    Some of the people that visited the
15   exhibit were interested, and so the answer is yes.
16     Q    Okay.  Mr. Fahnert, could you please
17   put Tab K on the screen?  And we'll mark that as
18   Exhibit 31, please.
19         (Iniguez Exhibit 31 was marked
20          for identification.)
21         BY MR. SIGLER:
22     Q    Do you see, Mr. Íñiguez, that this

Page 178

1   Exhibit 31 is Swarm's answers to Juniper's
2   interrogatories regarding venue and jurisdiction?
3     A    Yep, I see that.
4     Q    And did you review these interrogatory
5   answers, sir?
6     A    Yes, I did.
7     Q    And in fact, you verified these
8   answers, right, sir?
9     A    Correct.
10     Q    All right.  Let's go to page 4 of the
11   document, and if we could blow up the part that
12   says "ANSWER," and I want to focus on the
13   paragraph that starts with "Swarm did not
14   undertake."
15         Do you see that paragraph,
16   Mr. Íñiguez?
17     A    Yes, I see it.
18     Q    Okay.  And this talks about -- well,
19   strike that.
20         Swarm affirms here that it attended
21   these three trade shows in California, right?
22     A    Correct.

Page 179

1     Q    And that after these trade shows,
2   Swarm sent out letters seeking potential
3   licensees, correct?
4     A    Correct.
5     Q    They also sent out some documentation
6   to potential investors, right, sir?
7     A    That is correct.
8     Q    And that documentation included a
9   confidential pitch deck, confidential business
10   plan, and a confidential executive summary, right?
11     A    That is correct.
12     Q    And here you identify that those
13   documents were sent to a number of different
14   potential investors that are named here, right?
15     A    That is correct.
16     Q    All right.  And those potential
17   investors are identified here as Andreessen
18   Horowitz, Bomming Star Venture Capital, Play
19   Ground Global, Gradient Ventures, Lux Capital,
20   Nexstar Partner, Intel Capital, Khosla Ventures,
21   Jabil, Nvidia Business Development, Samsung
22   Research America, and Peter PC, right, sir?

Page 180

1     A    That is correct.
2     Q    And were any of those firms or people
3   located in California that received these
4   documents?
5     A    It is my understanding that all of
6   them are located in California.
7     Q    And so Swarm sent documents to
8   employees of those companies or the individuals
9   listed there in California, right?
10     A    Correct.
11     Q    All right.  And is Jabil the name of a
12   company?
13     A    No.  I could not find the last name.
14   It's a personal investor, but all I had was the
15   first name.
16     Q    All right.  And I assume Peter PC is
17   also a private investor?
18     A    He is another private investor,
19   correct.
20     Q    Did Swarm also communicate at one
21   point with someone named Neil Naveen of Orzota,
22   Inc.?

45 (Pages 177 to 180)

5/14/2021        Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 181

1    A   Correct.
2    Q   And who is Mr. Naveen?
3    A   At the time, he represented a company
4  that provided machine learning software, and we
5  discussed the possibility of him doing a software
6  module in order to detect objects, basically to
7  mount a camera on my robots, and then have them --
8  have them identify multiple objects.
9        We went back and forth on a few
10 emails, and he is the person.
11   Q   Okay.  Did you talk to Mr. Naveen at
12 all about licensing Swarm's patents?
13   A   No.  He was acting more as the
14 provider of a service.  In this case, he was
15 looking into providing software for my company,
16 which never happened.
17   Q   And you signed a non-disclosure or
18 confidentiality agreement with him, is that
19 correct?
20   A   Correct.
21   Q   All right.  And did that agreement
22 state where any disputes under it would be heard?

---

Page 182

1    A   I don't -- I would have to look into
2  the document.  I do not know the answer.
3    Q   Okay.  Well, I would show you the
4  document, but it was provided to me, but all of it
5  redacted out.  We'll circle back to that at the
6  end.
7        Did the documents that you sent to
8  these potential investors discuss Swarm's patents?
9    A   The documents that we provided --
10 for example, the pitch deck -- mentions that Swarm
11 has patents, as well as the business plan and the
12 executive summary.  So those documents mention
13 those patents.
14   Q   Do they talk about Swarm's efforts to
15 license its patents?
16   A   If you look into the business plan, it
17 says that it has multiple sources of revenue, and
18 one of these sources of revenue would be to
19 eventually license those patents.
20       Sadly, it never happened, and a source
21 of revenue never became a reality -- or has not
22 become a reality.

---

Page 183

1    Q   Okay.  We've been going about an hour.
2  Why don't we take another break, if that's
3  all right with you, Mr. Íñiguez.
4        MR. KELLY:  Thank you.
5        THE VIDEOGRAPHER:  Okay, we are going
6  off the record.  The time is 1:35.
7        (A break was taken.)
8        THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 1:50.
10       MR. KELLY:  I'm trying hard to be
11 respectful of the Court's order to not interpose
12 objections, but I did want to designate -- or did
13 want to mention on the record that your
14 questions -- your earlier questions regarding
15 Swarm's proprietary and trade secret information,
16 we believe that -- and I allowed you some -- some
17 good faith leeway, but for that reason, we didn't
18 object on the record, but we believe that subject
19 matter is beyond the scope of the jurisdictional
20 discovery that the parties have previously agreed
21 to in writing.
22       We don't need to argue about that, but

---

Page 184

1  I wanted to lay that on the record.
2        MR. SIGLER:  Understood, thank you.
3        BY MR. SIGLER:
4    Q   All right, Mr. Íñiguez, let's talk
5  about some of these documents that were sent to
6  potential investors.
7        Can we please put Tab DD on the
8  screen?  And if you could let me know what exhibit
9  number that should be, Mr. Fahnert, that would be
10 great?
11       THE VIDEOGRAPHER:  DD will be 32.
12       MR. KELLY:  Thank you.
13       (Iniguez Exhibit 32 was marked
14        for identification.)
15       BY MR. SIGLER:
16   Q   Mr. Íñiguez, do you have Exhibit 32 on
17 the screen there in front of you?
18   A   Yes.
19   Q   And the front cover of this document
20 says Swarm Technology Business Plan, right?
21   A   Correct.
22   Q   And is this one of the documents that

46 (Pages 181 to 184)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 185

1  you sent to potential investors in California?
2      A  Yes.  Not all of them got this
3  document.  Some got pitch deck, and/or executive
4  summary, and/or business plan.
5      Q  Understood.  Did you write this
6  document, sir?
7      A  Yes, I did.
8      Q  Did anyone else participate in the
9  writing of this document?
10     A  No.
11     Q  And I couldn't find a date in this
12 document.  Do you know what the date of this
13 document is?
14     A  I don't have -- it looks like there's
15 a year there, 2017 on the top.
16     Q  Oh, yeah.  Thank you for that.  My
17 printed version I'm looking at did not print that
18 part, so I appreciate that.  All right.
19         So it appears that this Business Plan
20 is dated 2017, right, sir?
21     A  Correct.
22     Q  All right.  What was the purpose of

Page 186

1  this document?
2      A  The purpose of the Business Plan was
3  to describe the business.
4      Q  Okay.  And in the limited time I have
5  left, Mr. Fahnert, can you take us to the tenth
6  page of this document, please?  It's got a
7  Bates stamp ending in 314.  All right.
8         And here you see, Mr. Íñiguez, the
9  version of this document I received has some
10 information that's been redacted?
11     A  Yes.
12     Q  Okay.  And there's a section there on
13 page 10 that says "Revenue Model."
14         Do you see that?
15     A  Correct.
16     Q  And it says, "The revenue model for
17 Swarm Technology is comprised of three streams,"
18 right?
19     A  Correct.
20     Q  All right.  And one of those streams
21 is consulting fees, right?
22     A  Correct.

Page 187

1      Q  And the other two streams are
2  licensing our intellectual property, right?
3      A  Correct.
4      Q  So two of the three revenue streams
5  making up the revenue model for Swarm Technology
6  relate to licensing Swarm's intellectual property,
7  right?
8      A  Yes.
9      Q  All right.  Please take us to page 14
10 of this document.
11         All right, Mr. Íñiguez, there's a part
12 in the middle there under the second redacted
13 block that says "Strategy to break into this
14 market."  Do you see that?
15     A  Yes, I see it.
16     Q  What market is this referring to?
17         MR. KELLY:  Object to the form.
18         THE WITNESS:  The first one, letter A,
19 is talking about intent-based networks.  Exhibit
20 or letter B is talking about the IoT market in
21 general -- well, essentially those three other --
22 B, C and D are talking about IoT in general.

Page 188

1         BY MR. SIGLER:
2      Q  Okay.  Actually, could you remove the
3  blowup, please?  It says at the top, "Why is
4  intent-based network significant?"
5         Do you see that, sir?
6      A  Yes.  Could you make it bigger?  Good.
7      Q  It's difficult for me because the
8  document is redacted, so I'm just trying to figure
9  out where it says "Strategy to break into this --
10 market," what does "this market" refer to?  Is it
11 referring to intent-based network?
12     A  Yes.  Can you zoom back on "Why is
13 intent-based network significant?"  I'm trying to
14 get context to answer your question.
15         Yeah, this is a beautiful quote from
16 the patent.  And why do I say "beautiful"?  It's
17 because this is the essence of the invention.
18         I broke away from every computer
19 architecture that had existed in the history of
20 the world, and I said, from now on, the CPU here,
21 or the solar, is going to have intentions to send
22 there.  That's a quote, "intended."

47 (Pages 185 to 188)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

---

Page 189

1          And then you have the processing
2     units, autonomous units, to fill in that
3     intention, and this is why I am the person who
4     invented what is known today as intent-based
5     proactive autonomous networks.
6          Q    Okay.  What does "this market" refer
7     to?
8          A    I created a new field, which is
9     basically what I just mentioned, having a computer
10    network to execute an intention.  And in order to
11    break into that market, I needed to go into those
12    conferences or exhibits or trade shows to exhibit
13    my groundbreaking new technology.
14         Q    Okay.  So one of the things you wanted
15    to do to break into this market was exhibit at
16    these three trade shows in California, right?
17         A    Correct.
18         Q    And the other thing you said that
19    Swarm was going to do was contact Apstra, right?
20         A    Correct.
21         Q    And Apstra is a company in California,
22    and you understand they're one of the plaintiffs

---

Page 190

1     in this case, right?
2          A    Correct.
3          Q    All right.  And what did you intend to
4     contact Apstra about?
5          A    We have reviewed that documentation.
6     We sent a letter to Apstra presenting a business
7     opportunity, and as you showed before, we sent
8     three letters, and we got no response.
9          Q    And those letters to Apstra offered an
10    opportunity to license Swarm's patents, right?
11         A    Correct.
12         Q    All right.  You can put that document
13    aside, and let's mark Exhibit 33.  It will be
14    Tab EE.
15             (Iniguez Exhibit 33 was marked
16              for identification.)
17         BY MR. ÍÑIGUEZ:
18         Q    Mr. Íñiguez, is this one of the
19    documents that you sent to potential investors
20    about Swarm?
21         A    Correct, that is the pitch deck.
22         Q    And did you write this document, sir?

---

Page 191

1          A    I wrote that document.
2          Q    Okay.  And if we could go to page 9 of
3     the document.  It ends in 1331.  And here, sir,
4     there's a discussion of the '777 patent, right?
5          A    Correct.
6          Q    As well as the '850 patent
7     application, right?
8          A    Correct.
9          Q    And so Swarm identified that patent
10    and that application to potential investors,
11    right?
12         A    Yes, correct.
13         Q    Okay.  Let's go to page 15, please,
14    that ends in 1337.  Okay.
15             This slide is entitled "Funding,"
16    right, sir?
17         A    Correct.
18         Q    And the second to last sentence of
19    this slide says, "As an innovation company, we
20    will continue to grow our patent portfolio in the
21    field of distributed artificial intelligence."
22             Do you see that, sir?

---

Page 192

1          A    Yes, I see it.
2          Q    And then it says, "To accelerate the
3     speed of development," and then the rest of it is
4     redacted.  Do you see that, sir?
5          A    Correct.
6          Q    Can you tell me generally what is
7     redacted there?
8             MR. KELLY:  Objection to the form of
9     the question.  And this is another instance where
10    I'd like to state for the record specifically that
11    this is beyond the scope of the jurisdictional
12    discovery that the parties previously agreed to in
13    writing, and that's why we redacted it.  I think
14    to ask the witness about it right now would defeat
15    the purpose of redacting.
16             And I know we don't agree about the
17    propriety of redacting, but let's take that up in
18    motion practice as opposed to with this witness.
19             MR. SIGLER:  All right.  And I think
20    you're seeing here in the real time the extreme
21    difficulty the redaction process is putting on me
22    to try to get testimony on these documents.

---

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 193

1          All right, and of course, that
2    redacted piece right there follows up a discussion
3    on the patent portfolio, so I don't have a clue
4    how it's not relevant.
5          Okay, we can put that document to the
6    side.
7          MR. KELLY:  For the record, I didn't
8    say it wasn't relevant, sir.  I said it was beyond
9    the scope of the discovery that the parties
10   previously agreed to in writing.
11         MR. SIGLER:  Yeah.  Well, that's what
12   I meant, it's not beyond that scope, it doesn't
13   appear, but regardless, let's go -- let's just put that
14   one aside.  Let's go to Tab FF, please, which will
15   be Exhibit 34.
16         (Iniguez Exhibit 34 was marked
17          for identification.)
18         BY MR. SIGLER:
19    Q   Is this one of the documents that you
20   sent to potential investors, Mr. Íñiguez?
21    A   Correct.
22    Q   And what document is this?

Page 194

1    A   This is a pitch deck.
2    Q   All right.  And Exhibit 33 was also a
3    pitch deck.
4          Is one of these earlier than the
5    other?
6    A   This one is earlier than the other.
7          The reason why I changed it is because
8    I got the feedback from people saying that they
9    got confused about the ants on those pictures, so
10   I went from the ants into a robot.
11         I don't know if that was a good
12   decision or not, but that was the purpose of the
13   change.
14    Q   Okay.  Would this pitch deck have been
15   sent to investors in 2017?
16    A   Yes, it was sent to some potential
17   investors.
18    Q   Okay.  And did you draft this
19   document, sir?
20    A   I did.
21    Q   All right.  Let's go to page 14,
22   please.  It ends in 1352.

Page 195

1          And Mr. Íñiguez, here you show the
2    '777 patent again, right, sir?
3    A   Correct.
4    Q   And the 850 patent application, right,
5    sir?
6    A   Correct.
7    Q   All right.  And it says at the top of
8    this slide, "Our IP gives us the right to exclude
9    others from monetizing our technology until 2033."
10         Do you see that, sir?
11    A   Yes, I see.
12    Q   What did you mean by "exclude others"?
13         MR. KELLY:  Object to the form.
14         THE WITNESS:  I'm basically
15   paraphrasing the Constitution of the
16   United States, Article 1, Section 8.  As inventor,
17   I have rights granted by the government for a
18   limited time, and that's what I'm saying over
19   there.
20         BY MR. SIGLER:
21    Q   Okay.  So the patents give you the
22   right to prevent others from monetizing that

Page 196

1    technology?  Is that what you're saying?
2    A   What I'm saying is the Constitution
3    grants me, for a limited time, rights to my own
4    discoveries as an inventor, and basically that's
5    what I'm saying right here.
6    Q   Okay.  Let's go to page 15, please,
7    the next page.  It says, "Risks.  Our intellectual
8    property plays in the field of gigantic
9    competitors."  Do you see that, sir?
10    A   Yes, I see it.
11    Q   And I assume, sir, that the portion
12   that's redacted there is the names of Swarm's
13   competitors; is that right?
14    A   Correct.  And it's not hard to see how
15   those competitors are gigantic compared to my
16   company that I'm building out of the kitchen in my
17   house.
18    Q   Is Juniper identified there as a
19   competitor?
20         MR. KELLY:  Object to the form of the
21   question.  And to the extent it's beyond the scope
22   of the deposition, it's an improper question

49 (Pages 193 to 196)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 197

1    entirely.
2         THE WITNESS:  Correct, it's beyond the
3    scope, and I don't remember.
4         BY MR. SIGLER:
5         Q    Is Apstra identified as a competitor
6    in there?
7         MR. KELLY:  Same objection, same
8    instruction.
9         THE WITNESS:  That would be, again,
10   trade secret.
11        BY MR. SIGLER:
12        Q    Well, under that there's a discussion
13   about litigation, right, sir?
14        A    Are you referring to -- can you point
15   me to what you have in mind?
16        Q    Sure.  You wrote there that "Should
17   [these] competitors decide to circumvent Swarm's
18   IP, they count with ample funding and unlimited
19   legal resources.  To quote Xerxes, their, 'Arrows
20   will block out the sun.'"
21             That's what you wrote, right?
22        A    I didn't write the quote.  I read the

Page 198

1    quote, and I put it in there.
2         Q    And then you say to potential
3    investors that Swarm's represented by Mr. Kelly,
4    right?
5         A    Correct.
6         Q    So you tell investors in 2017 that you
7    have a lawyer representing you, right?
8         A    Correct, on the record.
9         Q    And then you quote Leonidis, "Then we
10   shall have our battle in the shade!" right?
11        A    I'd like to continue with my --
12        MR. KELLY:  He was finishing his
13   answer.  You inadvertently cut him off.
14        MR. SIGLER:  Oh, I'm sorry, I didn't
15   hear.  Go ahead, sir.
16        THE WITNESS:  At that time, Michael
17   Kelly was my patent attorney.  He was prosecuting
18   patents with the United States Patent Office.  He
19   was not a litigating attorney for Swarm.
20        BY MR. SIGLER:
21        Q    Okay, but you told potential investors
22   in 2017 that you were represented by Mr. Kelly,

Page 199

1    right?
2         A    I was represented by Mr. Kelly, but
3    again, he was not litigating for Swarm.
4         Q    And then you quote Leonidas, "Then we
5    shall have our battle in the shade!" right?
6         A    Correct.
7         Q    What's the battle you're referring to?
8         MR. KELLY:  Object to the form.
9         THE WITNESS:  Can you repeat?  Are you
10   asking -- could you repeat the question, please?
11        BY MR. SIGLER:
12        Q    What is the battle you're referring to
13   there in that quote?
14        A    I don't know.  That quote corresponds
15   to the one on top.  It follows from the top.
16        Q    Right.  And the one at the top talks
17   about competitors circumventing your IP, right?
18        A    Again, Mr. Kelly was not representing
19   Swarm as a litigator.  He was practicing patent
20   law, prosecuting patents at the patent office.
21        Q    Is he representing Swarm as a
22   litigator right now?

Page 200

1         A    Yes, and this is a consequence of
2    Juniper's lawsuit against Swarm, by the way.
3         Before I received this lawsuit from
4    Juniper, I did not have legal representation in
5    order to wage a battle in court.
6         Q    Why are you telling investors in 2017
7    that you had an attorney and you were ready to
8    have a battle?
9         MR. KELLY:  Object to the form.
10        THE WITNESS:  Basically what I'm
11   saying there is that I got the best possible
12   patent attorney in the world, and his name is
13   Michael K. Kelly.
14        BY MR. SIGLER:
15        Q    All right, we can take that document
16   down.  Let's move on to Tab GG, please, and that
17   will be, I believe, Exhibit 35.
18        (Iniguez Exhibit 35 was marked
19        for identification.)
20        BY MR. SIGLER:
21        Q    Mr. Íñiguez, is this one of the
22   documents you sent to potential investors?

50 (Pages 197 to 200)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 201

1    A   Correct.
2    Q   Did you write this document?
3    A   I did.
4    Q   All right.  And this is the executive
5  summary that you referred to as being sent to
6  potential investors, right?
7    A   Yes, and this is a copy -- basically a
8  reduced version of the business plan, and what you
9  see there is also included in the business plan.
10   Q   All right.  Those are all the
11 questions I had on that document.
12       Do you recall speaking to someone from
13 NVIDIA at the 2018 IoT World trade show?
14   A   Yes.  The person -- just go ahead.
15   Q   Go ahead, you were saying something.
16   A   Yeah, the person represents a
17 development branch from NVIDIA.
18   Q   Okay.  And did you send that person
19 from NVIDIA the pitch deck after the IoT world
20 trade show in 2018?
21   A   Yes, and that is included on the list
22 that we have provided.

Page 202

1    Q   Okay.  And did you also send the pitch
2  deck and executive summary to someone at Intel in
3  2017?
4    A   For the record, it's Intel Capital.
5  This is an investment firm branch from Intel.
6    Q   Okay.  But it's part of Intel, right?
7    A   I don't know the internal structure,
8  but all I know is that it is Intel Capital.
9    Q   Okay.  And we saw earlier that you
10 sent NVIDIA and Intel letters in 2018 about
11 licensing Swarm's patents, right?
12   A   Correct.
13       MR. SIGLER:  Please, Mr. Fahnert,
14 please call up Tab JJ, and that will be
15 Exhibit 36.
16       (Iniguez Exhibit 36 was marked
17        for identification.)
18       BY MR. SIGLER:
19   Q   Mr. Íñiguez, do you see Exhibit 36 is
20 an email dated October 17, 2017?
21   A   Yes.
22   Q   And it's from you, right?

Page 203

1    A   Yes.
2    Q   And you're enclosing a copy of the
3  pitch deck, right?
4    A   Correct.
5    Q   And it's addressed to someone with a
6  google.com address, do you see that?
7    A   Correct.
8        And I need to elaborate on this.  I
9  mentioned before this morning that this person
10 represents Global Ventures, which I met this
11 person at a trade show, and he provided interest
12 to invest in Swarm.  I provided that information,
13 and he gave me a Google email address.
14       And if you look -- if you search for
15 this person on LinkedIn, you're going to see that
16 he is the funder of Global Ventures, and for some
17 reason, he gave me this google.com email.
18   Q   Okay, thank you for that
19 clarification, sir.  We can take that document
20 down, and let's move on.
21       Are you familiar with Samsung Research
22 America?

Page 204

1    A   Yes, I am.
2    Q   And they're located in Northern
3  California, right?
4    A   Correct.
5    Q   And did Swarm ever talk to them about
6  Swarm's patents?
7    A   We had a discussion -- you saw a
8  document for this conversation, or should I go
9  ahead and tell you?  Do you have a document to
10 show?
11   Q   Please go ahead, if you can answer my
12 question.
13   A   We -- this person -- these people --
14 person came to my booth, to my exhibit, and I
15 quote, he said, "I'm very impressed with what you
16 have.  I would like to see the opportunity to
17 translate this into a product."
18       Then we signed an NDA, and we had
19 conversations about how to translate that into a
20 product.  That never happened.  We never executed
21 on that idea, but that was the nature of the
22 conversation.

5/14/2021        Juniper Networks, Inc., et al., v. Swarm Technology LLC        Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 205

1          Q   Okay.  And do you recall sending
2    emails to -- well, strike that.
3                Was that person named Tom Kim from
4    Samsung?
5                MR. KELLY:  Object to the form.
6                THE WITNESS:  Perfect.
7                BY MR. SIGLER:
8          Q   And do you recall sending him some
9    emails that reference Swarm's patents?
10         A   I don't recall that off the top of my
11   memory.  I would have to go back to the documents
12   to refresh my memory.
13         Q   Okay.  And you mentioned that you
14   signed an NDA with Samsung Research America,
15   right?
16         A   Correct.
17         Q   Okay.  And did that NDA state where --
18   well, strike that.
19               Does that NDA state a location or a
20   court where any disputes under that agreement will
21   be litigated?
22               MR. KELLY:  Objection, form.

Page 206

1                THE WITNESS:  I don't recall.  I would
2    have to go back to the document to see what -- to
3    see -- to read what it says.
4                BY MR. SIGLER:
5          Q   Okay.  Yeah, I'd like to see that too.
6                Let's go on to -- let's take a look at
7    your declaration.  Mr. Fahnert, please call up
8    Tab RR, and that will be Exhibit 37, is that
9    right?
10               THE VIDEOGRAPHER:  Correct, 37.
11               (Iniguez Exhibit 37 was marked
12                for identification.)
13               BY MR. SIGLER:
14         Q   Mr. Íñiguez, do you recognize this as
15   an amended declaration that you provided in this
16   case?
17         A   Yes.
18         Q   All right.  And if we could please go
19   to the last page of this declaration.
20               Is that your signature there,
21   Mr. Íñiguez?
22         A   Correct.

Page 207

1          Q   And you signed it on April 19th, 2021,
2    right?
3          A   Correct.
4          Q   All right.  And do you recall you
5    signed this under the penalty of perjury under the
6    laws of the United States?
7          A   Correct.
8          Q   Okay, let's go to page 2 of this
9    document, please, and let's take a look at
10   paragraph 10.
11               And here, Mr. Íñiguez, you state under
12   oath that Swarm has sent licensing letters to
13   various companies in a number of other states
14   besides California, right?
15         A   Correct.
16         Q   Who are those other companies?
17               MR. KELLY:  Object to the form.
18               THE WITNESS:  You have that
19   information in the documents.
20               BY MR. SIGLER:
21         Q   I don't have that information.
22         A   Yes.  In the documents that we

Page 208

1    produced, you have all the letters that we sent to
2    any company within or outside California.
3          Q   Okay.  Yeah, I'm asking you because I
4    don't have the letters outside of California, but
5    maybe they don't exist.
6                Okay, so sitting here today, you can't
7    tell me the various companies in other states
8    besides California that Swarm sent licensing
9    letters to?
10         A   I don't have the list on the top of my
11   head.  You showed me before a document that
12   contains a list of companies, but that's all I can
13   remember at this point.
14         Q   Okay.  Did Swarm send claim charts to
15   any companies outside of California?
16               MR. KELLY:  Object to the form.
17               THE WITNESS:  There is one company
18   outside California.
19               BY MR. SIGLER:
20         Q   Who's that?
21         A   Microsoft.
22         Q   So there's one company outside --

52 (Pages 205 to 208)

5/14/2021         Juniper Networks, Inc., et al., v. Swarm Technology LLC         Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 209

1    strike that.
2           Microsoft is the only company outside
3    California that Swarm has sent claim charts to
4    that map their products to Swarm's patents, right?
5           MR. KELLY:  Object to the form.
6           THE WITNESS:  Correct.
7           BY MR. SIGLER:
8       Q   All right.  Has Swarm ever relied on
9    letters it's written to a company to claim that
10   company has willfully infringed its patents?
11          MR. KELLY:  Objection, form.
12          THE WITNESS:  Basically the letter is
13   the same that you have shown me before offering a
14   licensing opportunity.
15          BY MR. SIGLER:
16      Q   Okay.  And in the Amazon case,
17   for example, Swarm relies on that same July 16,
18   2018, letter to argue that Amazon was on notice of
19   Swarm's patents, right?
20          MR. KELLY:  Objection to form of the
21   question, and instruct the witness not to answer
22   to the extent doing show would reveal the

Page 210

1    substance of attorney-client privileged
2    communication.
3           BY MR. SIGLER:
4       Q   Can you answer the question, sir?
5       A   That information is public
6    information.  I don't have the entire Complaint
7    against Amazon.  It's a large document.
8       Q   All right.  Well, I can just take a
9    look at that myself and include it in our
10   briefing.
11          Let's go to paragraph 12 of the
12   declaration, please.  And you state here, "None of
13   Swarm's communications with Juniper (or anyone
14   else) — whether written or oral — included any
15   demand or deadline, nor did Swarm threaten any
16   judicial or extra-judicial enforcement action of
17   any kind whatsoever."
18          Did I read that correctly, sir?
19      A   Yes.
20      Q   What is an extra-judicial enforcement
21   action?
22          MR. KELLY:  Object to the form.

Page 211

1           THE WITNESS:  If judicial is within
2    the court, then extra-judicial would be outside
3    the court.  That would be my understanding.
4           BY MR. SIGLER:
5       Q   Okay.  So anything outside of court,
6    to your understanding, would be extra-judicial,
7    right?
8           MR. KELLY:  Object to the form.
9           THE WITNESS:  Correct.
10          BY MR. SIGLER:
11      Q   And paragraph 13 you say, "Swarm has
12   never sent a cease and desist letter to anyone."
13          Do you see that, sir?
14      A   That is correct.
15      Q   What's a cease and desist letter?
16          MR. KELLY:  Object to the form.
17          THE WITNESS:  I'm sure there's a legal
18   definition for that.
19          BY MR. SIGLER:
20      Q   What's your definition of it?
21          This is your declaration, right?
22      A   That would when to say a company,

Page 212

1    you're not allowed -- to make a demand,
2    essentially, saying you're not allowed to use my
3    patents in your products, which I have never done.
4           I have never sent a cease and desist
5    letter to anyone, inside California or outside
6    California.
7       Q   All right.  Well, I'm up against my
8    time limit.  Mr. Íñiguez, I appreciate your time
9    today.  I know your counsel had stated that he may
10   have some questions for you.
11          Before we get to that, I just wanted
12   to state on the record that we continue to believe
13   that we're entitled to unredacted versions of the
14   business documents we looked at.  I don't think
15   there's any basis to have those withheld, given
16   that there's a protective order here, and our
17   examination and investigation here has been
18   impeded because of those redactions.
19          Similarly, we believe we're entitled
20   to the unredacted version of the Financial
21   Considerations document that was given from Swarm
22   to RPX.  We believe that's relevant here to the

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

| Page 213 |
|---|

1   venue issue.  We don't know what is contained in
2   that document and have no way of examining
3   Mr. Íñiguez on it effectively without having it.
4          And we also continue to believe we're
5   entitled to the NDA agreements with Mr. Naveen and
6   Samsung Research America for multiple reasons,
7   including whether those contain form selection
8   clauses like the ones that -- excuse me, like the
9   one Swarm agreed to with RPX.
10         Therefore, we're going to hold the
11  30(b)(6) portion of this deposition open and
12  reserve our right to continue seeking that
13  information, including in our response brief to
14  the Court.  And with that, I pass the witness.
15         MR. KELLY:  Can we take 10?  Can we
16  take 10 minutes, please?  We'll resume in 10?  Off
17  the record?
18         MR. SIGLER:  Okay.
19         THE VIDEOGRAPHER:  Okay, going off the
20  record.  The time is 2:26.
21         (A break was taken.)
22         THE VIDEOGRAPHER:  We are back on the

| Page 214 |
|---|

1   record.  The time is 2:47.
2   EXAMINATION BY COUNSEL FOR DEFENDANTS
3          BY MR. KELLY:
4       Q   Mr. Íñiguez, I'd like to just go
5   through and clarify a few of the previous answers
6   that you gave to Mr. Sigler earlier in this
7   deposition.
8          Earlier he asked you if you spoke with
9   John Fisher when you were preparing for this
10  deposition, and you did not speak with
11  John Fisher, correct?
12      A   I did not.
13      Q   Did you review the declarations that
14  John Fisher had submitted in this litigation?
15      A   I did.
16      Q   Okay.  Do you have an understanding
17  what a patent troll is?
18      A   Yes.
19      Q   Are you a patent troll?
20      A   No.
21      Q   You characterized John Fisher as a
22  patent agent, which he is.

| Page 215 |
|---|

1       Q   Did you regard your communications
2   with Mr. Fisher as attorney-client privileged
3   communications?
4       A   Yes.
5          MR. KELLY:  Objection, form.
6          BY MR. KELLY:
7       Q   Did you ever accuse Juniper of
8   infringement?
9       A   No.
10      Q   Apstra?
11      A   No.
12      Q   Did you ever threaten Juniper or
13  Apstra with litigation?
14      A   No.
15         MR. SIGLER:  Objection, form.
16         BY MR. KELLY:
17      Q   Did you ever send -- did you ever send
18  Juniper -- did you ever threaten litigation
19  against Juniper?
20      A   No.
21      Q   Did you ever threaten litigation
22  against Apstra?

| Page 216 |
|---|

1       A   No.
2       Q   Did you ever send Juniper a demand
3   letter?
4       A   No.
5       Q   Did you ever send Apstra a demand
6   letter?
7       A   No.
8       Q   Did you ever send Juniper a cease and
9   desist letter?
10      A   No.
11      Q   Did you ever send Apstra a cease and
12  desist letter?
13      A   No.
14      Q   Did you ever send a Draft Complaint to
15  Juniper?
16      A   No.
17      Q   Did you ever send a Draft Complaint to
18  Apstra?
19      A   No.
20      Q   In your testimony you stated that
21  Swarm had sent Juniper and Phi Robotics draft
22  patent license agreements; is that correct?

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 217

1    A   Correct.
2    Q   Where is Phi Robotics located?
3    A   Mumbai, India.
4    Q   Do they have a presence in Northern
5  California?
6    A   They don't.
7    Q   Do they have a presence in the
8  United States anywhere?
9    A   They don't.
10    Q   Other than Juniper and Mumbai --
11  I'm sorry, Juniper and Phi Robotics, is there
12  anyone else that received a draft patent license
13  agreement from you, Mr. Fisher, Swarm, or your
14  counsel?
15    A   No.
16    Q   Can we pull up Exhibit 16 for a
17  moment, please.  Can you blow it up?
18        So earlier you testified that
19  Mr. Fisher, on your behalf, on Swarm's behalf,
20  sent claim charts to Mr. Saunders at Juniper,
21  correct?
22    A   Correct.

Page 218

1    Q   Did you do that to provoke litigation
2  with Juniper?
3    A   No.
4    MR. SIGLER:  Objection, form.
5    BY MR. KELLY:
6    Q   Isn't it true that you made strategic
7  decisions and affirmatively avoided provoking
8  litigation with Juniper or anyone else?
9    A   Correct.
10    MR. SIGLER:  Objection to form.
11    THE WITNESS:  Correct.
12    BY MR. KELLY:
13    Q   Okay.  Exhibit 16, is there a page 5,
14  Bates 282, we can scroll to?  Yeah, that's it.
15        You might blow it up a little bit so
16  Mr. Íñiguez can refresh his recollection.
17        Do you remember seeing that document
18  earlier today in your deposition?
19    A   Yes, I have.
20    Q   I believe it was characterized as a
21  Draft Patent License Agreement.
22    A   Correct.

Page 219

1    Q   And I believe you earlier testified
2  that you weren't sure who drafted it, but that you
3  thought maybe your patent attorney at the time,
4  Michael Kelly -- that's me -- drafted it?
5    A   Correct.
6    Q   Okay.  Have you had a chance to think
7  about that since then?
8    A   Yes.
9    Q   And as you're looking at that document
10  now when you're reading the language, who do you
11  think drafted that document?
12    A   I believe it was Mr. Fisher who
13  drafted the document.
14    Q   And is that because the language that
15  you see there is more reflective of Mr. Fisher's
16  style?
17    A   Correct.
18    MR. SIGLER:  Objection, leading.
19    BY MR. KELLY:
20    Q   Exhibit 17, can we pull up the
21  November 6, 2019, email from Fisher to Saunders?
22  And specifically, I'm looking for the reference to

Page 220

1  the Markman hearing, so either scroll down or
2  go -- I believe that's where the reference to the
3  Markman hearing was.
4    MS. JONES:  Second paragraph.
5    THE VIDEOGRAPHER:  You need to direct
6  me.  I don't know where that's at.
7    THE REPORTER:  Billy, it's the last
8  sentence of the second paragraph.
9    MR. KELLY:  Yeah, enlarge that entire
10  second paragraph, please.  Yes, thank you.
11    BY MR. KELLY:
12    Q   So in paragraph 2 of this email from
13  John Fisher to Dave Saunders, dated November 6,
14  2019, 2:44 p.m., it says, "In past communications,
15  Swarm has answered all of your questions
16  concerning the '004 claim chart.  Having answered
17  all of your questions, it appears that you have
18  failed to express any position that would prevail
19  in a Markman hearing."
20        Do you see that language?
21    A   Yes.
22    Q   And John Fisher sent that language

55 (Pages 217 to 220)

5/14/2021      Juniper Networks, Inc., et al., v. Swarm Technology LLC      Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 221

1    with your authorization, correct?
2        A   Correct.
3        Q   Did you intend that to be a veiled
4    threat of suit?
5        A   No.
6            MR. SIGLER:  Objection, leading.
7            THE WITNESS:  No.  It has never been
8    my intention to sue anyone.
9            BY MR. KELLY:
10       Q   So the reference to the Markman
11   hearing, you had earlier testified that you
12   believe the Markman hearing generally relates to
13   claim construction, how claim elements are
14   properly construed.
15           If your reference to the Markman
16   hearing in this paragraph you said was not to
17   threaten litigation, what was it for?  Why the
18   reference to Markman?
19       A   It is part of the process in claim
20   construction.
21       Q   And did Swarm agree with Juniper's
22   positions that they took in the email

Page 222

1    correspondence with Mr. Fisher regarding the
2    interpretation of the claims?
3        A   No.
4        Q   No.  And is it for that reason that
5    you said you didn't think they would prevail at a
6    Markman hearing?
7        A   Correct.
8        Q   All right.  Earlier Mr. Sigler asked
9    you if Swarm had prepared claim charts prior to
10   suing Amazon, prepared Amazon or AWF claim charts
11   before suit.
12       A   Right.
13       Q   In your earlier answer, you were
14   tentative about that.  I just want to ask you to
15   refresh your recollection and think about the
16   actual Complaint and its exhibits, because you
17   reviewed them before they were filed, correct?
18       A   Correct.
19       Q   And did they include detailed claim
20   charts mapping the claims to Amazon's products?
21       A   Yes, they did.
22       Q   So of course you've prepared claim

Page 223

1    charts before the suit was filed because they were
2    included with the suit, and that's a public
3    document.
4        A   That is correct.
5        Q   Okay, thank you.
6            Can we pull up Exhibit 28, please?
7    Next page.
8            Do you recognize this as a Mutual
9    Nondisclosure Agreement with RPX?
10       A   Yes.
11       Q   Did you ever enforce any sworn patents
12   against RPX?
13       A   No, I did not.
14       Q   Did you ever threaten to?
15       A   No.
16       Q   Was RPX capable of infringing Swarm's
17   patents at all?
18       A   No, because they don't make any
19   products.
20       Q   Were they a potential licensee?
21       A   No.
22       Q   Okay.  And if there had been a

Page 224

1    governing law provision in an NDA that designated
2    California either as governing law or venue, was
3    it your understanding that that governing law
4    would direct where the dispute -- where any
5    dispute would be brought regarding the NDA, or
6    regarding enforcing your patents?
7            MR. SIGLER:  Objection, form.
8            THE WITNESS:  Regarding the
9    enforcement of my patents?  Regarding the -- can
10   you -- could you restate the question?
11           BY MR. KELLY:
12       Q   The name of the document is
13   Mutual NDA.  To the extent that document includes
14   a choice of law or venue provision, what's your
15   understanding in terms of what that would mean for
16   disputes arising out of this document?
17           Would that relate to the venue for
18   disputes arising out of this document, or out of
19   documents unrelated to this document?
20           MR. SIGLER:  Objection, form.
21           THE WITNESS:  Well, given the fact
22   that this is an NDA between Swarm and RPX, and

56 (Pages 221 to 224)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 225

1   Swarm -- I mean RPX cannot make -- does not make
2   any products that can use Swarm Patents, any
3   dispute that would happen have to be related to
4   the NDA.
5          BY MR. KELLY:
6          Q   And I think you earlier testified that
7   RPX was not capable of infringing anyway, they're
8   not in the semiconductor business.
9          A   Correct, they don't make any products.
10  All they do is they buy patents, and then they use
11  them to develop their business model.
12         Q   Okay.  So RPX is neither a potential
13  licensee nor a potential infringer?
14         A   Correct.
15         Q   All right.  Could you put up
16  Exhibit 34, please, page 15.
17         BY MR. KELLY:
18         Q   Do you recall discussing this document
19  earlier today with Mr. Sigler?
20         A   Yes, I have.
21         Q   Okay.  And regarding the quotes
22  attributed to Xerxes and Leonidas, were those

Page 226

1   threats to sue?
2          A   No.  Those are quotes from a book.
3   They're meant to be used for motivational
4   purposes.
5          Q   And this is part of a pitch deck,
6   right?
7          A   Correct.
8          Q   From a start-up company?
9          A   Right.
10         Q   From a pre-revenue company?
11         A   Correct.
12         Q   So these are aspirational and were
13  never intended to be as threats; is that correct?
14         A   That is correct.
15         Q   Do you think that any reasonable
16  recipient of this document would interpret that as
17  being threatened with a lawsuit?
18         A   No.
19         Q   And in fact, that language went
20  primarily, if not exclusively, to investors, not
21  to potential licensees?
22         A   That is correct.

Page 227

1          Q   All right.  Near the end of your
2   deposition we talked about companies that may have
3   received your business plan, executive summary, or
4   the pitch deck, which we're calling for shorthand
5   "the Triad."
6          A   Okay.
7          Q   So to your knowledge, did you search
8   through your records and did you find all
9   communications to anyone, whether inside or
10  outside of California, to whom you had sent one or
11  more of those Triad documents?
12         A   Yes, and that information has been
13  provided as part of the documentation.
14         Q   And to the extent you uncovered any
15  emails or letters or other correspondence with any
16  company inside or outside of California that may
17  have included one or more of the Triad, you
18  included those comments -- or I'm sorry, you
19  included those communications in yesterday's
20  disclosure, didn't you?
21         A   Yes.  Yes, all those companies are
22  included in the answers to the interrogatories.

Page 228

1          Q   Is Andreessen Horowitz one of those
2   companies?
3          A   Yes.
4          Q   Is Bomming Star Venture Capital one of
5   those companies?
6          A   Yes.
7          Q   Is Playground Global one of those
8   companies?
9          A   Yes.
10         Q   Founding parter at Gradient Ventures?
11         A   Yes.
12         Q   Lux Capital?
13         A   Yes.
14         Q   A gentleman named Peter, private
15  investor?
16         A   Yes.
17         Q   John Jeffries of Samsung Partner?
18         A   Yes.
19         Q   And Nexstar Partners?
20         A   Yes.
21         Q   Intel Capital?
22         A   Yes.

57 (Pages 225 to 228)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 229

```
 1      Q   Khosla Ventures?
 2      A   Yes.
 3      Q   A gentleman you referred to as Jabil?
 4      A   Yes.
 5      Q   Nvidia Business Development?
 6      A   Yes.
 7      Q   Samsung Research America?
 8      A   Yes.
 9      Q   Bonzon (ph) Capital?
10      A   Yes.
11      Q   Other than that list that we've just
12   gone through, did anyone else receive one or more
13   of the Triad documents from or on behalf of Swarm?
14      A   No.
15          MR. KELLY:  I have no further
16   questions.
17          MR. SIGLER:  I have no follow-up
18   questions.  Thank you for your time today,
19   Mr. Íñiguez.
20          MR. KELLY:  Thank you, Mr. Sigler.
21   We'll read and sign.
22          THE VIDEOGRAPHER:  Okay, we are going
```

Page 230

```
 1   off the record.  This deposition is concluded at
 2   3:02 p.m.
 3              (Whereupon, at 3:02 p.m. Pacific Time,
 4              the taking of the deposition was
 5              concluded.  Reading and signature
 6              were RESERVED.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 231

```
 1          CERTIFICATE OF NOTARY PUBLIC
 2          I, DAWN A. JAQUES, a Notary Public in and for
     the Commonwealth of Virginia, before whom the
 3   foregoing deposition was taken, do hereby certify
     that witness whose testimony appears in the
 4   foregoing pages was duly sworn by me; that the
     testimony of said witness was taken by me in
 5   shorthand at the time and place mentioned in the
     caption hereof and thereafter reduced to typewriting
 6   under my supervision; that said deposition is a true
     record of the testimony given by said witness; that
 7   I am neither counsel for, related to, nor employed
     by any of the parties to the action in which this
 8   deposition is taken; and, further, that I am not a
     relative or employee of any attorney or counsel
 9   employed by the parties thereto, nor financially or
     otherwise interested in the outcome of the actions.
10
11
12
13
14
15
16                        _____
17                        Dawn A. Jaques, CSR, CLR
18                        Notary Public in and for
19                        Commonwealth of Virginia
20   My commission expires:
21   August 31, 2023
22   Registration No. 132328
```

Page 232

```
 1   Alfonso Íñiguez, c/o
     Beus Gilbert McGrode
 2   701 N. 44th Street
     Phoenix, Arizona  85008
 3
 4   Case: Juniper Networks, Inc., et al., v. Swarm Technology LLC
     Date of deposition: May 14, 2021
 5   Deponent: Alfonso Íñiguez
 6
 7   Please be advised that the transcript in the above
 8   referenced matter is now complete and ready for signature.
 9   The deponent may come to this office to sign the transcript,
10   a copy may be purchased for the witness to review and sign,
11   or the deponent and/or counsel may waive the option of
12   signing. Please advise us of the option selected.
13   Please forward the errata sheet and the original signed
14   signature page to counsel noticing the deposition, noting the
15   applicable time period allowed for such by the governing
16   Rules of Procedure. If you have any questions, please do
17   not hesitate to call our office at (202)-232-0646.
18
19
20   Sincerely,
     Digital Evidence Group
21   Copyright 2021 Digital Evidence Group
     Copying is forbidden, including electronically, absent
22   express written consent.
```

58 (Pages 229 to 232)

5/14/2021          Juniper Networks, Inc., et al., v. Swarm Technology LLC          Alfonso Íñiguez
Highly Confidential - Attorneys' Eyes Only - Pursuant to Protective Order

Page 233

1  Digital Evidence Group, L.L.C.
   1730 M Street, NW, Suite 812
2  Washington, D.C. 20036
   (202) 232-0646
3
4  SIGNATURE PAGE
   Case: Juniper Networks, Inc., et al., v. Swarm Technology LLC
5  Witness Name: Alfonso Íñiguez
   Deposition Date: May 14, 2021
6
7  I do hereby acknowledge that I have read
   and examined the foregoing pages
8  of the transcript of my deposition and that:
9
10 (Check appropriate box):
   ( ) The same is a true, correct and
11 complete transcription of the answers given by
   me to the questions therein recorded.
12 ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
13 correct and complete transcription of the
   answers given by me to the questions therein
14 recorded.
15
16 _____   _____
17    DATE          WITNESS SIGNATURE
18
19
20 _____   _____
21
22    DATE          NOTARY

Page 234

1  Digital Evidence Group, LLC
2  1730 M Street, NW, Suite 812
3  Washington, D.C.  20036
4  (202)232-0646
5
6          ERRATA SHEET
7
8  Case: Juniper Networks, Inc., et al., v. Swarm Technology LLC
9  Witness Name: Alfonso Íñiguez
10 Deposition Date: May 14, 2021
11 Page No.   Line No.   Change
12
13
14
15
16
17
18
19
20
21 _____   _____
22    Signature              Date